UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| FRANCES EARLINE SIMS, individually | § | |
| and as dependent administrator of, and on | § | |
| behalf of, the ESTATE OF STEVEN | § | |
| MITCHELL QUALLS and STEVEN | § | |
| MITCHELL QUALLS' heir(s)-at-law, | § | |
| | § | |
|     Plaintiff, | § | |
| | § | CIVIL ACTION NO. 1:20-CV-00124 |
| v. | § | |
| | § | JURY DEMANDED |
| CITY OF JASPER, TEXAS; TODERICK | § | |
| D. GRIFFIN; STERLING RAMON | § | |
| LINEBAUGH; HEATHER RENE | § | |
| O'DELL, and JOSHUA L. HADNOT, | § | |
| | § | |
|     Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

To the Honorable United States District Court:

Plaintiff files this complaint. This case arises from the untimely death of a young man in the City of Jasper jail. Mitchell Qualls was left alone in a cell, in his street clothes, for about 34 hours, speaking to nonexistent people, and unable to form coherent sentences. Mitchell vomited at least twice, vomiting up a baggie which had contained methamphetamine. Police officers did nothing in response, except clean up the vomit and dispose of the baggie (evidence). No one sought medical treatment or mental health care for Mitchell, even though it was obvious and apparent that he needed it. Mitchell was delusional and in pain for the enitety of his Jasper jail incarceration. Mitchell ultimately died, alone, in his vomit-stained street clothes. He suffered and died as a result of natural person Defendants' deliberate indifference and objective unreasonableness, and the policies, practices, and/or customs of the City of Jasper.

Table of Contents

I.     Introductory Allegations ..................................................................................4

       A.     Parties  .................................................................................................4

       B.     Jurisdiction and Venue.........................................................................7

II.    Factual Allegations ..........................................................................................7

       A.     Introduction..........................................................................................7

       B.     Jasper Police Department Death Investigation ....................................8

       C.     Witness Statements and Evidentiary Documents ...............................18

              1.     Witness Statements .................................................................18

                     a.     Armstrong, Jack ...........................................................18

                     b.     Bienvenu, B. – Mental Health Officer .........................18

                     c.     Brown, Diane ................................................................19

                     d.     Christopher, C. – Sergeant ...........................................19

                     e.     DeLome, Rustie – Telecommunications Officer ...................19

                     f.     Fulcher, Mark – Corporal .............................................20

                     g.     Gray, Chasity – Telecommunications Officer ..............20

                     h.     Griffin, Toderick – Sergeant ........................................21

                     i.     Hall, Gerald – Chief .....................................................24

                     j.     Hudson, G. - Detective..................................................24

                     k.     Lavender, Lena – Crime Scene Investigator Technician .........24

                     l.     Linebaugh, Sterling – Officer .......................................25

                     m.     Oberlechner - Officer ....................................................26

                     n.     O'Dell, Heather – Telecommunications Officer.....................26

                     o.     Peters, M. – Officer.......................................................29

                     p.     Poindexter – Captain .....................................................30

                     q.     Rudd, Kimberly..............................................................31

                     r.     Scoggan, Jared – Officer ...............................................31

                     s.     Stephenson, Patsy – Court Clerk ..................................32

                     t.     Woods, Derek – Lieutenant ...........................................33

              2.     Medical Treatment and Death Reports ...................................34

|  |  | a. | Autopsy – Forensic Medical Management Services of Texas, P.A. ...................................................................... 34 |
|  |  | b. | Custodial Death Report – Jasper Police Department ............... 34 |
|  |  | c. | Inquest Report – Judge Jimmy E. Miller ................................ 35 |
|  | D. | | Jasper Police Department Office Written Policies........................................ 36 |
|  | E. | | Individual Defendants' Knowledge and Education ........................ 39 |
|  | F. | | *Monell* Liability of City of Jasper .................................................. 43 |
| III. | | | Causes of Action ...................................................................................... 47 |
|  | A. | | 14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* .................................... 47 |
|  | B. | | Remedies for Violation of Constitutional Rights and Other Federal Claims .. 48 |
|  | C. | | Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of 14th Amendment Due Process Rights to Reasonable Medical/Mental Health Care, to be Protected, and not to be Punished .......... 48 |
|  | D. | | Cause of Action Against City of Jasper Under 42 U.S.C. § 1983 for Violation of 14th Amendment Due Process Rights to Reasonable Medical/Mental Health Care, to be Protected, and not to be Punished .......... 52 |
|  | E. | | Causes of Action Against City of Jasper for Violation of Americans with Disabilities Act and Rehabilitation Act ................................................. 54 |
| IV. | | | Concluding Allegations, Jury Demand, and Prayer .................................. 55 |

I.      Introductory Allegations

    A.      Parties

1.      Plaintiff Frances Earline Sims ("Frances Sims" or "Ms. Sims") is a natural person who resided in, was domiciled in, and was a citizen of Texas at all relevant times. Frances Sims was Steven Mitchell Qualls' biological and legal mother.  Steven Mitchell Qualls is referred to herein at times as "Mitchell," "Steven," or "Mr. Qualls."  Frances Sims sues in her individual capacity and as the Dependent Administrator of the Estate of Steven Mitchell Qualls, Deceased.  Frances Sims, when asserting claims in this lawsuit as the Dependent Administrator, does so in that capacity and on behalf of the estate and all of Mitchell's heir(s), including Mitchell's minor son, L.H.  The people in the immediately preceding sentence are collectively referred to herein as "Claimant Heir."  Frances Sims asserts claims on behalf of and seeks all survival damages and wrongful death damages available to Claimant Heir.  Letters of dependent administration were issued to Frances Sims on or about July 18, 2019, in Cause Number PR-09537, in the County Court of Tyler County, Texas, in a case styled *Estate of Steven Mitchell Qualls, Deceased*.

2.      Defendant City of Jasper, Texas ("City of Jasper" or "Jasper") is a Texas incorporated municipality/city.  City of Jasper may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer.  The identify of City of Jasper's chief executive officer is determined by City of Jasper's decision to use the council-manager form of government.  As a result, City of Jasper's chief executive officer is City Manager Denise Kelley.  City Manager Denise Kelley may be served with process at City of Jasper, 465 S. Main Street, Jasper, Texas 75951, or wherever City Manager Denise Kelley may be found.  City of Jasper may also be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving it in the manner prescribed by Texas State law for serving a summons or like process (a citation in Texas State courts) on such a Defendant.  Texas Civil Practice and Remedies Code

17.024(b) reads, "In a suit against an incorporated city, town, or village, citation may be served on the mayor, clerk, secretary, or treasurer."  Therefore, City of Jasper may be served with process by serving its mayor, clerk, secretary, or treasurer wherever any such person may be found.  City of Jasper acted or failed to act at all relevant times, in accordance with its customs, practices, and/or policies, through its policymakers, chief policymakers, employees, agents, representatives, dispatchers, and/or police officers, all of whom acted under color of State law at all relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act).

3.      Defendant Toderick D. Griffin (sometimes referred to herein as "Mr. Griffin," "Officer Griffin," or "Sergeant Griffin") is a natural person who resides, is domiciled, and may be served with process at 217 County Road 107, Jasper, Texas 75951.  Mr. Griffin may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Griffin at Mr. Griffin's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Griffin is being sued in his individual capacity, and he acted at all relevant times under color of state law. Mr. Griffin was employed by City of Jasper at all such times and acted or failed to act in the course and scope of his duties for City of Jasper.

4.      Defendant Sterling Ramon Linebaugh (sometimes referred to herein as "Mr. Linebaugh" or "Officer Linebaugh") is a natural person who resides, is domiciled, and may be served with process at 808 Duren Street, Lufkin, Texas 75904.  Mr. Linebaugh may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Linebaugh at Mr. Linebaugh's

dwelling or usual place of abode with someone of suitable age and discretion who resides there. Mr. Linebaugh is being sued in his individual capacity, and he acted at all relevant times under color of state law.  Mr. Linebaugh was employed by City of Jasper at all such times and acted or failed to act in the course and scope of his duties for City of Jasper.

5.      Defendant Heather Rene O'Dell (sometimes referred to herein as "Ms. O'Dell," "TCO O'Dell," or "Officer O'Dell") is a natural person who resides, is domiciled, and may be served with process at 358 Hatton Drive, Zavalla, Texas 75980.  Ms. O'Dell may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. O'Dell at Ms. O'Dell's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. O'Dell is being sued in her individual capacity, and she acted at all relevant times under color of state law. Ms. O'Dell was employed by City of Jasper at all such times and acted or failed to act in the course and scope of her duties for City of Jasper.

6.      Defendant Joshua L. Hadnot (sometimes referred to herein as "Mr. Hadnot," "Officer Hadnot," "Detective Hadnot," or "Investigator Hadnot") is a natural person who resides, is domiciled, and may be served with process at 622 Lake Drive, Jasper, Texas 75951.  Mr. Hadnot may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Hadnot at Mr. Hadnot's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Hadnot is being sued in his individual capacity, and he acted at all relevant times under color of state law.  Mr. Hadnot was employed by City of Jasper at all such times and acted or failed to act in the course and scope of his duties for City of Jasper.  All natural-person Defendants (Toderick D. Griffin, Sterling Ramon Linebaugh, Heather Rene O'Dell, and Joshua L. Hadnot)

are collectively referred to in this complaint as "Individual Defendants."

      B.     Jurisdiction and Venue

7.     The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statutes providing for the protection of civil rights.  This suit arises under the United States Constitution and the following federal statutes: 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act.

8.     The court has personal jurisdiction over City of Jasper because it is a Texas municipality.  The court has personal jurisdiction over Individual Defendants because they reside and are domiciled in, and are citizens of, Texas.

9.     Venue is proper in the Beaumont Division of the United States District Court for the Eastern District of Texas, pursuant to 28 U.S.C. § 1391(b)(2).  A substantial part of the events or omissions giving rise to claims in this lawsuit occurred in Jasper County, which is in the Beaumont Division of the United States District Court for the Eastern District of Texas.

II.     Factual Allegations

      A.     Introduction

10.     Plaintiff provides in factual allegations sections below the general substance of certain factual allegations.  Plaintiff does not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, Plaintiff intends that those sections provide Defendants fair notice of the nature and substance of Plaintiff's allegations, and demonstrate that Plaintiff's claims have facial plausibility.  Whenever Plaintiff pleads factual allegations "upon information and belief," Plaintiff is pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable

opportunity for further investigation or discovery.  Moreover, where Plaintiff quotes a document, conversation, or recording verbatim, Plaintiff has done Plaintiff's best to do so accurately and without any typographical errors.

11.     Steven 'Mitchell' Qualls was born in 1990, and he was only 28 years old at the time of his tragic, completely unnecessary death in the City of Jasper jail.  If he would have received necessary medical and/or mental health treatment, he would not have suffered as he did and/or died.  Individual Defendants' deliberate indifference and objective unreasonableness in their actions and inaction caused, were proximate causes of, and were producing causes of Mitchell's suffering, damages, and death.  Some material details regarding Mitchell's incarceration and death are set forth below, in the form of excerpts from and/or summaries of documents and witness statements.

B.     Jasper Police Department Death Investigation

12.     The Jasper Police Department conducted an investigation into Mitchell's death. Since Mitchell died in a police "jail," the Texas Commission on Jail Standards ("TCJS") did not have jurisdiction to investigate his death.  The TCJS generally only investigates county jails deaths. The Jasper Police Department death investigation report indicates that Investigator/Detective Hadnot was assigned the investigation on January 30, 2019.  Detective Hadnot listed as the location: 555 South Main Street, Jasper, Texas 75951.  He provided a height for Mitchell of 5'-9", and a weight of 180 pounds.  He listed as complainant "City of Jasper Police Dept."

13.     Detective Hadnot included in his report, on pages 6 through 19, narrative sections. Detective Hadnot wrote that, on Wednesday, January 29, 2019, at approximately 8:00 a.m., he arrived for work at the Jasper Police Department.  Detective Hadnot wrote that he walked through the jail and observed people being listed "on the board" as being inside the jail.  He saw April

Gallop-Stephenson in a female cell and a person whom he believed to be a male that was unknown to him in the detox cell. Detective Hadnot noted that the male was kneeling and had his right arm on the ledge of an open-door port that can be secured if needed. This door port was what is commonly referred to as "bean slot" or "food slot." Detective Hadnot learned by looking at the jail board that the inmate was Mitchell. He noted Mitchell's date of birth, which was in 1990.

Detective Hadnot wrote in part:

> Qualls was talking at random sentences and making faces that I could not understand as I observed he was arrested for a Public Intoxication charge on 1/28/19 at approximately 2200 hours by Sergeant Toddrick Griffin whom is partnered with Officer Sterling Linebaugh. Qualls remained kneeling down at the base of the door where I could see his arm and partially his face as I left the area. I made several other trips through the jail as Qualls still was inside detox alone as I a [sic] representative from Tyler Technologies identified as Chase Fleming with me conducting computer information technology work on the computer inside the book in area. Qualls appeared to be in good health and never questioned me for any assistance whether it be medical or a simple telephone calls [sic] as most arrestees do. Fleming and I departed from the jail area and continued to conduct computer maintenance services. We made several passes through the jail as Qualls still remained in the same position in the detox cell alone and appearing to be in good health.

> Later in the evening around 1630 hours I was speaking with Delome in dispatch and observed Qualls to be kneeling in the center of the room not in distress of any kind and moving around. I remained at the department past my normal working hour of 1700 hours to complete additional paperwork that could not be done due to computer maintenance with Tyler Technologies. Along with ensuring the night shift dispatcher Heather O'Dell and patrolman Sergeant Toddrick Griffin and Sterling Linebaugh had access to the system with no error messages. While showing O'Dell some features within the system at approximately 1915 hours I looked at the camera and observed Qualls to be surrounded by some dark colored liquid that I could not identify. I walked in the jail and looked through the window to ensure it was not blood eliminating that Qualls had injured himself which would require immediate assistance to prevent him from causing harm to himself. I instructed O'Dell to have Sgt. Griffin come to the jail and check on Qualls and provide me with an update as I had a follow up to conduct and had to depart the location. At approximately 1957 hours O'Dell advised me it was vomit and that officers were cleaning it up leading me to believe that Qualls was appearing to be in good health and in no distress that an average person would deem needing immediate medical attention and Sgt. Griffin was handling the situation. I did not get any further updates about the status of Qualls during the night.

On Wednesday January 30th, 2019 at approximately 0800 hours I arrived for work as normal and went through my normal routine of conducting business as mentioned above.  While doing this check I was accompanied by Fleming again as he was following up on computer maintenance from yesterday as we had to check the computer in the book in area.  At approximately 0839 hours in the book in area I checked the board and noticed Qualls was still listed as being in Detox but was not making any sounds and knew of his previous state from the night before. Officer Peters had stated that Qualls may be asleep due to his state from yesterday and level of intoxication.  Patsy Stephenson was in the jail at this time talking to Peters about paperwork and I decided to look through the window and visibly check on Qualls. I noted Qualls to be laying on his back on the mat as his left arm was extended outward so I could clearly see his wrist and saw an orange band and a white band on his left wrist. I also could see what appeared to be a dark colored liquid on his shirt and hands. I could not see his face but the darkness of his wrist and what appeared to be the stiffness of his limbs from a glance concerned me about the health of Qualls.  I have worked numerous cases in the past in conjunction with Drug Enforcement Agency (DEA) Pharmacologist Jordan Trecki, Ph.D. where the ingestion of illegal narcotics can cause constant vomiting which can cause affixation [sic], and the chemical imbalance can cause death as the victims are helpless if not provided medical attention.  Therefore I told Peters to get a key and lets physically check on Qualls at approximately 0842 hours. Peters had no idea what I had observed through the window nor does he know of my previous case experience with Dr. Trecki as I did not vocalize it to him as Patsy left the room prior to us opening the door. Meanwhile Fleming the Tyler Technology representative sat there working on the computer. Upon entry I could immediately tell Qualls was unresponsive and already discolored as due to my previous law enforcement experience and investigative skills lead me to believe Qualls was deceased. Peters yelled for Dispatcher Chastity Davis to contact EMS immediately as I immediately went and notified Captain Poindexter whom was seated in the break room area with Mental Health Officer Barbara Bienvenu and Crime Scene Investigator Lena Lavender and Chief Hall whom was seated in his office of the situation as they entered the jail and took control of the scene. I instructed Fleming to finish his work on that computer later. Fleming and I exited and went to the court clerk area. I never went back into the jail to further examine the situation as Captain Poindexter contacted Jasper County Sheriff's Office for a Justice of the Peace as Judge Jimmie Miller and Ronnie Billingsley arrived on scene later along with Texas Department of Public Safety Ranger Joe Haralson. Acadian EMS also later arrived and were let into the jail area as Ranger Haralson also later arrived and was briefed by Chief Hall and Captain Poindexter. Crime Scene Investigator Lena Lavender obtained photographs of the cell and area where Qualls was found.

Investigator Hadnot's allegations that Mitchell was in no distress, appeared to be in good health, and similar assertions, and the allegation that he did not need immediate medical assistance, were

false.  Upon information and belief, these "stock" phrases and assertions were used to attempt to cover up a travesty that occurred at the jail, under Investigator Hadnot's watch.  Mitchell needed immediate emergency medical intervention, as Investigator Hadnot knew in part from his described experience with the DEA pharmacologist.  Surprisingly, even though Investigator Hadnot was directly involved in the events leading to Mitchell's death, he wrote that he "decided to lead the investigation until notified otherwise by [his] command staff."  He asked dispatcher Chasity Gray to start a call for service sheet and placed pertinent information onto it as it happened real time.  He also instructed her to add things to it that allegedly happened before she made the sheet, thus creating evidence after the fact.  He did all things referenced in this complaint as a supervisor of other Individual Defendants, and he is liable for claims in this complaint pursuant to supervisor liability.

14.     Investigator Hadnot directed dispatcher Gray to update the jail log to show what they had discovered and to "note all situations from discovery until the removal of the body of Qualls by a funeral home."  Investigator Hadnot instructed Ms. Gray to take a break, while he maintained the console and area and obtained video recordings from the time Mitchell entered the jail, on January 28, 2019 at approximately 10:22 p.m., until Mitchell's body left the jail. Investigator Hadnot also made notes about staff present during Mitchell's incarceration:

> Qualls was arrested by Sergeant Toderick Griffin whom is partnered with Officer Sterling Linebaugh as the dispatcher for this shift being Heather O'Dell as three have worked the past two nights together being from January 28th, 2019 (6pm-6am) and January 29th, 2019 (6am-6pm). The day shift was Officer Brett Oberlechner and Officer Jared Scoggan with the dispatcher for this shift being Rustie Delome as three have also worked in the past two day shifts together being from January 28th, 2019 (6am-6pm) and January 29th, 2019 (6am-6pm). During these day shifts numerous personnel are present including Officer Peters who is the staff offier and has duties pertaining to the jail, court, and impound yard along with Mental Health Officer Barbara Bienvenu, Lieutenant Garrett Foster, Detective Gerald Hudson, Sergeant Gary Pullen, Narcotics Sergeant Anthony Smith and Narcotics Investigator Davy Hill, along with CSI Lena Lavender, Administration Secretary

Diane Brown, Captain Mike Poindexter, Chief Gerald Hall, Court clerks Patsy Stephenson and Kimberly Rudd, Municipal Judge Robert Jackson and myself. Other agency staff whom may have had contact with Qualls would be Jasper County Sheriff's Office Deputy Cody Abshier, Constable Nile Nichols, and several nurses from Jasper Memorial Hospital namely Becki Haley RN, Pattie Sanders RN, Jenniger Krajl RN, Mary Cloyd RN, Nancy Freck RN, and Christy Bailes. Numerous staff members go through the jail at random so I will speak with all individuals to obtain reports regarding their interaction, visual depictions, or knowledge of Qualls being in detox during the specified time period.

15.     Detective Hadnot wrote in this report that he began to review video recordings for the time period beginning Monday, January 28, 2019, before Mitchell's contact with law enforcement officers, through Wednesday, January 30, 2019, when Mitchell was discovered unconscious in the detox cell. Detective Hadnot wrote that it was he and staff Officer Mike Peters who discovered Mitchell. Detective Hadnot viewed video recordings from a Conoco store which Mitchell had visited. Detective Hadnot then reviewed body cam recordings of Sergeant Toderick Griffin, Officer Sterling Linebaugh, Officer Brett Oberlechner, and Officer Jared Scoggan. Officer Linebaugh and Sergeant Griffin had gone to the hospital before Mitchell's arrest. They saw that Mitchell was clearly under the influence of an apparent illegal substance. There was significant discussion about how Mitchell would leave the hospital, and that he could not leave the hospital alone due to his intoxicated state. At one point, Mitchell was making motions with his hands and his mouth as if he were talking, but there were no words coming out. Sergeant Griffin confirmed with Detective Hadnot that this happened during his contact with Mitchell.

16.     Later, as officers arrived again at Jasper Memorial Hospital, Officer Linebaugh's video showed him engage Mitchell in the emergency room portion of the hospital. Mitchell was standing in the doorway to his room, holding his stomach/chest area. Officer Linebaugh questioned Mitchell regarding his condition and offered him a seat multiple times, while Mitchell appeared to be looking at Officer Linebaugh but having random thoughts occurring and making

faces as if he was having a conversation with someone.  Mitchell was wearing a white long-sleeve

shirt with sleeves rolled up, blue jeans, and blue Crocs.  Sergeant Toddrick Griffin could also be

seen on Officer Linebaugh's video.  Officer Linebaugh instructed Mitchell to stay inside his room

and not go outside, or he would be arrested.  Mitchell replied that he did not want to be arrested.

During the entire contact, according to Investigator Hadnot, Mitchell had a blank stare on his face

and was acting as if he was under the influence of some type of illegal substance.  Police officers

then left the hospital and went back into service.

17.     According to jail video, Mitchell entered the jail with Sergeant Griffin and Officer

Linebaugh at approximately 10:09 p.m.  Officer Linebaugh intended to conduct a book-in process,

while Mitchell attempted to ask Officer Linebaugh a question but did not.  Mitchell was able to

respond with a "no" at times to a question, but at other times did not respond.  At one point, when

Mitchell was asked a question about his mental health, he stated that he attempted to go to Burke.

Upon information and belief, this indicated to Officer Linebaugh that Mitchell had significant

health issues.  The Burke Center was located in Jasper, Texas.  Sergeant Griffin, who was standing

beside Mitchell, conducted a cursory search of Mitchell.  However, neither Officer Linebaugh nor

Sergeant Griffin clothed Mitchell in anything other than his street clothes before putting him into

a cell.  This is a clear violation of all known jail standards, unsafe, unreasonable, and deliberately

indifferent to what substances Mitchell may have on his person.  Mitchell was then placed into

what the City refers to as a "detox cell" at approximately 10:17 p.m.  Thus, the purported "intake"

took no more than approximately eight minutes.

18.     Mitchell kneeled at the base of the cell door as Sergeant Griffin provided him with

a cup of water and Officer Linebaugh completed some paperwork.  Mitchell attempted to speak to

Officer Linebaugh and called him "sir" several times, but he did not say anything to continue the

conversation.  Instead, he randomly mumbled things that could not be clearly distinguished.
Camera View 16 showed Mitchell kneeling down by the door area from the time he entered the
"detox" cell until he began to crawl away several hours later during the night of January 29, 2019.
Mitchell ultimately had his right arm hanging out of the bean slot for several minutes at a time.  It
was difficult to see Mitchell in the camera view at times, as he was in the bottom left portion of
the screen and his face was not visible.  Mitchell looked up at the camera at times, and then
appeared to go back to looking out the bean slot.

19.     On Tuesday, January 29, 2019, at approximately 6:50 a.m., Mitchell hit the door
and called out to day shift TCO Rustie Delome.  She yelled back, "What?"  Mitchell did not
respond, and Officer Delome did not enter the book-in area to see if Mitchell needed anything.
Mitchell remained at the base of the cell door with his right arm out of the bean slot.  At
approximately 7:25 a.m., court clerk Patsy Stephenson walked by.  Mitchell attempted to converse
with Ms. Stephenson, but she was apparently unable to determine what he was saying.  At
approximately 7:36 a.m., Officer Oberlechner walked by and attempted to get closer to Mitchell
to determine what he was saying.  Mitchell communicated nothing of significance.  At
approximately 8:06 a.m., staff officer Peters entered the book-in area with Detective Hadnot.

20.     At approximately 8:18 a.m., Officer Peters returned as Jack Armstrong was seated
in a chair and tried to speak with Mitchell.  Officer Peters discussed something with Mr. Armstrong
as Mitchell mentioned some voices or other people.  Officer Peters told Mitchell that there was no
one else in the room.  At approximately 8:53 a.m., Officer Scoggan entered the jail with school
resource Officer Cling Fowler along with a juvenile arrestee.  Officer Peters shut the meal port on
Mitchell's door.  At approximately 10:32 a.m., Sergeant Anthony Smith and mental health officer
Beinvenu walked through the area but did not engage Mitchell at all.  Detective Hadnot wrote that

they did not engage Mitchell potentially because they may not have known he was in the cell, even though they came from the dispatch area where there are camera monitors.  At approximately 10:50 a.m., Mitchell hit his door and said something that sounded like the word "dispatch."  He then looked off and was talking to himself.

21.     At approximately 12:37 a.m., Officer Peters delivered a lunch meal to Mitchell and advised him to eat to help "sober him up."  Officer Peters asked Mitchell if he was hungry, and Mitchell responded, "Yeah."  Officer Peters opened the meal door and placed the meal on the ledge.  At approximately 1:15 p.m., Officer Peters removed the meal and closed the meal port again.  At approximately 1:22 p.m., Mitchell was still kneeling beside the closed meal port in his cell.  At approximately 2:50 p.m., Officer Scoggan entered the jail with another arrestee while Mitchell was still kneeling beside the meal port in his cell.  Detective Hadnot wrote, "The jail is very busy during the evening hours as several officers made arrests and walked through jail as they do normally during business hours."

22.     At approximately 6:00 p.m., TCO Healther O'Dell's shift began as TCO Rustine Delome left along with Officer Peters (who may have ended his shift prior to O'Dell starting her shift).  At approximately 6:07 p.m., when Sergeant Griffin conducted a visible check of Mitchell, he was still kneeling at the base of the cell door at the same place he was when he entered the cell.  Sergeant Griffin placed a dinner box on the counter in the jail area that was supposed to go to Mitchell.  At approximately 6:28 p.m., Mitchell began crawling toward the center of the cell.  This area of the cell was more in view of the camera than the corner Mitchell had been in for a lengthy period of time.  Mitchell's back was to the camera, and his face not visible, but he was still bent over kneeling in the center of the room.  Over thirty minutes later, at approximately 7:02 p.m., Mitchell can be heard vomiting and saying "hello" loudly a couple times.  The vomit is visible at

approximately 7:06 p.m.  It is then that Detective Hadnot enters the jail after coming from his office and completing computer maintenance in dispatch.  He tells TCO O'Dell to contact Sergeant Griffin.  TCO O'Dell checks on Mitchell at approximately 7:35 p.m. and asks what he is laying in.  Mitchell responds to her, saying that he vomited, and that he is not laying in it.  TCO O'Dell tried to instruct Mitchell to roll out of the vomit, and she told him that officers would come.

23.     At approximately 7:42 p.m., Sergeant Griffin and Officer Linebaugh arrived to assess the situation.  When an officer moved Mitchell, he screamed in pain.  Sergeant Griffin cleaned up the vomit, and Mitchell was placed on a mat with his head and his face north in the cell and feet toward the south.  At approximately 10:31 p.m., it sounded as if Mitchell was calling out "hello."  TCO O'Dell visibly checked on Mitchell and discovered that he had vomited again.  At approximately 10:44 p.m., Sergeant Griffin arrived and saw the vomit.  Officers cleaned Mitchell's vomit up again while Mitchell was still laying on his stomach on the mat moving around and shaking in a manner which, according to Investigator Hadnot, "appears to show some body twitches that he cannot control."  Investigator Hadnot also wrote, "For several hours, [Mitchell] laid on the mat and did not attempt to get up or move from his placement."

24.     On Wednesday, January 30, 2019, at approximately 2:24 a.m., Mitchell appeared to attempt to push himself up but ended up laying back down flat on his stomach.  Mitchell was saying random things which could not be understood and also dry heaving as if he were going to vomit again.  At approximately 2:40 p.m., Mitchell vomited, but not the volume of liquid which he had vomited earlier.  Mitchell then smeared vomit all over the floor with his left hand.  At approximately 2:57 a.m., Sergeant Griffin looked into the cell while Mitchell was on his stomach.  Mitchell can later be heard dry heaving.

25.    At approximately 5:05 a.m., Jack Armstrong arrived and got his cleaning cart from the area.  Mr. Armstrong had no contact with Mitchell.  At approximately 5:11 a.m., Sergeant Griffin conducted another visual check of Mitchell.  Detective Hadnot wrote, "[Mitchell] can also be heard moaning and groaning in the video consist[ent] with what Patsy Stephenson and Diane Brown claim they hard later in the morning."

26.    At approximately 6:00 a.m., TCO Chasity Gray arrived for duty and relieved TCO Heather O'Dell and was briefed by her regarding Mitchell and other things. There was random talking and noises recorded by the audio, some of which was "[Mitchell] moaning and groaning and saying random things."  At approximately 7:15 a.m., Mitchell was positioned halfway off the mat on the floor with his upper torso and head in camera view as he rolled around on the floor. Mitchell said "hello" multiple times and made numerous noises "that can clearly be heard on audio."  Mitchell was then completely off his mat and over the floor moving around a lot with moaning and groaning and saying "F**k, man"  several times along with other things as if he were talking to someone directly that was in the room.  Mitchell was making a lot of movements in the middle of the floor which were visible on the camera.

27.    At approximately 7:23 a.m., Mitchell screamed out very loudly, "Hello!"  The audio picked up his scream, as TCO Gray walked down the hallway adjacent to the detox cell but chose not to engage Mitchell.  Mitchell, still in camera view, can be heard saying random things such as "hello" and at one point something like, "CJ/TJ, I don't have no more of that shit."  It was clear that Mitchell was having significant issues, because there was no one else in the cell with him.  He followed up with the comment, "Man, come on dude."  It also sounded like he said "TJ" over and over.

28.     Mitchell was making a large amount of noise as he rolled around on the floor and then repositioned himself on the mat with his head south near the door and his feet north.  Mitchell said, "Please dude, hello, hello, hello, hello, please dude."  He then said, "Hello, yeah, yeah."  At approximately 7:29 a.m., Mitchell was completely out of camera view except for his feet and legs. Mitchell continued to scream out, "Hello, please sir!"  Followed by, "hello" over and over again. Mitchell rolled completely out of camera view but could be heard making noises and saying words. At approximately 7:30 a.m., Mitchell said "help" followed by "hello" again and rolled from the mat onto the floor and then back onto the mat where he continued to say "hello."

29.     At approximately 7:35 a.m., Mitchell's moans and groans became faint, although it sounded as if he was hitting the base of the door.  At approximately 7:38 a.m., Mitchell was positioned in the southeast corner of the cell on the mat.  He made no further movements or sounds. Mitchell died, alone, with no help, after yelling for help, and after no medical or withdrawal treatment whatsoever.

C.     Witness Statements and Evidentiary Documents

1.     Witness Statements

a.     Armstrong, Jack

30.     Jack Armstrong signed a statement indicating that, on January 30, 2019, at approximately 5:30 a.m., he went into the Jasper City jail laundry room to get his cart.  Mr. Armstrong could hear Mitchell talking to himself.

b.     Bienvenu, B. – Mental Health Officer

31.     Mental Health Officer B. Bienvenu wrote a brief statement, in which she indicated that she was standing in the kitchen at the Jasper Police Department with Chief G. Hall when Detective Hadnot said that there was a death in the Jasper Police Department jail.  MHO Bienvenu entered the jail to offer help to CSI Technician Lena Lavender and Officer M. Peters.  She saw

Acadian Emergency Medical personnel enter and attempt to retrieve vital signs for Mitchell.  They were unable to do so.  The Mental Health Officer said that she "returned to [her] regular duties."

### c.  Brown, Diane

32.  Diane Brown signed a statement indicating that, on January 30, 2019, at approximately 7:30 a.m., she and Patsy Stephenson were in the kitchen at the jail.  Ms. Brown thought she heard some low moaning coming from the jail.  She asked Ms. Stephenson if she could also hear it, and Ms. Stephenson said it was probably Mitchell.

### d.  Christopher, C. – Sergeant

33.  Sergeant Christopher wrote in his statement that he arrived for his shift at the Jasper Police Department on January 30, 2019.  His shift was from 6:00 a.m. to 6:00 p.m.  He attended a shift turnout meeting with Sergeant Griffin, Officer Linebaugh, and Officer Fulcher.  He was told that Mitchell was in custody in the detox cell.  He was also told that Mitchell was brought in the night before, "which would have been the night of 01/28/2019."  Sergeant Griffin said that Mitchell "was unable to be arraigned due to his level of intoxication."  Sergeant Griffin also said that Mitchell had been sick and was vomiting.  Sergeant Christopher ate breakfast with Officer Fulcher at approximately 6:30 a.m. and then returned to the Police Department.  He wrote:

> While I was in my office working on the computer I could here [sic] what I believed to be yelling from the jail area.  My office is approximately 10 yards from the jail door and the detox cell door is approximately 10-12 yards inside that jail door.  I was aware of three inmates in the jail and cannot positively say that what I was hearing was coming from [Mitchell].  When I completed my task Officer Peters was at work eating breakfast and I knew he would be entering the jail shortly there after [sic].  I did not complete a check on any inmate on this date.

### e.  DeLome, Rustie – Telecommunications Officer

34.  Telecommunications Officer ("TCO") Rustie DeLome signed a written statement indicating that, on January 29, 2019, after the 6:00 a.m. shift change, TCO DeLome began to feed breakfast.  TCO DeLome sat Mitchell's food on the door flap for him to grab.  He tried to talk, but

he was unable to fully form a sentence, and he continued to sit at the door.  TCO Delome indicated that she did not have to deal much with Mitchell during the day, because Officer Peters was in the jail most of the day.  TCO DeLome also wrote:

> During shift we are not required to go into the jail to check on inmates we check them on the tv monitor which has surveillance of the jail cells.  This is only to make sure they are still in the same place we placed them.  The recording box is normally turned down to due to the feedback it can cause officer safety issue[s] when officers are trying to give radio traffic being that it is connected to the lobby and jail.

### f.      Fulcher, Mark – Corporal

35.      Corporal Fulcher wrote a statement.  On Wednesday, January 30, 2019, he was in the Jasper Police Department squad room having shift briefing with night shift Sergeant Toderick Griffin and Officer Sterling Linebaugh.  Sergeant Griffin said that Mitchell was in the detox cell, "still highly intoxicated from the night before last."  Moreover, Sergeant Griffin said they "could not get a responsible adult to come get [Mitchell] from [Jasper Memorial Hospital] and they just could not let him walk down the road due to medications administered by [Jasper Memorial Hospital] and his intoxicated state, leaving the arrest the only viable option."  Corporal Fulcher wrote that he never made contact with Mitchell while he was in the detox cell, but he learned of Mitchell's death shortly after it occurred.

### g.      Gray, Chasity – Telecommunications Officer

36.      Telecommunications Officer Chasity Gray provided a written statement and indicated that she reported for duty on January 30, 2019 at approximately 6:00 a.m.  Heather O'Dell advised TCO Gray of calls, jail issues, and inmates from the night before.  TCO O'Dell advised that Mitchell was in the detox cell, and had thrown up twice, a black substance one time and a plastic baggie as well.  TCO O'Dell remained in dispatch until about 7:35 a.m.  They saw Mitchell on surveillance moving in the middle of the floor, as described elsewhere in this pleading.

TCO Gray admitted they heard Mitchell several times making noises, but she also falsely alleged that it did not sound like he was in distress.  Someone had closed the food slot to Mitchell's cell before TCO Gray arrived.  TCO Gray also wrote:

> Approximately 08:00, jail check was administered by checking surveillance to make sure inmates where [sic] still where they are supposed to be.  As a dispatcher we do not physically get up to check on the inmates due to having to leave the radio and putting officers on the street at risk.  This is why the volute on the audio recorder stays turned down as well.  When the volume is up it creates background noise due to it being on in the lobby and in the jail.  This makes it hard to hear the radio and emergency calls.  At this time I noticed that Qualls had repositioned himself in the corner of the cell, leaving only his foot in view of the cell camera. Jail log was updated.

### h.    Griffin, Toderick – Sergeant

37.    Sergeant Toderick Griffin provided a written statement.  He wrote, regarding pre-arrest interaction with Mitchell at the hospital, "I went to go speak with [Mitchell] to see if we could get any kind of information out of him but his speech was bad, thoughts were delayed that it was of no use."  Sergeant Griffin also wrote, "After about 30 minutes of listening to Deputy Abshire try and talk to [Mitchell], we eventually got him in his room and we left the hospital." Some time later, officers were dispatched back to the hospital due to Mitchell not wanting to stay in his room and because he was "talking to his reflection in the ER entrance glass doors and was getting agitated again."  Sergeant Griffin wrote that Mitchell "was still highly intoxicated on some drug."  Officers, including Sergeant Griffin, walked to Officer Linebaugh's unit and observed Mitchell to see if he would leave the property.  Ultimately, Mitchell was arrested for Public Intoxication.  When Sergeant Griffin arrived at the Jasper Police Department, he wrote that Mitchell was allowed to keep his clothes on but had them checked.  Apparently, a decision was made to ask only the "main questions" on the intake questionnaire before Mitchell was left in the detox cell.  Mitchell "went into the cell and sat at the door for the rest of the night."

38.     The Jasper Police Department Book-In Medical Form for Mitchell had handwritten at the bottom of it, "Searched no Dressed out intoxicated badly."  Unfortunately, this deliberate indifference and objective unreasonableness, and clear violation of all known jail standards, upon information and belief, caused, proximately caused, and was a producing cause of Mitchell's death. He was able to, later, upon information and belief, ingest a baggie which he had on him which contained methamphetamine.   The only items listed in the property inventory, which are presumably the only items which were taken away from Mitchell, were a wallet, watch, belt, and shoes.  Mitchell did not sign the form.  The arrest report listed as Mitchell's arrest condition "Narcotics, Intoxicated."  It further indicated that he did not resist arrest.  Interestingly, a copy of a complaint secured through a Public Information Act request regarding Mitchell's purported offense, which was unsigned, indicated that Mitchell was intoxicated "by reason of the introduction of alcohol into the body."  Individual Defendants knew this to be false.

39.     Sergeant Griffin wrote that, on Tuesday, January 29, 2019, he returned to work at approximately 6:00 p.m.  He learned that Mitchell was still in jail.  After the shift meeting, he went to the jail and gave Mitchell food.  "At that time [Mitchell] was leaning over talking but not in sentences just a lot of words."  Sergeant Griffin left Mitchell to do other things and was notified by dispatch a few hours later that Mitchell had vomited and was laying in it.  Officer Linebaugh and Sergeant Griffin arrived at the jail and saw vomit on the floor and Mitchell laying in it. Sergeant Griffin got a mop and entered the cell to clean the area.  They tried to get Mitchell to move but he did not do so.  Therefore, they lifted him up and put him on a mat.  Mitchell's head was facing toward the toilet area, and his feet were facing toward the door.  He remained in that position until Sergeant Griffin left work.  Sergeant Griffin mopped up the vomit and saw that

Mitchell did not eat his food.  The food was in the corner still in the packet. Nobody obtained any medical or mental health help or treatment for Mitchell.

40.     Sergeant Griffin went back on patrol and received a call indicating that Mitchell had vomited again.  He returned to the police department and entered the cell with the mop and moved Mitchell to clean.  Mitchell "was still moving and talking but nothing made sense."  He also wrote:

> While I was moping [sic] this time, I noticed a small item that did not mop up but it was covered in the vomit.  Qualls was also wiped off as much as we could try and clean some of the stuff off of him.  Once I clean the area up, I picked the item up and took it over to the trash area to look at it.  The item was a small bag that was tied up which is normally used to hold illegal narcotics of some kind.  The bottom of the bag was not there, and there was nothing in the top area which was tied in a knot.  I opened the bag just to make sure nothing was in it and did not see any narcotics or any substance at this time.  After viewing it, I placed that bag in the trash and went back to work.

41.     Sergeant Griffin knew that Mitchell was intoxicated as a result of drug use.  He knew that Mitchell had apparently swallowed a baggie of drugs.  And he did nothing – other than dispose of the evidence.  Sergeant Griffin wrote that he and Officer Linebaugh checked on Mitchell throughout the night to "make sure he was still breathing and moving."  Apparently, the prisoner-care standard at the City of Jasper was very low – lack of death.  "Every time we checked on him, he was still alive."  Sergeant Griffin checked on Mitchell for the last time at 5:42 a.m.  He notified the next shift that Mitchell had vomited twice, and that he was "still highly intoxicated."  It was apparent to Individual Defendants that Mitchell would not have still been intoxicated so many hours after he was arrested, from a pre-arrest drug ingestion.  They knew that he was seriously ill and needed emergency medical treatment.  Nevertheless, instead of obtaining needed treatment, Sergeant Griffin left the police department after shift meeting.

i.     Hall, Gerald – Chief

42.    Chief Hall drafted a statement indicating that, on January 30, 2019, at around 8:30 a.m., Detective Hadnot came to his office and said that there was a death in the jail.  Chief Hall wrote that Mitchell was in the detox cell "located just off the book in area."  "He was laying on a mattress in one of the corners of the cell . . . on his back with his mouth open and had urinated on himself."  Chief Hall noted a large stain on Mitchell's left shoulder area.

j.     Hudson, G. - Detective

43.    Detective Hudson, in his/her statement, wrote that, on Monday, January 28, 2019, he/she responded to Jasper Memorial Hospital regarding a combative subject in an ambulance. When he/she saw Mitchell in the ambulance, he/she recognized Mitchell from prior encounters. Detective Hudson wrote: ". . . I noticed that Mr. Qualls was not being combative, but he was talking and not making any sense.  I listened to Mr. Qualls for a moment and at no point was I able to understand anything that he was saying."  Detective Hudson left.

k.     Lavender, Lena – Crime Scene Investigator Technician

44.    CSI Lavender wrote a statement indicating that, on January 30, 2019, at approximately 8:50 a.m., she was notified by Detective Hadnot that Mitchell was possibly deceased in the detox cell.  She took her camera to the cell and observed Mitchell laying on his back to the right of the doorway.  He was laying on a light blue mattress, with his left arm partially bent at the elbow, and mouth and eyes open.  "There was a smeared reddish brown spot on the floor approximately 1 to 2 ft. in diameter.  There was a reddish brown spot also on [Mitchell's] shirt toward the top left side, with what seemed to be the same substance that was on the floor." CSI Lavender took photos.  She noticed on the back of the sink a "spaghetti TV dinner" that had not been opened.  She also swabbed the floor where the reddish brown spot was and the inside Mitchell's inside cheeks.  EMS arrived, and they were followed by Judge Jimmy Miller and Justice

of the Pace Ronnie Billingsly to pronounce Mitchell deceased.  A funeral home representative arrived at 10:15 a.m. to remove Mitchell's body.  CSI Lavender and Officer Peters assisted the funeral home representative in removing Mitchell's body from the cell and placing into a hearse.

### l.      Linebaugh, Sterling – Officer

45.      Officer Linebaugh provided a written statement indicating that, on Tuesday, January 29, 2019, at approximately 6:00 p.m., he arrived for work and made contact with Mitchell. He indicated that Mitchell was being held in a detox cell "due to being under the influence of an unknown substance."  He wrote that he and Sergeant Griffin arrested Mitchell on January 28, 2019. He also wrote that, on January 28, 2019, at approximately 6:00 p.m., along with Sergeant Griffin, they opened the bean slot and gave Mitchell a TV dinner.  Mitchell looked at them and mumbled some words which Officer Linebaugh could not understand.

46.      Officer Linebaugh went on patrol, but at approximately 7:36 p.m., he was notified that Mitchell had a substance on him.  The dispatcher said that she could not tell if it was food or vomit.  Once Officer Linebaugh and Sergeant Griffin arrived at the jail, they saw that Mitchell had vomited on the floor and was laying in it.  They put Mitchell onto a mat and mopped up the vomit. The TV dinner was unopened, on the toilet.  Mitchell was still trying to speak.

47.      Approximately three hours later, the dispatcher notified Officer Linebaugh that Mitchell vomited again.  Once they arrived at the jail, Officer Linebaugh placed Mitchell back onto the mat while Sergeant Griffin mopped up the vomit.  Officer Linebaugh used paper towels to clean vomit off of Mitchell's face, arms, and hands.  Officer Linebaugh wrote, "While Sgt Griffin was mopping he found a small plastic baggie in the vomit, the baggie was empty."  Officer Linebaugh knew that Mitchell had swallowed a baggie of drugs and needed emergency medical care, but he did nothing about it.

48.      Jasper Officer Oberlechner gave a statement, writing that, on January 28, 2019, he went to Jasper Memorial Hospital for an aggressive patient in an ambulance.  Officer Oberlechner, when seeing Mitchell in the ambulance, saw that he was calm.  Officer Oberlechner wrote:

> EMS then escorted [Mitchell] into Jasper Memorial Emergency Room.  [Mitchell] seemed to be intoxicated.  His eye movement was erratic, and his face seemed to be stuck.  [Mitchell] was speaking, but incoherently.  Some of his speech could be made out, but for the most part, not understandable.  [Mitchell] asked for Detective Hudson to ask a question, but I could not understand anything else he said.

Officer Oberlechner wrote that, after Mitchell was put into E.R. Room 9, he did not seem aggressive or agitated.  Police officers then left the hospital.  At approximately 5:01 p.m., Dispatch told Officer Scoggan to go back to the hospital.  Officer Oberlechner responded a short time after Officer Scoggan, arriving at the hospital at approximately 5:12 p.m.  Officer Oberlechner met with Officer Scoggan, and Mitchell "seemed to be calm in his room."  Mitchell attempted to speak with Officer Oberlechner, but his speech was erratic.  When Mitchell would get out of his bed, he would return to the bed when asked to do so.

49.      Officer Oberlechner wrote that the day shift on January 29, 2019 was busy, and he was in and out of the jail.  At one point, when he left dispatch, Mitchell had his arm out of the bean slot.  Mitchell stopped Officer Oberlechner to ask a question.  Mitchell started to speak, but then sat silent for a minute.  Officer Oberlechner left the jail.  When Officer Oberlechner returned later that afternoon, he noticed that the bean slot in the detox cell was closed.  Officer Peters told Officer Oberlechner later in the day that Mitchell had not been seen by the judge due to his intoxication.

n.      O'Dell, Heather – Telecommunications Officer

50.      TCO Heather O'Dell provided a statement, which must be construed in the light most favorable to Plaintiff.  TCO O'Dell was demoted from her telecommunications supervisor position just a few months before Daniel's death, because she falsified her time records.  She was

arriving late for work, taking lunch much longer than allowed, and leaving work early.  However, when she completed her timesheets, she falsely represented to Jasper that she had worked her required hours.  This shows that she had little issue falsifying records in her self-interest.

51.    TCO O'Dell noted in her statement that Mitchell entered the Jasper Police Department book-in area at approximately 10:22 p.m. on Monday, January 28, 2019, and that she observed this through "camera feed."  She indicated that his entry was "without incident."  She also wrote that she "was made aware by Officer's [sic] that he wasn't going to be dressed out to inmate clothing and he was being placed in detox cell due to the level of intoxication."  TCO O'Dell indicated that, when she checked the Detox camera feed showing Mitchell in his cell, he was "dominantly sitting at the base of the cell door with his head and arm rested on the 'meal door.'"  TCO O'Dell wrote:

> Randomly throughout the night I could hear Mr. Qualls make sounds when I went back and attempted to visually check on him he was unable to pronounce words, his eyes were bouncing from side to side and [h]is body was "twitching" and "jumping" in a manner that appeared he could not control.  The only word I was able to understand was him requesting a phone call.  Once I realized his level of intoxication, due to his body language and lack of responding to questions.  I advised Mr. Qualls to lie down and try to sober up and he would be allowed a phone call later.

52.    TCO O'Dell did not obtain any medical treatment for Mitchell, even though it was obvious that Mitchell needed emergency medical treatment.  When shift-change occurred, TCO O'Dell made TCO Rustie Delome aware of Mitchell "being heavily under the influence and that he was not able to communicate clearly and to keep an eye on him."

53.    TCO O'Dell's next shift began on Tuesday, January 29, 2019 at approximately 6:00 p.m.  At approximately 7:20 p.m., Detective Hadnot was in dispatch.  He brought Mitchell's cell to TCO O'Dell's attention via the camera feed.  TCO O'Dell observed what appeared to be Mitchell bent over on his knees with his back facing the camera in the middle of the floor, with a

dark/black liquid next to him.  It appeared to her that Mitchell may have been smearing it onto his face due to his head moving around and his hand motions.  TCO O'Dell asked Detective Hadnot to go and check.  Detective Hadnot returned and advised that Sergeant Griffin needed to be contacted and asked to come check. on Mitchell and clean up the vomit and/or possibly feces.  Detective Hadnot said that the liquid did not appear to be blood.

54.     Sergeant Griffin was called at about 7:23 p.m. and told about Mitchell being sick.  Detective Hadnot left and told TCO O'Dell to update him regarding Mitchell after Sergeant Griffin arrived.  Nobody called for medical treatment.  TCO O'Dell wrote:

> As a dispatcher it is difficult to leave the radio even though a portable radio is available as officers are constantly transmitting information.  Along with the telephone ringing on both standard and emergency lines that be transferred at anytime from Jasper County Sheriff's Office.  Therefore, we check the television screen to review the jail and other areas of the department versus physically going to these area[s] multiple times.  I used a portable radio to complete my duties as a dispatcher such as laundry and to check on Qualls but immediately went back to my assigned post inside the secure area once officers notified.

55.     While TCO O'Dell was waiting for Sergeant Griffin and Officer Linebaugh to arrive, she went back to Mitchell's cell and attempted to speak to him.  She asked him if he had vomited and told him that she had officers in route.  She asked if he could roll over to get out of the vomit.  She said that Mitchell had gone from being on his knees to lying flat in the middle of the vomit with it smeared on his face. She also said that Mitchell was unable to move or roll over.  Sergeant Griffin was made aware that the black liquid appeared to be vomit, and that he was now laying in it and needed to be check out.  Nobody called for medical or mental health treatment.

56.     At approximately 7:40 p.m., Sergeant Griffin and Officer Linebaugh entered to detox cell and rolled Mitchell over.  "[A]s he was being rolled over onto his sleeping mat he yelled out in pain as if any movement at all was extremely painful."  TCO O'Dell also wrote:

Sgt Griffin mopped up the vomit and cleaned the area. I asked Sgt. Griffin if EMS was needed he replied no Mr. Qualls is "coming down" and he is dehydrated. I then asked if we needed to give him water and then retracted it due to assuming he would vomit it up anyways. Sergeant Griffin advised that he did not eat the food that was given and this will probably continue through the night and just notify him when he does it again. For the next few hours Mr. Qualls laid flat on his stomach, occasionally could hear him dry heaving like he was going to vomit but never did. At 23:00hr I observed Mr. Qualls vomiting for the second time and notified Sgt Griffin and Officer Linebaugh. Officer's [sic] responded and again cleaned the vomit and re-positioned him. Throughout the night Officer Linebaugh and Sgt. Griffin conducted random checks on Mr. Qualls, he remained in the same position he was placed in by officers lying flat on his stomach appearing to be sleeping with no further incidents occurring on shift.

57.    TCO O'Dell also wrote that, at approximately 6:00 a.m. the following day, TCO

Chasity Bearden reported for duty. She was advised of all calls, jail issues, and current inmates.

I advised TCO Bearden of Mr. Qualls being in Detox Cell and of his vomiting twice a black substance and the Officer's cleaning and re-positioning him. As I assisted TCO Bearden in dispatch, we witnessed in Detox camera view Mr. Qualls moving and rolling from his mat to the middle of the floor and making sounds. Mr. Qualls continued rolling from his mat to the middle of the floor up to the point of time that I exited the department ending my shift approximately at 07:32.

o.    Peters, M. – Officer

58.    Officer Peters provided a statement and wrote that, on January 29, 2019, he arrived

at work and saw that Mitchell had been arrested for Public Intoxication and left in the Jasper City

jail detox cell. Early in his shift, Officer Peters spoke to Mitchell. He said that Mitchell was sitting

on the floor at the door of the detox cell mumbling incoherent words and not able to form a

complete sentence. At approximately 10:30 a.m., Mitchell was still sitting at the door with his left

arm "dangling out of the food chute in the Detox cell door." Officer Peters asked Mitchell to

remove his arm from the opening, to which Mitchell did not respond. Officer Peters moved

Michell's arm into the cell and closed the food chute door, placing a pin into it to keep it closed.

Mitchell "was still speaking unintelligibly."

59.    At approximately 12:10 p.m., Mitchell was given a chicken patty dinner. Mitchell

refused to eat and "did not touch the meal."  Further, "At this point [Mitchell] was still unable to communicate or form a complete sentence."  Officer Peters alleges that he checked on Mitchell several times during the afternoon, and Mitchell was still sitting on the floor next to the door each time.  Even after traffic court was concluded, Mitchell "was still incoherent and unable to be arraigned by Judge Jackson."  Officer Peters' last check of Mitchell on January 29, 2019 was at approximately 6:10 p.m., and Mitchell was still sitting by the door.

60.     The next day, at approximately 7:55 a.m., Officer Peters looked into the detox cell window and saw Mitchell laying on the mattress with his head at the south end of the cell.  Officer Peters did not open the door or speak to Mitchell.  He did not attempt to confirm whether Mitchell was sleeping or in the alternative deceased.  At approximately 8:40 a.m., Officer Peters was in the book-in area with Detective Hadnot.  Detective Hadnot had looked through the detox cell window and said that they needed to check on Mitchell.  Detective Peters went to the cell door with a key and opened the door.  Mitchell "appeared to be deceased at this time."  Detective Peters then, at approximately 8:45 a.m., yelled for dispatch to get an EMS unit in route.  Acadian EMS arrived at approximately 8:48 a.m., and an EKG showed a flat-line at 8:58 a.m.  Detective Hadnot notified Captain Poindexter and Chief Hall.  Officer Peters wrote:

> I observed [Mitchell] to be lying flat with his head to the south, mouth open and staring blankly.  The left shoulder of [Mitchell's] shirt was covered in a dark substance which was swabbed by CSI Lavender.  Mitchell's left arm was slightly outstretched and approximately 8 inches off the ground and appeared to be in rigor.

Thus, Mitchell had been deceased for quite some time without having been checked.

p.     Poindexter – Captain

61.     Captain Poindexter wrote in his/her statement that, on January 30, 2019, at approximately 8:46 a.m., Captain Poindexter was in the kitchen area at the Jasper Police Department with Mental Health Officer Barbara Bienvenu and Evidence Tech Lena Lavender.

Detective Josh Hadnot came down the hall and said that he thought Mitchell was deceased in the detox cell.  Captain Poindexter went to the detox cell and observed Mitchell, deceased.  He was clothed in white socks, blue jean pants, what appeared to be a white thermal long sleeve shirt, and another white shirt over the thermal shirt.  He also still was wearing a red hospital band on his left wrist.  Captain Poindexter noticed a dark colored substance on Mitchell's left front chest and shoulder area, and that his lips had a blue color to them.  Captain Poindexter saw that the camera in the cell is in the southeast top corner.  Thus, Mitchell was laying under the camera.

q.      Rudd, Kimberly

62.    Kimberly Rudd signed a statement indicating that, on January 29, 2019, at approximately 8:15 a.m., she witnessed Officer Peters and Patsy Stephenson have a discussion about inmates in the Jasper City jail.  Patsy was advised that Mitchell was an inmate in the jail, arrested on the evening of January 28th, but who wat not as of January 29th "coherent enough to be arraigned."

r.      Scoggan, Jared – Officer

63.    Officer Scoggan wrote a statement indicating that, on January 28, 2019, at approximately 4:37 p.m., he was dispatched to the ambulance bay of Jasper Memorial Hospital at the request of EMS to assist with a 28-year-old combative male.  However, as with other officers referenced herein, Officer Scoggan learned after seeing Mitchell in the ambulance that he was in fact not combative.  Officer Scoggan wrote:

> [Mitchell] was lying on the Ambulance stretcher and appeared calm.  He had rapid eye movement as if he was trying to watch something and his mouth was open. [Mitchell] appeared to be rather calm compared to my previous encounters with him.  The paramedic stated to me that he was picked up on FM777 at a family member's house and was believed to be high on methamphetamines.

64.    Once inside the emergency room, Officer Scoggan noted that Mitchell was transferred to a hospital bed in Room 9 – the psychiatric room – without assistance from law

enforcement.  Mitchell "was unable to complete a sentence when asked for information, however while I was present he was calm and compliant."  At approximately 5:05 p.m., after Officer Scoggan left the hospital and drove the approximate one mile to the Jasper Police Department, he was notified by dispatch that Acadian was requesting officers to return to the hospital because Mitchell had allegedly become disruptive.  Officer Scoggan returned to the hospital.  Mitchell "would mumble inaudible and incomprehensible words."

65.    At approximately 5:50 p.m., as shift change was approaching, Officer Scoggan contacted Officer Oberlechner.  Officer Scoggan requested that he contact the Sheriff's office and see if they get help, since Mitchell had been transported form outside Jasper city limits.  Mitchell was calm, sitting in his hospital bed, and "still unable to complete sentences or say anything."  On January 29, 2019, during Officer Scoggan's shift at the police department, he noticed that someone had taped a piece of paper over the window to the detox cell "further isolating' Mitchell from a juvenile to be fingerprinted.  After the juvenile was fingerprinted, Officer Scoggan removed the piece of paper covering the window.  Officer Scoggan, even though he walked through the jail several times that day, going to dispatch or to the court from the sally port, alleged that he did not hear or speak with Mitchell.

s.    Stephenson, Patsy – Court Clerk

66.    Patsy Stephenson signed a statement indicating that, on January 29, 2019, she went to the jail to see if anyone was incarcerated.  Mitchell, in the detox cell, was looking out the bean slot.  When he saw Ms. Stephenson, he attempted to get her attention.  However, she could not understand what he was trying to say.  She told Mitchell that she could not understand him and then proceeded toward the kitchen area.  At approximately 8:15 a.m., Officer Peters entered the office and advised the court that Mitchell was too intoxicated to be seen, and further noted that he had been arrested on January 28, 2019 at approximately 10:00 p.m. for Public Intoxication.

67.     At approximately 8:50 a.m. on January 30, 2019, Ms. Stephenson went to the jail. She saw that Detective Hadnot became concerned about Mitchell.  Detective Hadnot looked through the jail door window and told Officer Peters to get the jail key, so they could open the door and check on Mitchell.  As they were opening the door, Ms. Stephenson went back toward her office and heard Officer Peters tell dispatch to get an ambulance on the way.

t.       Woods, Derek – Lieutenant

68.     Jasper Lieutenant Derek Woods drafted a statement, writing that, on January 28, 2019 at 8:55 p.m., he received a text message from Sergeant Toderick Griffin asking him to contact Sergeant Griffin.  Lieutenant Woods called Sergeant Griffin, and Sergeant Griffin explained that he and Officer Linebaugh had been at the hospital dealing with Mitchell.  Lieutenant Woods was familiar with Mitchell from dealing with him in the past.  He wrote, "Mr. Qualls is a known drug user and has been in our facility multiple times."  He also wrote that, the last time that Lieutenant Woods had dealt with Mitchell in the jail, he came in extremely intoxicated on some type of substance.  Lieutenant Woods explained to Sergeant Griffin that, if Mitchell was intoxicated to the point that he was a danger to himself or others, and they could not find anyone to whom to release him, that he would have to be placed under arrest for Public Intoxication "until he sobered up." Sergeant Griffin also said that the hospital was probably going to want to file criminal trespass charges on Mitchell when he was released, because "he never wants to leave."  Lieutenant Wood then wrote:

> I advised Griffin that it was not going to do any good filing a Class B Trespass on him because the Sheriff's office was not going to take him in his current state and to file the lesser of the two charges if he had to file anything.  Sgt. Griffin stated that was what he was planning on doing with him if he did not have any other options.

Lieutenant Woods explained to Sergeant Griffin that Lieutenant Woods was going to be unavailable shortly, and that he should contact Captain Poindexter if he had any additional

questions. Lieutenant Woods wrote that he learned the following morning that Mitchell was placed in the Jasper City jail for Public Intoxication.

2.      Medical Treatment and Death Reports

a.      Autopsy – Forensic Medical Management Services of Texas, P.A.

69.      An autopsy was conducted by Forensic Medical Management Services of Texas, P.A., in Beaumont, Texas.  The autopsy indicates that Mitchell passed away at 7:38 a.m. on January 28, 2019, and that the autopsy was conducted three days later – at 8:00 a.m. on January 31, 2019.  Tommy J. Brown, D.O. was the forensic pathologist who conducted the autopsy.  The report listed several pathologic diagnoses, including amphetamine and methamphetamine toxicity, mild pulmonary edema, and mild dehydration.  One of the pathologic diagnoses read, "Decedent was a known drug abuser.  "Mitchell's body was clothed, according to the forensic pathologist, in two white shirts, a pair of blue jeans trousers, a pair of grey undershorts, and two white socks.  Clearly, this is not appropriate attire for someone being kept in a jail or holding facility.  This is also clear evidence that Individual Defendants and/or other City of Jasper employees were deliberately indifferent regarding searching a known drug abuser for drugs which Mitchell may have had on his person.  This is further evidence that City of Jasper simply dropped Mitchell into a cell, paid virtually no attention to him, and allowed him to suffer and die from a known drug problem.  The report listed as cause of death: "Complications of amphetamine and methamphetamine toxicity."

b.      Custodial Death Report – Jasper Police Department

70.      The Jasper Police Department filed a custodial death report with the Texas Attorney General.  The report indicates that Mitchell was only 28 years of age at the time of his death.  The report was drafted before the autopsy, and listed as manner of death "[p]ending autopsy results."

However, as the means of Mitchell's death, it provided: "Drug overdose."  The report indicates that Mitchell was in custody in a municipal jail.  It lists Mitchell's entry time and date into the "jail" as 10:00 p.m. on January 28, 2019, and it provides a time of death of 8:00 a.m. on January 30, 2019.  Therefore, approximately 34 hours passed from the time Mitchell was incarcerated until when he was found, deceased.  The "most serious offense" listed by the Jasper Police Department was Public Intoxication.  The summary portion was relatively short and provided little detail, especially in light of other details discovered by Plaintiff's counsel and included in this complaint:

> subject is a known narcotic user and subject was placed in detox cell due to being too intoxicated to book into jail. subject sat by door throughout the next day and in the early morning hours of January 30th, subject began throwing up and was believed to be detoxing from narcotics. subject was checked on periodically and around 08:00 was found unresponsive.

### c.      Inquest Report – Judge Jimmy E. Miller

71.     Justice of the Peace Jimmy E. Miller, Jasper County, Texas, Precinct 2, signed autopsy authorizations on January 30, 2019, presumably due to his authority to conduct and/or request an inquest into Mitchell's death.  One such autopsy authorization, which was on a Forensic Management Services of Texas, P.A. form, provided Mitchell's location of death at the Jasper City jail, and a time of death, which appears to have changed or handwritten after the form was originally completed, of 7:38 a.m.  It listed the date of death as January 30, 2019.  In response to the printed request for a brief account of circumstances of death, Judge Miller wrote:

> in jail couldn't keep food down, Last seen Alive at 7:30 a.m. Found unconscious unresponsive 8:46. Substantial amount of blood by his [illegible] and his shirt.
>
> **Look for signs of neglect.**

(Emphasis added).

Judge Miller listed as the suspected cause of death possible asphyxiation due to vomiting while unconscious.  Upon information and belief, he had obtained this information from one or more

Jasper Police Department employees.  Judge Miller also put a star next to his handwritten phrase "Known Drug user."  Judge Miller wrote, "Last movement on video moved himself about 8 ft. to bed 7:25. about 7:38 last movt"  Francis Sims was listed as Mitchell's next of kin.  Once again, documents indicate that Mitchell was a known drug user, who had clearly been intoxicated at the time of arrest.  There is little doubt that Defendants treated him in an objectively unreasonable manner and were deliberately indifferent to his known serious medical and drug abuse issues.

D.      Jasper Police Department Office Written Policies

72.      The Jasper Police Department had in place certain policies related to what occurred to Mitchell.  Any violation of such policies by Individual Defendants is some evidence of a constitutional violation causing, proximately causing, and/or acting as a producing cause of damages referenced in this pleading, including Mitchell's death.

73.      The Jasper Police Department had, at the time of Mitchell's death, certain written policies and procedures regarding its jail.  The general policy read:

> It is the policy of the Police Department that any person incarcerated in the lockup facility will be afforded their rights under the law, will be treated humanely, and will be provided with proper food, shelter, and if required, medical treatment. Procedures will comply with state law.

Upon information and belief, Jasper Police Department practice and custom were contrary to this written policy.

74.      The Staff Officer was responsible for management and operation of the jail, unless unavailable, when the patrol sergeant or designee would oversee the jail.  The Staff Officer was responsible for maintenance and inspections of the jail or, if unavailable, the patrol sergeant or designee would have such responsibility.  Finally, the Staff Officer was responsible for direct supervision and care of prisoners, such as Mitchell.  If the Staff Officer was unavailable, then communications personnel must fulfil those duties.  The procedures also mandated, "The

maximum period of detention should not normally exceed 48 hours . . . ."  This was recognition

that Jasper knew that its jail was not sufficiently staffed with, upon information and belief, certified

jailers and other appropriate staff to take care of inmates.  Regarding the booking process, a

procedure provided:

> If a prisoner refuses to cooperate with the booking process, i.e., fingerprinting and
> photographing, or the prisoner's physical and mental condition inhibits processing,
> allow the prisoner a reasonable period of time to calm down, become sober or rest.
> If the prisoner still refuses to be processed, the prisoner will be taken before a judge
> and ordered to submit to processing.

Further:

> The apparent physical condition of all prisoners placed into the lockup facility will
> be indicated on the Medical/Property Sheet.  Apparent physical condition of the
> prisoner will include such comments as; [sic] violent, suicidal, injured (describe
> injury), addict, normal, or other conditions as determined by the booking officer.

"The officer placing the prisoner into a cell is responsible for notifying the Communications

operator to begin visual monitoring of the prisoner in the cell."

75.    Another policy provided:

> ARRESTEE UNDER EXTREME INFLUENCE OF ALCOHOL OR DRUGS – a
> prisoner, who appears highly intoxicated, disoriented or appears to be suffering
> from some form of physical or medical problem should be examined by a
> paramedic or Emergency Medical Technician and, if necessary, transferred to a
> medical facility.  Once medically cleared, subject should be placed in the Detox
> Cell on a mattress until condition improves and then moved to a regular holding
> cell.  The officer will instruct the communication operator to check on the prisoner
> more frequently while in detox.  Communications operator will document each time
> prisoners are checked in the jail log.  Multiple subjects of the same gender may be
> placed into detox to sober up.  Males and females will not be placed into the detox
> cell at the same time.  When the detox is occupied, the booking officer will
> determine which prisoner needs placement in the detox cell by severity of
> inebriation.

Moreover:

>  Prisoners WITH MENTAL DISORDERS – Prisoners with a known history of
> mental disorder or mental defect, or who show evidence of such condition, will be
> detained only temporarily in the lockup and will be transferred as soon as possible.

> The Mental Health Officer will be notified when a mental health client is locked
> up.

Upon information and belief, Jasper Police Department practice and custom were contrary to these

written policies.

76.     A portion of Jasper's prisoner processing policies required prisoners to be "properly

searched" before entering the jail.  It also read, "Strip searches must conform to law."  It gave a

list of certain types of things which must be inventoried and to which special attention should be

given, but the list did not include street clothing other than a belt, ties and scarves, and generally

"personal property."

77.     The Prisoner Supervision portion of Jasper policies read in part:

> Prisoners detained at the Police station lockup facility will be under twenty-four
> (24) hour monitoring.  The arresting officer is responsible for ensuring that
> communications operators are informed that a prisoner is being held in the lockup.

Moreover, the communication operator was required to view the monitor "on a frequent and

regular basis."  This provided no guidance at all as to how often a prisoner must be viewed, and it

provided for no face-to-face observations.

78.     The Health/Medical Screening Report and Health Care Services section of Jasper

policies included the following:

The following are guidelines to be followed in the event a prisoner is in need of medical assistance:

> Prisoners who are ill or injured, should be treated by paramedics or Emergency
> Medical Technician.  The paramedics or the Emergency Medical Technician will
> examine the prisoner and determine whether his condition warrants transportation
> to a medical facility. . . .

> Whenever there is a doubt about the health or medical condition of a prisoner the
> officer should summon the paramedics or Emergency Technician.  The final
> decision to transport to a medical facility rests with the paramedics or the
> Emergency Medical Technician.

Upon information and belief, Jasper Police Department practice and custom were contrary to this written policy.

E.  Individual Defendants' Knowledge and Education

79.  The Texas Commission on Law Enforcement ("TCOLE") keeps records of service histories and training and education of Individual Defendants and which relates to law enforcement and/or jailer activities.  TCOLE records indicate that each of the Individual Defendants had sufficient experience and/or education to be fully aware that a failure to act reasonably and/or being deliberately indifferent, would violate Mitchell's rights under the United States Constitution.

80.  TCOLE records indicate the following service history for Sergeant Griffin:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Peace Officer (Full Time) | Jasper Police Dept. | Peace Officer License | 04/03/14 | |
| Peace Officer (Full Time) | Kirbyville Police Dept. | Peace Officer License | 03/07/11 | 03/31/14 |
| Reserve Officer | Jasper Co. Sheriff's Office | Peace Officer License | 02/04/11 | 02/08/11 |

81.  TCOLE records indicate the following award history for Sergeant Griffin:

| Award | Type | Action | Action Date |
|---|---|---|---|
| Peace Officer License | License | Granted | 02/08/11 |
| Basic Peace Officer | Certificate | Certification Issued | 01/13/16 |
| Intermediate Peace Officer | Certificate | Certification Issued | 02/16/17 |

82.  TCOLE records indicate that Sergeant Griffin received the following training and/or education which was, upon information and belief, relevant to claims against him:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|

| 3737 | New Supervisor's Course | 01/09/19 | 40 | OSS Academy |
| 3851 | Breathalyzer / Intoxilyzer | 11/16/17 | 28 | Texas Department of Public Safety LEA |
| 3402 | DWI/DUI Detection and Enforcement | 04/09/14 | 4 | Texas Municipal Police Association |
| 2108 | Arrest, Search, and Seizure (Intermediate) | 02/12/14 | 16 | Texas Municipal Police Association |
| 2178 | S.F.S.T. Practitioner Update | 02/12/13 | 8 | Texas Municipal Police Association |
| 3722 | Peace Officer Field Training | 08/08/11 | 100 | Jasper Police Department (Training Rosters) |
| 1000 | Basic Peace Officer | 08/09/10 | 680 | Angelina College Police Academy |
| 2176 | S.F.S.T. NHTSA 24hour Practitioner – BPOC | 08/09/10 | 0 | Angelina College Police Academy |

83.     TCOLE records indicate the following service history for Officer Linebaugh:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Peace Officer (Full Time) | Jasper Police Dept. | Peace Officer License | 12/27/17 | |

84.     TCOLE records indicate the following award history for Officer Linebaugh:

| Award | Type | Action | Action Date |
|---|---|---|---|
| Peace Officer License | License | Granted | 12/27/17 |
| Basic Peace Officer | Certificate | Certification Issued | 12/26/18 |

85.     TCOLE records indicate that Officer Linebaugh received the following training and/or education which was, upon information and belief, relevant to claims against him:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3722 | Peace Officer Field Training | 04/26/18 | 150 | Jasper Police Dept. (Training Roster) |

| 1000643 | Basic Peace Officer Course (643) | 07/21/16 | 643 | Angelina College Police Academy |
|---|---|---|---|---|
| 101 | Addendum Basic Peace Officer | 07/21/16 | 77 | Angelina College Police Academy |
| 3402 | DWI/DUI Detection and Enforcement | 06/10/16 | 4 | Texas Municipal Police Association |

86.     TCOLE records indicate the following service history for TCO O'Dell:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Telecomm-unications Operator | Beaumont Police Dept. | Telecommunicat-ions Operator License | 04//08/19 | 09/07/19 |
| Telecomm-nications Operator (Full Time) | Jasper Police Dept. | Telecommuincat-ions Operator License | 04/20/17 | 04/05/19 |
| Telecomm-unications Operator (Full Time) | Angelina Co. Sheriff's Office | Telecommuicat-ions Operator License | 02/20/17 | 05/01/17 |
| Telecomm-unications Operator (Reserve) | Jasper Police Dept. | Telecommu-nications Operator License | 02/18/17 | 04/20/17 |
| Telecomm-unications Operator | Jasper Police Dept | Telecommu-nications Operator License | 01/01/14 | 02/18//17 |
| Telecomm-unications Operator | Jasper Police Dept | Telecommu-nications Operator | 10/16/13 | 12/31/13 |
| Telecomm-unications Operator | Jasper Police Dept. | Telecommunicat-ions Operator | 09/07/13 | 10/16/13 |
| Jailer | Newton Co. Sheriff's Office | Temporary Jailer License | 07/28/08 | 11/23/08 |

87.     TCOLE records indicate the following award history for TCO O'Dell:

| Award | Type | Action | Action Date |
|---|---|---|---|
| Temporary Jailer License | License | Granted | 07/28/08 |

| | | | |
|---|---|---|---|
| Telecommunications Operator License | License | Granted | 01/01/14 |
| Temporary Telecommunications Operator | Letter | Granted | 09/07/13 |
| Telecommunications Operator | Certificate | Certification Issued | 10/16/13 |
| Basic Telecommunicator | Certification | Certification Issued | 04/16/18 |
| Intermediate Telecommunicator | Certificate | Certification Issued | 04/06/18 |
| Advanced Telecommunicator | Certificate | Certification Issued | 04/06/18 |

88.    TCOLE records indicate that TCO O'Dell received the following training and/or

education which was, up on information and belief, relevant to claims against her:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3009 | Supervision | 09/14/18 | 28 | Greater Harris County 9-1-1 Emergency Network |
| 3852 | Communications Operations / 911 | 04/18/18 | 8 | Lamar Institute of Technology Reg. Police Academy |
| 3027 | Verbal/Nonverbal Communication | 04/11/18 | 2 | Galveston Co. Sheriff's Academy |
| 3852 | Communications Operators / 911 | 04/11/18 | 1 | Greater Harris County 9-1-1 Emergency Network |
| 3751 | Effective Leadership / Leadership Training | 04/10/18 | 3 | Galveston Co. Sheriff's Academy |
| 3896 | Technical / Specialized | 04/08/18 | 8 | Greater Harris County 9-1-1 Emergency Network |
| 3720 | Telecommunications Operator Field Training | 04/05/18 | 100 | Jasper Police Dept. |
| 3737 | New Supervisor's Course | 01/25/18 | 40 | Bill Blackwood LEMI of Texas |
| 420 | Crisis Communications Telecommunicator | 05/04/16 | 24 | TCOLE Online |
| 403 | The Telecommunicator and Stress (Online) | 11/12/15 | 4 | TCOLE Online |

| 3925 | Ethics for Law Enforcement | 09/17/15 | 4 | TCOLE Online |
|------|----------------------------|----------|---|--------------|
| 3925 | Ethics for Law Enforcement | 10/07/14 | 4 | TCOLE Online |
| 3809 | TLETS/NLETS Basic Operators Course | 06/19/14 | 24 | Texas Department of Public Safety LEA |
| 1013 | Basic Telecommunicati-ons Certification Course | 10/16/13 | 40 | Classen Buck Seminars, Inc. |

89.     TCOLE records also show that Detective Hadnot had significant training and experience relevant to claims against him.  He had earned bachelor's and master's degrees.  He has 3,140 total training hours.  He held at one time or another both Peace Officer and Jailer licenses.  He had worked for the Jasper Police Department since December 2009.  Detective Hadnot had even earned the Master Peace Officer award.  He knew that he was faced with a dire situation, when dealing with Mitchell, and he did nothing.

F.     *Monell* Liability of City of Jasper

90.     Plaintiff sets forth in this section of the pleading additional facts and allegations supporting liability claims against City of Jasper pursuant to *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978).  It is Plaintiff's intent that all facts asserted in this pleading relating to policies, practices, and/or customs of City of Jasper support such *Monell* liability claims, and not just facts and allegations set forth in this section.  Such policies, practices, and/or customs alleged in this pleading were moving forces behind and caused constitutional violations and damages and death referenced herein.  City of Jasper knew, when it arrested and incarcerated Mitchell, that its personnel, policies, practices, and/or customs were such that it could or would not meet its constitutional obligations to provide appropriate medical and/or mental health treatment to

Mitchell.  Upon information and belief, City of Jasper made decisions about policy and practice which it implemented through its city council, its city manager, its chief of police, and/or through such widespread practice and/or custom that such practice and/or custom became the policy of City of Jasper as it related to arrest and/or incarceration of people who presented as intoxicated and/or had significant mental health issues.  It appears that the City may have conferred upon its city manager authority to supervise its chief of police, as indicated in minutes for a special-called city council meeting on or about December 15, 2016.  Regardless, the Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege at the pleading stage the specific identity of City of Jasper's chief policymaker.

91.     There were several policies, practices, and/or customs of City of Jasper which were moving forces behind, caused, were producing causes of, and/or proximately caused Mitchell's suffering and death, and other damages referenced in this pleading.  The City made deliberate decisions, acting in a deliberately indifferent and/or objectively unreasonable manner, when implementing and/or allowing such policies, practices, and/or customs to exist.  Further, when the City implemented and/or consciously allowed such policies, practices, and/or customs to exist, it knew with certainty that the result would be serious injury, suffering, physical illness, and/or death.

92.     Plaintiff lists in this paragraph policies, practices, and/or customs which Plaintiff alleges, at times upon information and belief, caused, proximately caused, were producing causes of, and/or were moving forces behind all damages referenced in this pleading, including Mitchell's suffering and death.  Thus, City of Jasper is liable for all such damages. Those policies, practices, and/or customs of City of Jasper included:

- Upon information and belief, a custom and/or practice of not requiring police officers to fully complete the prisoner intake form with correct information;

- Requiring a police dispatcher, most if not all of whom were female, to watch inmates (including males) on a video monitor at unspecified intervals, which was not consistent with any known jail standard or even minimum interval and face-to-face standards specified by the Texas Commission on Jail Standards;

- Having a written policy regarding "appropriate searches" which left unfettered discretion to police officers as to how to conduct a search, including searching for drugs like, upon information and belief, those kept and ingested by Mitchell while incarcerated;

- Apparently staffing its jail with primarily if not entirely female dispatchers during nighttime hours, while other officers are on patrol and had to be called if needed for any inmate issue, especially when considering that a single officer was prohibited from entering a cell alone pursuant to other Jasper policy;

- Not requiring arrestees such as Mitchell to undergo a mental health evaluation and/or receive mental health care from an on-staff employee, especially when such a mental health professional was on-site and available;

- Upon information and belief, failing to train at all its employees who were charged with watching, observing, and/or interacting with inmates in its jail who were highly intoxicated on drugs and/or alcohol and/or who had mental health issues regarding such issues;

- Upon information and belief, failing to supervise those in charge of inmates in the Jasper jail;

- Allowing inmates to be incarcerated for any length of time, other than just a couple hours, before transporting them to the County jail where there would be licensed jailers and other staff;

- Running a jail at all, as it should not have done as a municipality, because it was not prepared or qualified to do so without licensed jailers and others;

- Allowing people to "detox" without appropriate jail and/or medical staff present;

- Upon information and belief, ignoring inmates in its jail who were seriously intoxicated, were perceived as withdrawing from illegal drugs and/or alcohol, and/or had serious mental health issues;

- Not using any medical procedures and/or well-accepted withdrawal protocols for inmates who suffering the effects of drug and/or alcohol intoxication and/or abuse;

-  Employing a mental health officer which was not required to evaluate prisoners thought to be "detoxing;"

- Allowing and/or instructing dispatchers to turn audio down in the dispatch area, thus muting inmate requests and verbalization of pain;

- Requiring communications personnel (dispatchers) to fulfill duties of supervision and care of prisoners, when they could not do so while fulfilling duties in the dispatch area;

- Continuing to employ TCO O'Dell after she has shown herself to be untrustworthy and lacking care for her job duties and supervising communications officers;  and

- Placing a camera in its "detox" cell at a location which would allow inmates, such as Mitchell, to be in a portion of the cell not visible to a viewer in the dispatch area.

Additional evidence that these policies, practices, and/or customs pre-existed Mitchell's incarceration is that, upon information and belief, none of the Individual Defendants suffered any adverse employment decision or reprimand as a result of Mitchell's suffering and death.

III.     Causes of Action

A.     14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

93.     In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him. *Id*. at 2470. The Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original). The Court concluded that the objectively unreasonable standard was that to be used in excessive force cases, and that an officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72. The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. Instead, "courts must use an objective standard." *Id* at 2472-73. "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts to analyze officers', or jailers', conduct on an objective reasonability standard. Since pretrial detainees' rights to receive reasonable medical and mental health care, to be protected from harm, and not to be punished at all, also arise under the 14th Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights. Thus, in the alternative, the

court should not apply the "deliberate indifference "standard to Plaintiff's constitutional claims but instead objective unreasonableness.

B.      Remedies for Violation of Constitutional Rights and Other Federal Claims

94.      The United States Court of Appeals for the Fifth Circuit has held that using a State's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, Plaintiff individually, and for and on behalf of Claimant Heir, seeks, for causes of action asserted in this complaint, all remedies and damages available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law. If Mitchell had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action for violation of the United States Constitution, and actions for violation of the Americans with Disabilities Act and Rehabilitation Act, and obtain remedies and damages provided by Texas and federal law. Plaintiff incorporates this remedies section into all sections asserting cause(s) of action.

C.      Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of 14th Amendment Due Process Rights to Reasonable Medical/Mental Health Care, to be Protected, and not to be Punished

95.      In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Individual Defendants are liable to Plaintiff individually and to Claimant Heir, pursuant to 42 U.S.C. § 1983, for violating Mitchell's rights to reasonable medical/mental health care, to be protected, and not to be punished as a pretrial detainee.  These rights are guaranteed by the 14th Amendment to the United States

Constitution.  Pre-trial detainees are entitled to a greater degree of medical and mental health care than convicted inmates.  Pre-trial detainees are also entitled to protection, and also not to be punished at all since they have not been convicted of any alleged crime resulting in their incarceration.

96.     Individual Defendants acted and failed to act under color of state law at all times referenced in this pleading.  They wholly or substantially ignored Mitchell's obvious serious medical and/or mental issues and/or they were deliberately indifferent to and acted in an objectively unreasonable manner regarding those needs.  They failed to protect Mitchell, in their arrest and/or incarceration of him, and placement of him into a cell to die alone after knowing about his serious medical and/or mental health needs, as well as other actions and/or inaction referenced in this pleading, resulted in unconstitutional punishment of Mitchell.  Individual Defendants were aware of the excessive risk to Mitchell's health and safety and were aware of facts from which an inference could be drawn of serious harm, suffering, and death.  Moreover, they in fact drew that inference.  Individual Defendants violated clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents.

97.     In the alternative, Individual Defendants' deliberate indifference, conscious disregard, state of mind, subjective belief, subjective awareness, and/or mental culpability are irrelevant to determination of constitutional violations set forth in this section of this pleading.  Constitutional rights set forth in this section of the pleading, and constitutional rights affording pretrial detainees protection against excessive force, all flow from the 14th Amendment's Due Process Clause.  Since such constitutional protections flow from the same clause, the analysis of what is necessary to prove such constitutional violations is identical.

98.     Individual Defendants are also liable pursuant to the theory of bystander liability. Bystander liability applies when the bystander jailer/officer (1) knows that a fellow jailer/officer is violating a person's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.  As demonstrated through facts asserted in this pleading, Individual Defendants' actions and inaction meet all three elements.  Each Individual Defendant, regardless of his or her title or rank, had a duty and an obligation to assure that Mitchell receive appropriate medical and/or mental health care, as well to assure that other constitutional violations in this pleading did not occur.  They chose not to do so.  Therefore, Individual Defendants are also liable to Plaintiff individually and Claimant Heir pursuant to this theory.  Defendants Griffin and Hadnot are also liable pursuant to supervisor liability.

99.     Individual Defendants are not entitled to qualified immunity.[1]  Their denial of reasonable medical and/or mental health care, and other actions and/or inaction set forth in this pleading, caused, proximately caused, and/or were producing causes of Mitchell's suffering and death and other damages mentioned and/or referenced in this pleading, including but not limited to those suffered by Plaintiff and Claimant Heir.

100.   Therefore, Mitchell's estate and/or his heir(s) at law (Claimant Heir) suffered the following damages, for which they seek recovery, through Plaintiff, from Individual Defendants:

---

[1]   The defense of qualified immunity is, and should be held to be, a legally impermissible defense. In the alternative, it should be held to be a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted.  Congress makes laws. Courts do not.  However, the qualified immunity defense was invented by judges.  When judges make law, they violate the separation of powers doctrine, and the Privileges and Immunities Clause of the United States Constitution.  Plaintiff respectfully makes a good faith argument for the modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited.  Plaintiff includes allegations in this footnote to assure that, if legally necessary, the qualified immunity abrogation or limitation issue has been preserved.

- Mitchell's conscious physical pain, suffering, and mental anguish;

- Mitchell's medical expenses;

- Mitchell's funeral expenses; and

- exemplary/punitive damages.

101.    Plaintiff and Claimant Heir also individually seek and are entitled to all remedies and damages available to each such person individually for 42 U.S.C. § 1983 claims.  Plaintiff seeks such damages as a result of the wrongful death of her son; and Claimant Heir L.H. (minor son) seeks such damages for the wrongful death of his father,  Those damages were caused and/or proximately caused by Individual Defendants.  Therefore, their actions caused, were a proximate cause of, and/or were a producing cause of the following damages suffered by these people, for which they individually seek compensation:

- loss of services that Plaintiff would have received from Mitchell;

- expenses for Mitchell's funeral;

- past mental anguish and emotional distress suffered by Plaintiff and Claimant Heir resulting from and caused by Mitchell's death;

- future mental anguish and emotional distress suffered by Plaintiff and Claimant Heir resulting from and caused by Mitchell's death;

- loss of companionship and society that Plaintiff and Claimant Heir would have received from Mitchell; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Mitchell's constitutional rights.  Individual Defendants' actions and inaction showed a reckless or callous disregard of, or indifference to, Mitchell's rights and safety.  Moreover,

Plaintiff individually, and also on behalf of Claimant Heir, seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

        D.      Cause of Action Against City of Jasper Under 42 U.S.C. § 1983 for Violation of 14th Amendment Due Process Rights to Reasonable Medical/Mental Health Care, to be Protected, and not to be Punished

102.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant City of Jasper is liable to Plaintiff and Claimant Heir, pursuant to 42 U.S.C. § 1983, for violating Mitchell's rights to reasonable medical and/or mental health care, to be protected, and not to be punished as a pre-trial detainee.   These rights are guaranteed by the 14th Amendment to the United States Constitution.  Pretrial detainees are entitled to a greater degree of medical and mental health care than convicted inmates.  They are also entitled to be protected and not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration.

103.    City of Jasper acted or failed to act, through natural persons including Individual Defendants, under color of state law at all relevant times.  City of Jasper's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate causes of Mitchell's suffering, damages, and death, and damages suffered by Plaintiff and Claimant Heir.  Plaintiff incorporates by reference allegations regarding the appropriate chief policymaker made by Plaintiff in other portions of this pleading.

104.    City of Jasper was deliberately indifferent regarding policies, practices, and/or customs developed and/or used regarding issues addressed by allegations set forth above.  It also acted in an objectively unreasonable manner.  Policies, practices, and/or customs referenced above

were moving forces behind and caused violation of Mitchell's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur. City of Jasper's relevant policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to Mitchell.

105.    Therefore, Mitchell's estate and/or his heir at law (Claimant Heir) suffered the following damages, for which he seeks (through Plaintiff) recovery from City of Jasper:

- Mitchell's conscious physical pain, suffering, and mental anguish;

- Mitchell's medical expenses; and

- Mitchell's funeral expenses.

106.    Plaintiff and Clamant Heir also individually seek and are entitled to all remedies and damages available to each such person individually for the 42 U.S.C. § 1983 violations. Plaintiff seeks such damages as a result of the wrongful death of her son; and Claimant Heir L.H. (minor son) seeks such damages for the wrongful death of his father.  City of Jasper's policies, practices, and/or customs caused, were proximate and/or producing causes of, and/or were moving forces behind and caused the following damages suffered by these people, for which they individually seek compensation:

- loss of services that Plaintiff would have received from Mitchell;

- expenses for Mitchell's funeral;

- past mental anguish and emotional distress suffered by Plaintiff and Claimant Heir resulting from and caused by Mitchell's death;

- future mental anguish and emotional distress suffered by Plaintiff and Claimant Heir resulting from and caused by Mitchell's death; and

- loss of companionship and society that Plaintiff and Claimant Heir would have received from Mitchell.

Moreover, Plaintiff individually, and on behalf of Claimant Heir, seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

> E.      Causes of Action Against City of Jasper for Violation of Americans with Disabilities Act and Rehabilitation Act

107.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, City of Jasper is liable to Plaintiff and/or Claimant Heir pursuant to the Americans with Disabilities Act ("ADA") and federal Rehabilitation Act.  Upon information and belief, City of Jasper has been and is a recipient of federal funds.  Therefore, it is covered by the mandate of the federal Rehabilitation Act.  The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with mental and physical disabilities in their facilities, program activities, and services, and also reasonably modify such facilities, services, and programs to accomplish this purpose.  Further, Title II of the ADA applies to City of Jasper and has the same mandate as the Rehabilitation Act.  Claims under both the Rehabilitation Act and ADA are analyzed similarly.

108.    The Jasper jail is a "facility" for purposes of both the Rehabilitation Act and ADA, and the jail's operation comprises a program and services for Rehabilitation Act and ADA purposes.  Mitchell was a qualified individual for purposes of the Rehabilitation Act and ADA, regarded as having a mental impairment and/or medical condition that substantially limited one or more of her major life activities.  Mitchell was therefore disabled.  Upon information and belief, Mitchell was also discriminated against by reason of his disability.

109.    A majority of circuits has held, for Rehabilitation Act and ADA claims, that one may prove intentional discrimination by showing that a defendant acted with deliberate

indifference.  The Fifth Circuit has declined to follow the majority view.  Nevertheless, intent can never be shown with certainty.  Direct and circumstantial evidence can be used to support an "intent" jury finding, and allegations in this pleading show that there is more than enough of both.

110.    City of Jasper's failure and refusal to accommodate Mitchell's mental and/or medical disabilities while in custody violated the Rehabilitation Act and the ADA.  Such failure and refusal caused, proximately caused, and was a producing cause of Mitchell's suffering and death and Plaintiff's and Claimant Heir's damages.  City of Jasper's violations of the Rehabilitation Act and the ADA included the failure to reasonably modify facilities, services, accommodations, and programs to reasonably accommodate Mitchell's disabilities.  These failures and refusals, which were intentional, proximately caused Mitchell's damages and death, and Plaintiff's and Claimant Heir's damages.  Because Mitchell's death resulted from City of Jasper's intentional discrimination against him, Plaintiff and Claimant Heir are entitled to the maximum amount of compensatory damages allowed by law.  Plaintiff and Claimant Heir seek all such damages itemized in the prayer and or body in this pleading (including sections above giving appropriate and fair notice of Plaintiff's and Claimant Heir' 42 U.S.C. § 1983 claims and resulting damages) to the extent allowed by the Rehabilitation Act and/or the ADA, and Plaintiff and Claimant Heir also seek reasonable and necessary attorneys' fees and other remedies afforded by those laws.

IV.    Concluding Allegations, Jury Demand, and Prayer

111.    Plaintiff and Claimant Heir intend to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).  Plaintiff and Claimant Heir demand a jury trial on all issues which may be tried to a jury.

112.    Therefore, Plaintiff asks that Defendants be cited to appear and answer, and that Plaintiff and Claimant Heir have judgment for damages within the jurisdictional limits of the court and against all Defendants, jointly and severally, as legally available and applicable, for all damages referenced above and below in this pleading:

a)    actual damages of and for Frances Earline Sims, individually and as administrator of the referenced estate; and Claimant Heir L.H. (minor son), including but not necessarily limited to:

- loss of services that Plaintiff would have received from Mitchell;

- medical expenses for Mitchell;

- expenses for Mitchell's funeral;

- past mental anguish and emotional distress resulting from and caused by Mitchell's death;

- future mental anguish and emotional distress resulting from and caused by Mitchell's death;

- Mitchell's conscious physical pain, suffering, and mental health anguish; and

- loss of companionship and society that they would have received from Mitchell;

b)    exemplary/punitive damages for Plaintiff and Claimant Heir, from Individual Defendants (Todderick D. Griffin, Sterling Ramon Linebaugh, Heather Rene O'Dell, and Joshua L. Hadnot);

c)    reasonable and necessary attorneys' fees for Plaintiff and Claimant Heir, through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988, the ADA, and the Rehabilitation Act;

d)    court costs and all other recoverable costs;

e)    prejudgment and postjudgment interest at the highest allowable rates; and

f)      all other relief, legal and equitable, general and special, to which Plaintiff

and Claimant Heir are entitled.

Respectfully submitted:

Law Offices of Dean Malone, P.C.

_____/s/ T. Dean Malone_____
    T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:       (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Kristen Leigh Homyk
Texas State Bar No. 24032433
kristen.homyk@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:     (214) 670-9989
Telefax:         (214) 670-9904

Attorneys for Plaintiff