IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| FRANCES EARLINE SIMS, individually and as dependent administrator of, and on behalf of, the ESTATE OF STEVEN MITCHELL QUALLS and STEVEN MITCHELL QUALLS' heir(s)-at-law, | § § § § § § | |
| Plaintiff, | § § | CIVIL ACTION NO. 1:20-CV-00124 JURY DEMANDED |
| VS. | § § | |
| CITY OF JASPER, TEXAS; TODERICK D. GRIFFIN; STERLING RAMON LINEBAUGH; HEATHER RENE O'DELL, and JOSHUA L. HADNOT, | § § § § § | |
| Defendants | § § | |

**DEFENDANTS, CITY OF JASPER, STERLING RAMON LINEBAUGH, TODERICK GRIFFIN, HEATHER O'DELL and JOSHUA L. HADNOT'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, **CITY OF JASPER** ("Jasper" or "Defendant(s)"), **STERLING RAMON LINEBAUGH** ("Linebaugh" or "Defendant(s)"), **TODERICK GRIFFIN** ("Griffin" or "Defendant(s)"), **HEATHER O'DELL** ("O'Dell" or "Defendant(s)") and **JOSHUA L. HADNOT** ("Hadnot" or "Defendant(s)"), Defendants in the above-referenced cause, and files this their FRCP 56 Motion for Summary Judgment, and in support thereof, respectfully show as follows:

**NATURE AND STAGE OF THE PROCEEDING**

1.      On or about March 30, 2020, Plaintiff filed her 57-page Civil Rights Original Complaint.  *See* Doc. 1.

2.      The Original Complaint alleges against Defendants herein a 42 U.S.C. §1983

claim based on alleged violations of the Fourteenth Amendment to the U.S. Constitution (i.e., alleged inadequate medical care thru episodic acts/omissions and conditions of confinement), a Rehabilitation Act of 1973 claim ("Rehabilitation Act"), and an Americans With Disabilities Act claim ("ADA"), all allegedly arising out of Steven Qualls' ("Qualls") alleged 34 hour detention in the detoxification cell at the Jasper City Jail. *See* Doc. 1.

3.     On or about April 22, 2020 and May 8, 2020, respectively, Defendants filed their Motions to Dismiss Plaintiff's Original Complaint. *See* Docs. 9 and 12.

4.     From May 13, 2020 to June 4, 2020, Plaintiff filed her Responses, Defendants Replied, Plaintiff provided Sur-Replies, and most of the Defendants filed their Sur-Sur-Reply. *See* Docs. 14-15, 19-22 and 24.

5.     On, September 14, 2020, the Court granted, in part, Defendants' Motions to Dismiss, with respect to Plaintiff's Failure to Train, ADA and Rehabilitation Act claims; and thus, what remains are the 42 U.S.C. §1983 claims based on alleged violations of the Fourteenth Amendment to the United States Constitution (i.e., alleged inadequate medical care based upon episodic acts/omissions and conditions of confinement). *See* Doc. 39.

6.     As the deadline for dispositive motions is January 22, 2021, Defendants file their comprehensive/collective[1] FRCP 56 Motions for Summary Judgment. *See* Doc. 29.

## STATEMENT OF UNDISPUTED FACTS[2]

7.     Plaintiff, Mrs. Frances Sims, Mitchell Qualls' mother, currently resides in Woodville, Texas, and prior to that, Silsbee and Fred, Texas. *See* Ex. "A," p. 5:7-16 and 6:23-8:1.

8.     Mrs. Sims has numerous relatives in Tyler and Hardin Counties. *See* Ex. "A," p. 9:4-

---

[1] Instead of filing separate FRCP 56 Motions for Summary Judgments of up to 30 pages each for each of the five Defendants, Defendants have filed one comprehensive Motion for Summary Judgment on behalf of all five Defendants herein.

[2] The Statement of Undisputed Facts is taken from Exhibits "A" – "U," and "1"- "10," and some of Plaintiffs Complaint (Doc. 1), as referenced, which are incorporated herein by reference as if set forth at length herein.

11, 11:15-19, 12:17-13:22, and 14:18-17:2 and 38:1-9.

9.      Mrs. Sims admitted there were more than a couple of occasions in which she requested police assistance in dealing with her son, and she was read a number of police incident reports (over 30) beginning on May 29, 2011, where she needed police assistance in dealing with Qualls, leading up to the time of his death; and although she could not confirm the dates of these reports, she did not really deny any event listed in these reports (sometimes she just said she did not recall some of them), and confirmed many of them.  More specifically, she confirmed a number of incidents including:  requesting criminal trespass warrants to keep Qualls away from her home, or when he would be released from jail; calling the police a number of times to have Qualls removed because he would not leave her property or was intoxicated; telling various hospitals a number of times that Qualls was not welcome at her home and he was not going to get in her car after he had used methamphetamines; and calling the police to have him arrested.  *See* Ex. "A," p. 42:14-61:13.

10.     Mrs. Sims testified that in addition to Jasper and Tyler County, Qualls had been arrested in Hardin, Jefferson, Liberty and possibly, Polk, County.  *See* Ex. "A," p. 73:12-20.

11.     Mrs. Sims testified that, in January of 2019, the Thursday before his death, Qualls had been released from the Tyler County Jail and had moved back home with her and stayed with her until Sunday evening.  Sunday evening, Qualls had wondered off down the road and came back intoxicated and he complained of chest pain.  When Mrs. Sims offered to take him to the Beaumont Hospital, Qualls stated he wanted to go to the Jasper Hospital.  Later, as she started to turn into the Jasper Hospital, Qualls changed his mind and stated he wanted to be taken to the law, the Jasper County Sheriff's Department; so, she dropped him off there, and went back home. *See* Ex. "A," p. 30:4-15, 31:3-33:12.

12.     Mrs. Sims also testified, after that, she did not know where he went, but she next heard from him on Monday (during the day), January 28, 2019, when he called her from a cell phone in an intoxicated state, and he said he was on FM 777, and asked her to come get him.  She responded, "Mitchell, you know in your state of mind right now, what you're on, under the influence, you and I can't be around each other." She also said, "So, I'm telling you now, I cannot come get you," and/or "Mitchell, you know I cannot come get you as long as you're in the shape you're in." Mrs. Sims did not speak to him after that.  *See* Ex. "A," p. 33:13-34:11 and 61:14-62:5.

13.     Acadian Ambulance Services records indicate that on January 28, 2019, at around 4:06 P.M., one of their EMS units was dispatched to 4391 FM 777 in Jasper County, Texas in reference to Qualls, whom they checked out and transferred to Jasper Memorial Hospital arriving at about 4:36 P.M.  Treatment was eventually halted by EMS when Qualls got agitated, and was hallucinating and refusing any treatment, other than simply transportation to the hospital.  Although there is no evidence that any officer was able to review Qualls Acadian Ambulance Services records, those records reflect a Chief Complaint of Intoxication, and except for "unconfirmed" sinus tachycardia (faster than normal heart rate) his ECG was normal, as were most all of their other medical findings (i.e. – normal breathing, lungs, circulation, skin, temperature, mental status, neurological, respiration, etc.) with no pain, and he was originally found walking in the front yard, awake and alert in no obvious distress, and he was transported without lights and siren. *See* Ex. "B," Medical Records Affidavit for Acadian Ambulance Service and attached Prehospital Care Report

Summary, dated 1/28/2019, p. 1-5, from Acadian Ambulance Service.

14.     Around 4:37 P.M. on January 28, 2019, Jasper P.D. Officers Scoggan, Oberlecher, and Detective Hudson were dispatched to Jasper Memorial Hospital ambulance bay regarding an aggressive/combative 28-year-old male patient in an ambulance, later identified as Qualls from prior encounters, and it was discovered, when they arrived, he was not combative, and he was calm, and he was transferred to a hospital bed in room 9.   Scoggan, Hudson and Oberlechner then left, and at about 5:05 P.M., Scoggan was notified by dispatch that Acadian was requesting officers to return to the Hospital because Qualls had allegedly become disruptive, and so, Scoggan and then, Oberlechner (around 5:12 P.M.) returned to the hospital.   Around 5:50 P.M., as shift change was approaching, Scoggan asked Officer Oberlechner to Contact the Sheriff's Office for some help, because Qualls was originally picked up outside the Jasper City limits. *See* Doc. 1, Plaintiff's Original Complaint,[3] ¶¶ 43, 48, 63-65.

15.     At around 6:40 p.m., City of Jasper Officers Griffin and Linebaugh arrived at Jasper Memorial Hospital to deal with Mr. Qualls, and Griffin explains Jasper P.D.'s, and Tyler County's, history with Qualls, and him not wanting to leave the hospital when he is ready to go, and his possibly being arrested for criminal trespass, which they do not want to do. (18:40:44-18:41:32).  When they enter the Hospital E.R. area, they observe Deputy Abshire from the Jasper County Sheriff's Office talking to Qualls about not making any more calls to the Jasper County Sheriff's Office (6 times), and he advises Qualls that once he is discharged, he needs to call someone to come get him, or start walking. (18:42:00- 18:43:25 and 19:06:30-19:06:50).  Griffin asks if Qualls has been discharged, but a nurse says that, because he has been given Ativan, he has to have a ride.  (18:43:26-18:44:00).  The nurse and Abshire try to get information so they can get someone out there to pick him up. (18:44:00-18:45:30).  Eventually, someone gets Qualls' mother on the phone and Sgt. Griffin talks to her about picking Qualls up, and then, Griffin hands the phone to Abshire, and goes over to talk to Qualls about getting a number from Qualls for someone to pick him up. (18:45:31-18:50:00).  Abshire continues to talk to his mother, explains the situation, and that law enforcement cannot give him a ride, and Abshire finally says alright, that's fine, but I need to get off the phone here so I can find him a ride.  (18:47:30-18:50:45).  Abshire eventually hangs up the phone and tells Qualls that his family is done with him. (18:50:45-18:51:20).  Abshire leaves and returns stating he has received word from his superiors (way high up) that he cannot take responsibility for him, or give Qualls a ride anywhere, and can't do nothing.  (18:51:40-18:55:20).  The ER physician eventually comes out and tells Qualls that he needs to either chill and go back in his room and lay down, or someone has got to pick him up and take responsibility for him, because he is intoxicated and will be arrested if he runs out of here. (18:56:30-19:01:15).  Abshire patiently spends a long period of time talking to Qualls, and is eventually able to talk Qualls back into his room and get him to sit down and relax, and he further explains the situation, with Griffin and Linebaugh assisting some, and the Officers then left.  (19:03:50-19:35:00).  During this interaction with Qualls his speech is not great and his thoughts are delayed, but he also made some clear statements like: "I want to tell you something brother;" and "Yea, I told, I want to go to the County not the City;" and "they say I ain't got no family and this and that," and otherwise converses with Abshire throughout the video (18:57:27-18:58:00 and video generally).  It is mentioned that Qualls has black all over his mouth, or his mouth

---

[3] Defendants reference Plaintiff's Original Complaint, as undisputed, only for the statement of fact asserted herein *and* referenced by paragraph herein, in Plaintiff's Original Complaint, and not with respect to any other portion of Plaintiff's Original Complaint.

is stained black, or that he looks like he possibly ingested charcoal or crayons, and it is also mentioned that the Burke Center won't take him. (18:55:16-18:56:00 and 19:04:57-19:05:05 and 19:10:35-19:11:00). *See* Exs. "C," Toderick Griffin Body Cam Video, No. 201901281840 WFC1-041284 and "D," Sterling Linebaugh Body Cam Video, No. 201901281840 WFC1-041910.

16.     Around 8:30 p.m., Officers Griffin and Linebaugh were dispatched, and arrive, back at the hospital, because Mitchell would not stay in his room, was agitated and was talking to his reflection in the ER glass doors. (20:30:00-20:31:00). Upon entry, Mitchell is standing in the doorway to his room and Griffin asks if Qualls has been discharged. (20:31:01-20:31:44). A few minutes later, there is a discussion among medical staff, and they conclude that Qualls needs to be kept at the hospital for 4 hours; so, he has about an hour to go. (20:33:17-20:33:50). Otherwise, Griffin is standing by, as Linebaugh patiently deals with Qualls including: asking him to step inside his room; asking if he is ready to go home; offering him a seat; asking him to lay down and relax; asking if he has a phone number for someone to come get him; asking if he is hungry and wants to eat the sandwich and water provided; informing him he has about an hour to go before his release; and eventually Linebaugh steps out of the room and tells Qualls not to move from the doorway. (20:32:00-20:49:00). During this time, the E.R. physician asks if his Mom will come get him, or would his Mom like Griffin to give Qualls a ride home, and Griffin responds, "No, No, he has been criminally trespassed from her house, he can't go back …" (20:36:15-20:36:35). Griffin and Linebaugh stand at the E.R. counter, or near it, and watch Qualls stand in the door way to his room. (20:49:00-20:51:06). Griffin eventually decides to leave, and tells Linebaugh to stay behind for about ten minutes, and observe him from a distance, to see what he is going to do, and if Qualls doesn't move, to just leave, as they cannot arrest him, because he is not a danger yet, and hasn't committed a crime yet, and then, Griffin leaves. (20:51:06-20:53:30). Linebaugh remains behind and observes Qualls, who does not move from the doorway to his room, and then, Linebaugh leaves. (20:53:31-20:57:36). *See* Exs. "E," Toderick Griffin Body Cam Video, No. 201901282029 WFC1-041284, and Ex. "F," Sterling Linebaugh Body Cam Video, No. 201901282030 WFC1-041910.

17.     Around 9:52 p.m., Officers Griffin and Linebaugh are dispatched to the hospital about Qualls being discharged, but refusing to sign his papers and leave. (21:52:44-21:53:00). Griffin gathered his discharge papers, Linebaugh informed Qualls he has been discharged, gathered his coat, and told Qualls that he can't stay at the hospital, and they escorted him out of the ER doors toward their police units. (21:52:45-21:53:43). The door to a police vehicle is opened, and Qualls is repeatedly offered a ride by Griffin anywhere in the County, they repeatedly ask where he wants to go, and Griffin even suggests that Qualls sit in the car to get out of the rain and think about it, and Linebaugh again states he cannot stay here; it is also suggested by Linebaugh that Qualls could choose to just walk, and they both repeatedly ask if he wants a ride, or to walk. (21:53:45-21:57:30). Qualls does not accept the ride; so, they shut the car door, give him his papers and coat, and tell him not to go back inside the hospital. (21:57:30- 21:58:02). The Officers back off, and drive to the back of the parking lot, to observe Qualls, to see if he starts walking, and make sure he was safe in doing so. (21:58:30-21:59:53). Griffin then notices, and asks, if Qualls is at the E.R. door, and then notices and asks if they opened the door. (21:59:54-22:00:33). *See* Ex. "G," Toderick Griffin Body Cam Video, No. 201901282152 WFC1-041284 and Ex. "H," the Affidavit of Heather O'Dell, p.2.

18.     According to Dispatcher O'Dell, a nurse called dispatch and explained that Qualls keeps pressing the E.R. button outside the door and it sets off an alarm, and the only way they can

turn off the alarm is by opening the door, and she stated they wanted him off the property, as he has been seen, and treated and needs to go. *See* Ex. "H," p. 2.

19.     Griffin and Linebaugh each exit their patrol vehicles around 10:05 P.M., and met up with each other, and approach Qualls, and arrest and handcuff Qualls without incident; Griffin asks Qualls why he couldn't just leave this hospital and go to where he needs to go to; Qualls is then walked to Griffin's patrol vehicle, and placed in same, and Linebaugh collects Qualls jacket and discharge paperwork, which he finds on the ground and wet, and they depart. (22:05:18-22:07:57). Around 10:07 P.M. Griffin advises dispatch Qualls was in custody for Public Intoxication and in route to Jasper P.D. Ex. "I," Toderick Griffin Body Cam Video, No. 201901282205 WFC1-041284, and Ex. "J," Sterling Linebaugh Body Cam Video, No. 201901282204 WFC1-041910 and Ex. "H," Affidavit of Heather O'Dell, p. 2, and Ex. "K," Probable Cause Affidavit of Toderick Griffin.

20.     Other than observing that Qualls was intoxicated, or under the influence of, some drug, and other than being advised that they had treated Qualls with Ativan, and that somebody with authority needed to pick him up when medically discharged, the videos do not reveal that any Officer was informed of anything by the Hospital staff that they needed to be medically aware of, as far as any medical conditions for them to watch out for.  Further, the Hospital medical records indicate a primary impression of agitation and a secondary impression of tachycardia which got better before release, and there was a differential diagnosis of potential methamphetamine abuse versus other substance abuse, and blood labs, EKG and vitals were taken, I.V. fluids and Ativan were given, and a complete physical exam, circulatory assessment and respiratory assessment (all with normal findings), and various other assessments were made, with  no current suicidal tendencies, and accordingly, Qualls was medically discharged and he was no longer tachycardic and was neurologically intact and walking with a steady gait, with departing instructions of self-care and to follow up with a doctor in 2-3 days and to not use illegal substances. *See* Ex. "L," Medical Records Affidavit and partial attached medical records pertaining to Qualls' 1/28/2019 visit to Jasper Memorial Hospital, p. 1-67.

21.     Qualls arrived at the Jasper City Jail with Griffin and Linebaugh around 10:09 p.m. Officer Linebaugh begins the book in process by asking him medical questions from the questionnaire, to which Qualls primarily responds in the negative, including that he does not have a drug addiction, or any diseases, and is not currently on medications or prescriptions nor does he have any current medical problems that need treatment.  When asked about his mental health, Mitchell only responds that he *"tried"* to go to Burke after Linebaugh suggested Burke, and Qualls states in response to another question regarding whether he had ever been admitted to a mental facility like Burke, "No."  He also stated he was not thinking of committing suicide and had not ever attempted suicide, and never had PTSD.  The completed Book-In Medical Form questionnaire reflects that he has never been tested for, or had: asthma, heart trouble, hypertension, diabetes, epilepsy, drug addiction, alcoholism, venereal disease, tuberculosis, HIV/AIDS or hepatitis.  The Book-In Medical Form also reflects Mitchell is "intoxicated badly."   Griffin then removes Mitchell's shoes and searches Mitchell, including searching his socks and around the bottom of his pant legs, turning his pockets inside out, and checking his waist line, and removing his belt, and searching his shirt, and other known compartments on his clothing, and neck/collar area, and removed everything he found. Mitchell was allowed to stay in his own clothes and is not dressed out. *See* Ex. "1," Jail Video 20190128-2200_20190130-0300.avr,  22:09:33-22:17:23  and Ex. "M,"  Jasper P.D.  Records

Custodian Affidavit, including Book-In Medical Questionnaire for Qualls.

22.    Around 10:17 P.M., Qualls is placed in the detox cell by Griffin and Linebaugh, and walks into the cell, and around 10:19 P.M. Griffin provides him a cup of water, and Linebaugh finishes his paperwork.  Mitchell calls out "Sir," to Linebaugh multiple times around 10:22 P.M., but does not otherwise say anything understandable, and Linebaugh asks, "What's up?  and also states, "… got some water there for you."    Linebaugh leaves a few minutes later.  *See* Ex. "1," 22:17:24-22:26:13.

23.    Around 11:30 P.M., Qualls attempts to talk, or ask question(s) of, dispatcher O'Dell as she passes through book-in, and she responds that he is there because of public intoxication and being under the influence of something, and it is best if he would lay down and rest, and sleep off, whatever he has got going on with him. *See* Ex. "1," 23:30:30-23:31:26.

24.    Around 11:37 P.M., Qualls again speaks to O'Dell, and she responds that he will not be allowed to make a phone call until he comes down from whatever he is on and can speak, and she repeatedly says he needs to just lay down, and he won't be able to make a call right now.  *See* Ex. "1," 23:37:07-23:39:15.

25.    Around 11:48 P.M., Griffin enters the book-in area through the back door and looks at Qualls' cell and asks Qualls if he is good; and although Qualls does not verbally respond, he has his hand out of the meal slot and wiggles his fingers and moves his hand, and Griffin walks off.  *See* Ex. "1," 23:48:32-23:48:56.

26.    Around 12:06 A.M., Officer Linebaugh walks in the back door and through book-in, and Qualls mumbles something, and Linebaugh responds, "Yeah?" with no further response from Qualls, and his hand still out of the meal slot.  *See* Ex. "1," 00:06:04-00:06:19.

27.    Around 12:08 A.M., Linebaugh comes back through the book-in area and asks Qualls if he is doing alright and Qualls mumbles something and says he needs some water, and Linebaugh responds, "You need some water? Here it is right here, man," and pushes the cup of water already on the meal slot ledge closer to Qualls, and goes back to dispatch. *See* Ex. "1," 00:08:32-00:08:55.

28.    Around 12:10 A.M., Linebaugh is walking through book-in and Qualls gets his attention, and Linebaugh asks "Yes?" and approaches the meal slot, bends down to listen closely to Qualls, and responds, "Yes, we are going to get you a call tomorrow, and here is your water right here," and walks off toward the back door.  *See* Ex. "1," 00:10:00-00:10:30.

29.    Around 3:20 A.M., Qualls says, "Sir?" to Griffin, who is behind the desk in book-in, and Griffin responds, "Huh?" and Qualls does not respond; so, Griffin asks, "What's up?, and Qualls mumbles, and Griffin responds, "Huh?' and "Come on, spit it out for me," and Qualls does not respond, and Griffin goes back to assisting with another detainee. *See* Ex. "2," Jail Video 20190128-2200_20190130-0300-1.avr, 03:20:50-03:21:18.

30.    Around 3:22 A.M., Qualls mumbles and Griffin responds, "What's up man?" and Qualls mumbles, and Griffin says, "Huh?" and Qualls says, "I want to ask you something, …" and

Griffin responds, "Mr. Mitchell [or Miller] don't work here buddy." *See* Ex. "2," 03:22:14-03:22:27.

31.     With no one in the book-in area, around 4:38 A.M., Qualls yells he needs a hospital to look at his legs, and a little over two minutes later, he generally yells "Help" a couple of times, and around 40 seconds later Officer Griffin comes back into the book-in area and asks, "Qualls, what is your issue man?" and Qualls does not respond; so, Griffin exits the back door. *See* Ex. "2," 04:38:22- 04:41:45.

32.     Around 5:36 A.M., Qualls knocks the cup of water over onto the food slot ledge and then, onto the floor, and the cup, both when it tips over, and hits the floor, sounds like it is empty, indicating Qualls drank his water.  *See* Ex. "2," 05:35:55-05:36:38 and 03:57:08 (pulls cup into cell).

33.     Around 5:37 A.M., Griffin enters the back door and walks into the book-in area and says, "Qualls," and looks back at his cell to see Qualls' arm out of the food slot and moving, and he looks at some paper work, and exits the back door. *See* Ex. "2," 05:36:50-05:37:32.

34.     Around 6:03 A.M., Jack Armstrong (janitor) walks by and asks Qualls, "Are you all right?"  Although Qualls does not appear to answer, he moves his hand which is partially out of the food slot. *See* Ex. "2," 06:03:23-06:03:35.

35.     Around 6:07 A.M., Dispatcher Rusty DeLome enters the book-in area, and Qualls asks her a question, as she approaches the meal slot and gives him his breakfast, and she leans forward and attempts to listen, as he mumbles, and she responds, "You're in Jail ... for public intoxication." She also states, "Eat your breakfast it is warm," and he mumbles, and she says, "What?" and he mumbles, and she says "Do what?" and he mumbles, and she finally looks back and says, "Hey Steven, go to sleep, okay," and goes back toward dispatch. *See* Ex. "2," 6:07:50-6:08:27.

36.     Around 6:50 A.M, Qualls beats on the door repeatedly and yells, "Dispatch" and Dispatcher DeLome, from the dispatch area, yells back, "What?" and Qualls softly mumbles something, but never responds loudly, or in a particular way that can be heard or understood, and he is still periodically moving with his arm hanging out the food slot. *See* Ex. "3," Jail Video 20190128-2200_20190130-0300-2.avr, 06:50:04-06:50:40.

37.     Around 7:25 A.M., Court Clerk Patsy Stephenson walks by, and Qualls says, "Mam?" and she says she cannot hear him and Qualls mumbles something and she says, "Huh?" and she moves closer, but Qualls says nothing that can be heard, and then mumbles, and she moves on to perform her duties. *See* Ex. "3," 07:25:10-07:25:34.

38.     Around 7:36 A.M., Officer Oberlechner walks through book-in, and Qualls says something to him, and Oberlechner says, "Hey" and walks closer to his cell and says "Huh?" and "Are you going to ask me about Sgt. Hudson again," and Qualls mumbles.  Oberlechner again responds, "Huh?" and states "You were rambling yesterday about Sgt. Hudson," and Qualls does not respond at all, and Oberlechner responds, "Alright, have a good day," and Qualls mumbles as Oberlechner turns and walks out the back door. *See* Ex. "3," 07:35:57- 07:36:24.

39.     Around 8:06 A.M., Officer Peters has arrived and asks Qualls what's going on, twice,

and Peters looks at the cell and awaits a response, but Qualls either just softly mumbles something and/or gives no response at all, other than moving his arm outside the food slot.  *See* Ex. "3," 08:06:35-08:07:00.

40.     Around 8:18 A.M., Peters ask Qualls, "What's up Steven? What's going on man? Hey, talk to me," and Qualls mumbles something softly.  Peters also tells Qualls, "Steven you have got to stop doing this stuff man."  Qualls mumbles something and Peters responds, "No, I don't hear anybody, but you and me and Mr. Jack.  Jack Armstrong asks how long he has been like this, and Peters responds, "He has been that way for a while … he has been in there 2 or 3 days before just like this. *See* Ex. "3," 08:18:00- 8:19:35.

41.     Around 8:51 A.M., Jack Armstrong asks, "How long will it take for him to come off that stuff," and Peters responds, "One of the last times he was in here it took 3 days."  Next, other Officers come in and they, and Peters, tell Qualls they need to close the meal slot up for juveniles, and Peters tells Qualls he needs to put his arm inside, or move his arm, because they need to close it up.  *See* Ex. "3," 08:51:43-08:52:26.

42.     Around 8:53 and 8:55 A.M., while they are processing juveniles, Qualls beats on the cell door and Peters tells him to just wait a minute.  *See* Ex. "3," 08:53:53- 08:55:28.

43.     Around 9:20 A.M., Peters enters through the back door and walks into the book-in area and looks through the detox cell window, checking on Qualls and then, exits the book-in area. *See* Ex. "3," 09:20:10-09:20:30.

44.     Around 10:51 A.M., Peters enters the book-in area and makes a quick glance into the detox cell window of Qualls, cell, and then, stands there for a while with his back to the cell door, and Qualls never says anything to Peters.  *See* Ex. "4," Jail Video 20190128-2200_20190130-0300-3.avr, 10:51:30-10:53:05.

45.     Around 12:37 P.M., Peters enters the book-in area with lunch for Qualls, asks Qualls if he is hungry several times, Qualls says yes, and Peters places his food on the meal slot ledge and says "here" and later says, "There is some food right there."  Peters also says, "You need to eat man, it will help you come down, so the judge can see you and then you can get out," "you need to eat." Finally, Peters says, "Hey Steven, why don't you eat man so the judge can see you later on," and "Food will help you come down from whatever you're on."  *See* Ex. "4," 12:36:56-12:38:28.

46.     Around 1:15 P.M., Peters comes into the book-in area and goes to the detox cell door and asks, "Are you going to eat Steven?"  Qualls mumbles and Peters says, "Huh?" with no response from Qualls; so, Peters collects the food and shuts the food slot door. *See* Ex. "4," 13:14:57-13:15:27.

47.     From Around 1:22 to 2:08 P.M., Peters is dealing with booking in a new female arrestee, and managing another female detainee as she cleans.  *See* Ex. "4," 13:22:00-14:08:21.

48.     From around 2:09 to 6:07 P.M., Peters and other officers are dealing with booking in numerous arrestees and Peters is also taking arrestees before the Judge, and then, allowing them to make their phone calls.  It is also determined by Peters that Qualls is in no condition to see the Judge,

and the dispatchers can be heard discussing Qualls and others during shift change.  *See* Ex. "5," Jail Video 20190128-2200_20190130-0300-4.avr, 14:09:29-18:07:00.

49.    Around 6:07 P.M., Officer Griffin enters the book-in area with Qualls' dinner, and places it on the desk counter, and looks into the detox cell window several times, and Qualls is still leaning against the front door.  *See* Ex. "6," Jail Video 20190128-2200_20190130-0300-5.avr, 18:07:27-18:08:00.

50.    Around 6:15 P.M., Griffin walks back into book-in and looks into the detox cell door window for about 18 seconds, and Linebaugh walks up and says, "He was spitting a while ago," and Griffin says, "In about 3 days he will be good."  They also give him his food.   *See* Ex. "6," 18:15:15-18:15:55.

51.    Around 7:06 P.M., vomit starts to appear beside Qualls.  *See* Ex. "6," 19:05:53.

52.    Around 7:20 P.M., Hadnot enters the book-in area from dispatch and checks on Qualls by looking into his cell door window for about 22 seconds, and Qualls is on all fours and moving around.  Dispatcher O'Dell, says, that food is in there, and asks, "Has he eaten?"  Hadnot asks, "Is that his on the counter right there?"  and O'Dell says no, that is from lunch, but Griffin gave him another one."  Hadnot says it looks bad, and to have it looked at, and Hadnot states he is taking off.  *See* Ex. "6," 19:20:45-19:21:48.

53.    Around 7:35 P.M., O'Dell comes into the book-in area to check on Qualls, and looks into the cell door window for about 3 seconds, and calls out, "Steven," and knocks on the cell door several times.  Qualls responds, "What?"  O'Dell asks, "What are you doing?  What are you laying in?"  Qualls response cannot be understood, but O'Dell says, "Okay … I need you to roll over."  Qualls mumbles something and she says, "Steven … Did you throw up?" and "Steven … can you roll over?"  Qualls pushes up with his right hand, but does not roll over, and she asks Qualls to look at her and again asks, "Did you throw up?"  She again asks, "Okay, can you roll over and get out of it … roll over and get out of it."  She also states, "I have officers coming okay."  Qualls says, "What?"  She responds, "I have officers coming," and walks off. Qualls has positioned his head away from the vomit.  *See* Ex. "6," 19:35:23-19:37:04.

54.    Around 7:41 P.M., Linebaugh arrives through the side door and immediately looks through the cell door window for about 55 seconds, and Qualls is lying flat on his stomach next to the vomit.  At 7:42 P.M., Griffin arrives through the back door and he looks in the window for about 9 seconds.  They discuss what Qualls possibly ate, and Linebaugh asks if there is a need to go in there, and Griffin suggests that they go in there and try to roll him out of it, and put him on the bed and clean it up. Finally, Linebaugh suggests he can walk because he was not detoxing that hard.  *See* Ex. "6," 19:41:13-19:43:20.

55.    Around 7:43 P.M., they get ready to enter, and discuss getting him on his bed and keeping him there while they mop, and O'Dell asks if it is vomit, and Linebaugh responds that he has no idea, but we are going to find out, and Griffin says, but it is nothing he can't live with.  *See* Ex. "6," 19:43:30-19:44:13.

56.     Around 7:45 P.M., both Linebaugh and Griffin enter the cell, and Linebaugh says, "Hey … Man, what are you laying in?"  Linebaugh looks at something behind the partitioned off toilet area (possibly Qualls' dinner), and returns, and tells Qualls they are going to put him on the bed, and both officers position themselves to lift and move Qualls, with Linebaugh on the right and Griffin on the left.  They lift and slide Qualls over to the pad a few feet away, as Qualls screams for no known reason, and Griffin grabs the mop and starts cleaning the vomit up.  Griffin and Linebaugh ask Qualls if he threw up on the floor and Qualls responded that he has been throwing up, and Griffin asked Qualls twice what he ate yesterday, with no response from Qualls.  *See* Ex. "6," 19:45:45-19:47:30.

57.     Around 7:47 P.M., outside of the detox cell, there is a discussion between Griffin Linebaugh and O'Dell about why Qualls possibly threw up; including what he ate at the jail (which was discounted as he had not eaten what had been provided), and in the end, Griffin, and they, appeared to primarily suspect that Qualls had consumed charcoal at the house before EMS was called and this made him throw up, and Griffin concluded it looks like he probably ate some charcoal, and O'Dell further noted, she thinks he threw up the black stuff last time he was in jail.  In any event, Griffin stated that Qualls is starting to detox, to come down, and that he is going to be like this for a while, and that Qualls can throw up again, and they will come back and clean it up.  *See* Ex. "6," 19:47:38- 19:48:45.

58.     Around 9:30 P.M., Griffin comes into book-in through the back door and looks into Qualls' cell door window for about 20 seconds, and then, walks toward dispatch.  At this time, Qualls is moving around and rubbing the left side of his head, and moving his head and upper body and still laying on his stomach on the mat.  *See* Ex. "6," 21:30:23-21:31:00.

59.     Around 9:44 P.M., Griffin comes back into the book-in area from dispatch, and walks up to Qualls' cell, and briefly looks in the window, and Qualls is in a similar position, with movement, and Griffin exits the side door.  *See* Ex. "6," 21:44:07-21:44:18.

60.     Around 10:31 P.M., Qualls starts throwing up to his left, and in a normal tone, says, "Hello."  During this time, O'Dell has been in the utility room with the dryer running and starting the washing machine, and there is no indication she heard Qualls.  *See* Ex. "7," Jail Video 20190128-2200_20190130-0300-6.avr, 22:30:00-22:31:45.

61.     Regardless, less than 30 seconds later, O'Dell returns and looks into Qualls' cell through the window for about 6 seconds, and she quickly walks back to dispatch.  At this time, Qualls is still on the mat, and moving.  *See* Ex. "7," 22:31:58-22:32:09.

62.     Around 10:44 P.M., Griffin enters book-in through the side door and looks inside Qualls' cell door window for about 10 seconds.  Around 10:49 P.M. Linebaugh also enters book-in through the side door and looks through the window for about 10 seconds.  During this time, Qualls is moving and still on the mat on his stomach.  *See* Ex. "7," 22:44:18-22:50:10.

63.     Around 10:50 P.M., Griffin and Linebaugh get together, put on their gloves and discuss Qualls' and what they are going to do, and Griffin gets the mop, they enter the cell and Linebaugh informs Qualls they are going to move him back.  Linebaugh pulls Qualls by his feet,

back a few inches away from the vomit and Qualls yells for no known reason. Linebaugh next reaches under each arm, and lifts Quals' torso up, and scoots Qualls to the center of the mat, while Griffin mops, and Linebaugh exits the cell. *See* Ex. "7," 22:50:07-22:52:20.

64.     While mopping, Griffin notices something remaining on the floor, and bends down to look at it, and as Linebaugh returns to the cell with paper towels, Griffin points it out to Linebaugh. Linebaugh walks toward Qualls, and tries to wipe the vomit off of the side of his face and head, as well as his arm, shirt and other parts of his body. *See* Ex. "7," 22:52:24-22:53:50.

65.     Around 10:54 P.M., Griffin and Linebaugh exit the cell, with Griffin carrying the mop and what he just found on the floor, and asks, Linebaugh, "What do you think?" Griffin eventually walks over to the trash can to inspect it, and Linebaugh and Griffin communicate (can't understand what they are stating), with Griffin eventually stating, he thinks Qualls will be fine, as he is going to "throw the rest of that shit up." Linebaugh asks Griffin, do you think it is possible that he called the ambulance, and he swallowed it before they got there? *See* Ex. "7," 22:54:00-22:55:22.

66.     Around 1:36 A.M., Griffin comes into the book-in area through the side door and goes directly to Qualls' cell and looks through the cell door window for about 10 seconds, and walks out the back door. At this time, Qualls is still on his stomach, on the mat, and moving around. *See* Ex. "7," 01:36:39-01:37:06.

67.     Around 2:12 A.M., Linebaugh enters book-in from the back door and goes directly to check on Qualls for about 3-5 seconds, and then, exits toward dispatch. During this time frame, Qualls is still on his stomach, on the mat, and moving around. *See* Ex. "7," 02:12:25-02:12:53.

68.     From about 2:38-2:40 A.M., Qualls coughs a few times and heaves, and he spits up a little bit, as there appears to be a small dark spot to the left of his ear. A few minutes later, around 2:43 A.M., Griffin comes in the side door into the book-in area and goes directly to look in on Qualls through the cell door window for about 25 seconds, and then, he walks off and exits the back door. During this time, Qualls is still on his stomach on the mat, and moving around. *See* Ex. "8," Jail Video 20190128-2200_20190130-0300-7.avr, 02:38:36-02:41:00 and 02:43:00-02:43:42.

69.     Around 2:53 A.M., Qualls appears to discover the small spot he spit up, which was for the most part hidden under his left shoulder area, and he uses his left hand to rub it across the floor for about 3 minutes, until only a faint outline remains. *See* Ex. "8," 02:53:15-02:57:24.

70.     Around 4:03 A.M., Griffin walks into book-in through the side door and goes directly to look in on Qualls for about 5 seconds, and then walks off toward the dispatch area. During this time, Qualls is still on his stomach, on the mat and moving. *See* Ex. 9, Jail Video 20190130-0230_20190130-1111.avr, 04:03:28-04:03:44.

71.     Around 4:32 A.M., Linebaugh enters the back door and goes directly to Qualls' cell and looks through the cell door window for about 5 seconds, and then, walks off toward the dispatch area. During this time, Qualls is still on his stomach, on the mat and moving. Upon entry, Officer Linebaugh even appears to be closing the door slowly and quietly so as not to potentially wake Qualls. *See* Ex. "9," 04:32:00-04:32:25.

72.     Around 5:10 A.M., Griffin enters the book-in area through the side door and goes straight to look in on Qualls for about 25 seconds, and Qualls is still on his stomach, on the mat, and moving; so, Griffin exits the back door. *See* Ex. "9," 05:10:40-05:11:20.

73.     Around 5:45 A.M., Griffin enters book-in through the back door and goes directly to Qualls' cell and looks through the cell door window for about 20 seconds, and Qualls is still on his stomach, on the mat, and moving around; so, Griffin, who is almost complete with his shift, exits the back door. *See* Ex. "9," 05:45:13- 05:45:53.

74.     Around 6:04 A.M., O'Dell can be heard updating Dispatcher Gray, who had just come on duty, about Qualls, and him throwing up the night before. *See* Ex. "9," 06:04:45-06:05:30.

75.     From then, until about 6:36 A.M., Qualls becomes more vocal, and coughs, sings, hums, says "hello," mumbles, makes noises, and random statements, and he is still on his stomach, and mostly off the mat, and moving, as before. *See* Ex. "9," 06:05:30-06:36:00.

76.     From about 6:37 A.M. until about 7:15 A.M., Qualls is still occasionally coughing, and continues to sing parts of songs and humming (but much more often), says "hello" and mumbles and makes noises, and makes random statements, and is still partially on the mat, and moving as before. *See* Ex. "10," Jail Video 20190130-0230_20190130-1111-1.avr, 06:37:00-07:15:00.

77.     From about 7:15 A.M., until the time Qualls stops moving and talking around 7:38, he continues to make random statements, mumbles, and continuously says "hello," and although he says "help" once among a string of "hello[s]", he never asks for medical help, or states he has a medical issue.  During this time, Qualls, was also off his mat, rolling from front, to side, to front, to side, to back, to side, to back, to front, to side, to back, to front, to back, to side, to back, and moving in a half circle across the floor.  Although, it could be argued that he also makes sounds indicating he is in pain, there is no evidence indicating anyone heard these sounds and interpreted them as such. *See* Ex. "10," 07:15:00 -07:38:38.

78.     Although, during this time frame, a dispatcher walks through book-in (7:23), and out of, and back in, the back door, returning through book-in (7:24), to dispatch, Qualls was not making any loud sounds or statements indicating he needed help.  *See* Ex. "10," 07:23:42-07:24:25.

79.     Around 7:58 A.M., Peters comes to work, entering the book-in area through the side door, briefly stops at the desk, and heads back out through the back door, where other officers are located and talking, presumably for a shift change meeting. *See* Ex. "10," 07:58:00-07:58:38.

80.     Around 8:21 A.M., both Hadnot and Peters walk into the book-in area through the back door, and Hadnot goes to the utility room and Peters walks directly over to Qualls' cell and looks through the cell door window for about 4-5 seconds.  Hadnot informs Peters that Qualls vomited all over himself last night, and Peters responds, "He is sleeping right now; so, I am not going to wake him." *See* Ex. "10," 08:21:32-08:21:56.

81.     Around 8:41 A.M., Hadnot walks over to Qualls' cell and looks through the cell

window for about 15 seconds, and subsequently asks, "Are you sure he is asleep?"  Peters immediately walks over to the cell, opens it, they both enter, and Peters immediately says, "Call the Chief," and yells, "Get EMS!" and "Run them hot!"  *See* Ex. "10," 08:41:22-08:42:04.

82.     The jail log indicates surveillance video jail checks by dispatchers were done at least every hour while Qualls was there from 1/28/2019- 1/30/2019.  *See* Ex. "M," Jasper P.D. Records Custodian Affidavit, including Jasper P.D. Jail Log.

83.     The written policy of Jasper P.D. regarding medical care for prisoner/detainees at the Jasper Police Department states on page 4, that highly intoxicated arrestees should be examined by a paramedic or EMT, and if necessary, a medical facility, and cleared, before being placed in the Detox cell.  It also states, on page 6, that detainees shall be under twenty-four-hour monitoring and that the communication operator will view the monitor on a frequent and regular basis.  On pages 8-9, it states, that detainees are to first undergo a health/medical screening interview and completion of the Medical Sheet, including any physical and mental issues, and in the event a prisoner is in need of medical assistance, whenever there is a doubt about the health or medical condition of a prisoner, the officer should summon the paramedics or EMTs, and further, the decision on transportation to a medical facility rests with the paramedics/EMTs.  Finally, the policy on page 9-10 states detainees of the Police Department will be granted all rights and privileges provided for by federal and state law and judicial orders.  *See* Ex. "M," Jasper P.D. Records Custodian Affidavit, including Prisoner Detention and Lockup Facility Procedure 5.100, effective Aug. 21, 2017.

84.     Although Officer Peters testified they do not medically treat an intoxicated person, if a person needs treatment (whether with or without their permission), or someone asks for it, they call EMS.  *See* Ex. "N," p. 38:14-40:4, Excerpts from the Deposition of Officer Mike Peters.  Peters said that, other than the incident at issue, he has never had someone die in the jail while he was on duty, nor has anyone died after being transported from the jail to a hospital.  *See* Ex. "N," p. 43:18-24.  Peters stated prior to the incident at issue, he had dealt with Mitchell Qualls multiple times, and he was intoxicated the majority of the time, and one time, similar to the incident at issue, he was in the jail, intoxicated at the same level, speaking incoherently and not making any sense, such that he was not able to see the Magistrate for a few days.  *See* Ex. "N," p. 46:6-48:21 and 50:5-52:22.  Regarding the incident at issue, the video/audio tapes referenced above most accurately reflect Peters' interactions with Qualls, and the deposition testimony is consistent with same. *See* Ex. "N," p. 44:25-45:6; 45:24-46:2; 52:23-55:6; 55:7-15; 55:24-57:20; and 57:21- 60:1.  Again, around 8:40 A.M., Peters and Detective Hadnot enter the cell and Qualls looked dead to Peters ("there was no doubt"), as one of his arms was slightly elevated, possibly in rigor (which Peters had seen before in car accidents, murder, and natural causes), and not in a natural position, so, he did not attempt to resuscitate him, but instead, yelled for dispatch to get EMS, which arrived shortly thereafter, and began medical treatment.  *See* Ex. "N," p.  61:2-64:3; 64:20-65:3 and 71:19-25.  Officer Peters testified it was common for people to vomit and not seek medical assistance, and this "happens a lot," and he was asked if he had a problem with Griffin not calling EMS when Qualls vomited, and Peters said he did not, as it was Griffin's call, Peters was not there, every circumstance or incident is different, and it depends on the totality of the circumstances.  *See* Ex. "N," p. 69:3-70:13 and 74:4-75:3.  Regarding dressing suspects out into oranges at the jail, Peters said there are instances he is aware of where that was not done, and usually it is related to intoxication, and the night shift is limited to two officers and a dispatcher, and with an intoxicated individual, they don't always have

the option of doing things that are done during the day with a full staff. *See* Ex. "N," p. 70:16-71:18. Further, during the following day, Peters did not feel it was necessary to change Qualls into oranges because he was not coherent, and following instructions would have been difficult for him, and going, or putting, hands on him, would not be the right thing to do. *See* Ex. "N," p. 76:22-78:9. Finally, Peters has taken approximately 4-5 TCOLE courses on jail standards, as requested by the municipal judge. *See* Ex. "N," p. 24:8-26:7

85.     Chief Franklin Gerald Hall of the Jasper Police Department testified he has been Chief of Police since May or June 2016, and he has worked as a licensed police officer for the Jasper Police Department in various positions (patrolman, sergeant. detective, lieutenant, captain and chief) for about 27-28 years, since graduating from the Police Academy. *See* Ex. "O," p. 4:8-9 and 5:25-9:5. He testified that the Jasper Police Department is not governed by jail standards and is forbidden by TCOLE, from hiring licensed jailors, as their Police Department can only employ TCOLE licensed police officers (peace officer's license) and dispatchers (telecommunication operator's license), which must be documented on an F1 form; and further, all their training must be approved by TCOLE and their guidelines. *See* Ex. "O," p. 14:1-10 and 17:12-19:22. The Jasper *County* Jail however, is under the Texas Commission on Jail Standards. *See* Ex. "O," p. 19:23-20:6. Chief Hall stated that the length of stay reflected in their written policies, depends upon what class of crime a person is accused of; so, a class C gives them the option of laying it out for whatever fine the Judge gives them, which can be numerous days (there is no maximum), and if it is a class B and above, they try to get them to the County jail as soon as they can get them arraigned and the county accepts them, so they can make bond, which can be an hour, or a few days. *See* Ex. "O," p. 16:12-17:11. Finally, Chief Hall testified that the City Council approves, or signs off on, all policies instituted, or changed, at the Jasper Police Department dealing with peace officer duties, including those at the jail. *See* Ex. "O," p. 15:1-14.

86.     Officer Sterling Ramon Linebaugh of the Jasper Police Department has been a licensed and commissioned patrol officer with the City of Jasper Police Department since December 27, 2017. *See* Ex. "P," p. 5:6-8 and 13:2-23. Regarding the incident at issue, the video/audio tapes referenced above most accurately reflect Linebaugh's interactions with Qualls, and the deposition testimony is consistent with same. *See* Ex. "P," p. 21:9-22:18; 35:13-16; 21:3-8; 23:4-15; 29:18-30:10; 59:16-60:5; p. 24:14-21; 26:3-6; 31:16-20; 30:11-31:5; 31:6-32:2; 35:13-37:8; 37:9-38:11; 38:12- 39:6; 44:12-45:7; 39:7-19; 47:18-48:3; 50:6-18; and 50:19-22 and 52:16-53:14. Linebaugh testified he considered Qualls to be intoxicated, and it was their custom or practice to put such a person in a detox cell to let them rest or sleep, if that's what they needed to do to sober up. *See* Ex. "P," p. 27:5-18. With Qualls, they did not know what he was on, and they had just left the hospital; however, if they knew what he, or someone else was on, or if he, or someone else, asked for medical treatment, or stated he was coming down off of opiates, or I need help, they will get them medical treatment. *See* Ex. "P," p. 27:19-29:8 and 48:19-25. From the time they booked him in, until he got off of work at 6:00 A.M. on January 29th, Linebaugh does not recall receiving any negative information about Qualls, and Linebaugh does remember: checking on him to make sure he was alive and moving and didn't need help; and although Qualls may have said a few words to him through the bean slot, Qualls did not ask for help, or anything like that; Qualls was still moving around and doing fine, and he was not doing anything out of the ordinary, like smashing his head against the wall, or bleeding, or asking for help, or trying to hang himself; Qualls was just sitting on the floor with his arm out of the bean slot, which is not uncommon. *See* Ex. "P," p. 32:3-34:7.

Linebaugh testified he has not had training regarding first aid, or medical observations on people being ill, or dehydration, or dealing with highly intoxicated people in jail, and he did not have an understanding that severely dehydrated people needed emergency medical treatment, and he did not witness Qualls dry heaving. *See* Ex. "P," p. 45:15-46:23 and 51:15-52:2. As indicated above, while Griffin was mopping, he found a small empty plastic baggie in the vomit, and he showed it to Linebaugh, but they did not think much of it, because it was just part of an empty bag, and they did not know if it was in the cell before they put Qualls in it, or if Qualls threw it up, or what was in it, and there were no traces of any substance in the bag. *See* Ex. "P," p. 39:20-23; 40:17-41:7 and 47:8-17. Around 6:00 A.M., Linebaugh went home; so, he was not there when Qualls passed away or EMT's were requested. *See* Ex. "P," p. 55:8-56:1.

87.     Sergeant Toderick Dewan Griffin is a licensed peace officer, who went to work for the City of Jasper Police Department, as a patrolman, then as a Corporeal, then as a Sergeant, and where he remains to the present day. *See* Ex. "Q," p. 4:15-19 and 8:25-9:12 and 13:15-17:3. On Monday, January 28, 2019 and Tuesday January 29, 2019 and up through Wednesday morning January 30, 2019, he was working the night shift from 6:00 P.M. to 6:00 A.M. with Officer Linebaugh and Dispatcher/TCO Heather O'Dell. *See* Ex. "Q," p. 27:14- 28:11. Regarding the incident at issue, the video/audio tapes referenced above most accurately reflect Griffin's interactions with Qualls, and the deposition testimony is consistent with same. *See* Ex. "Q," p. 32:6-33:5; 34:25-36:10; 43:23-44:4; 46:24-47:8; 48:7-49:25; 61:16-64:19; 93:20-94:7; 68:24-69:15; 70:11-72:15; 68:19-23; 73:2-74:7; 74:8-76:5; 81:4-82:15; 83:10-84:2; 84:3-85:19; and 97:22-98:19. Griffin, who is certified in standard field sobriety testing, had prior dealings with Qualls on approximately 5 occasions, including once while he was believed to be intoxicated, and once when he read an arrest report about another officer arresting him at the hospital (similar to the incident at issue, he was seen at the hospital, was discharged, asked to leave and would not leave). *See* Ex. "Q," p. 36:20-43:12. During book-in Griffin did not smell alcohol on his breath, but did observe Qualls at that time, to be very sluggish, talking in circles, with an unsteady balance, and under the influence of something, or some type of drug, or illegal substance, or pills, but Griffin was not sure what he took. *See* Ex. "Q," p. 44:10-13 and 45:14-46:23. Qualls was not changed out into orange jail clothing because Griffin, exercising his discretion, felt like his search was good, there were no things on his body, and Qualls needed to just rest and lay down, and sleep it off, which was typical, and he did not think he would be there long (one to two days, or, no more than a few days), and Griffin wanted to get him out as soon as he sobered up. *See* Ex. "Q," p. 50:5-51:2; 52:23-53:18; 55:16-56:3 and 60:5-61:10. Griffin also explained that trying to dress out an intoxicated person can be a complicated task; so, he felt the best choice was to search Qualls and leave him in his clothes until Qualls was able to dress himself, or sober himself up. *See* Ex. "Q," p. 120:1-13. It was Griffin's experience that it takes less time to sober up from alcohol than drugs, and he has seen people intoxicated on alcohol for a day or two, and marijuana a day or two; but in any event, it depends on what is ingested and how much is ingested, and their height and weight; however, since he did not know what Qualls had ingested, or how much, he did not know whether he would be there 2-3 days, or exactly how long, but he did not think it would be weeks. *See* Ex. "Q," p. 52:1-22; 53:4-14; 53:19-54:5; 55:3-25; 56:9-23 and 59:3-15. He also did not think Qualls would be there long, as he had just brought Qualls from the hospital, and he thinks they would have done their due diligence in finding what he was on, hydrating him, or whatever they do to an intoxicated person to help him sober up. *See* Ex. "Q," p. 54:11-55:2. Griffin testified that on their checks, they look for a number of things including: whether he will talk, or is talking, or will talk to you, and whether he is breathing and moving. *See* Ex. "Q," p. 94:8-14.

Regarding the vomit, Griffin did not think about getting Qualls some medical care or treatment for same, because it was just vomit, and Qualls had come from the hospital, and normally, people vomit; he also believed Qualls may have taken some stuff at the hospital to help him vomit, or sober up from, whatever he ingested, possibly a typical charcoal substance, which he had seen used before to help people vomit. *See* Ex. "Q," p. 76:15-77:8.  Griffin testified he has called for EMS before, by notifying the dispatcher, who would then place the call to EMS, and they have always shown up. *See* Ex. "Q," p. 79:5-16; 80:10-81:3 and 95:15-24.  Griffin stated, they do not have doctors, nurses, or nurse practitioners on staff at the Police Department.  *See* Ex. "Q," p. 96:14-97:12.  Griffin testified: that an inmate does not have to ask for treatment to get it; and if Griffin had observed that Qualls needed medical treatment, he would obtain it for Qualls; and he was aware of Qualls' right to reasonable medical care.  *See* Ex. "Q," p. 82:16-83:9.  As Griffin was cleaning up the vomit for the second time, he noticed a tied up small bag with the other end open which was made of material like a Walmart bag, and covered in vomit; he showed it to Linebaugh to see what he thought of it, and then, Griffin went over to the trash can and untied the knot and stretched the bag out, and there was nothing in it. *See* Ex. "Q," p. 86:16-88:13 and 108:17-109:13.  Although Griffin had heard of the terms "stuffing" and "packing," in his experience, no one he as ever arrested has swallowed the drugs; further, he has never heard of anyone dying from swallowing all the drugs they had in their possession, nor has he ever heard of people swallowing drugs to get the drugs across the border, or on an airplane flight.  *See* Ex. "Q," p. 88:14-91:11.  Griffin put the bag in the trash can, as he did not feel it had any evidentiary value for the following reasons:  Griffin could not prove that the bag was in Qualls' possession,  nor that Qualls brought it in, nor that it was on him, as Griffin had searched Qualls and did not feel it; and while Griffin stated Qualls could have swallowed it,  he is not sure how Qualls would get it back, nor did he actually know Qualls had even swallowed it before Griffin made contact with him; and Griffin could not just assume the bag was Qualls' or that he smuggled drugs into the jail, and he could not assume he vomited the bag up, nor did he know if an ingested bag can separate in your body; in short, he had no idea how the bag ended up in the vomit, or if Qualls vomited up the bag. *See* Ex. "Q," p. 91:12-93:19.  When Griffin left that morning, it was his opinion that Qualls was still intoxicated, but could communicate, and was alive.  *See* Ex. "Q," p. 100:10-101:7.  He later learned of Qualls death, and returned to the Police Department to type up everything that happened, and Qualls had already been removed.  *See* Ex. "Q," p. 107:13-108:4.  Griffin testified he is not aware of any Jasper P.D. policies he violated relating to the incident at issue, and he believes all of his actions were correct.  *See* Ex. "Q," p. 117:18-21 and 118:20-119:8.

88.    Joshua LeQuence Hadnot is currently a Detective Sergeant with the City of Jasper Police Department, holding various prior positions, and with numerous peace officer licenses and having extensive education and training.  *See* Ex. "R," p. 4:14-21; 9:16-12:5; 13:6-15:22; 17:15-19:10; and 20:11-24.  Hadnot came to work on Tuesday, January 29, 2019, around 8:00 A.M., determined that Qualls was in detox, and observed him to be kneeling with his right arm on the ledge of an open door-port of the detox cell and talking randomly.  *See* Ex. "R," p. 30:23-33:12; 34:19-23; and 35:8-36:22.  Qualls could be observed from the book-in area through the detox cell door window, or the food slot, or in the dispatcher's office by video camera feed screen.  *See* Ex. "R," p. 35:17-36:6. Before the incident at issue, Hadnot had been around Qualls on two or three occasions, and on one of which he was alleged to be intoxicated.  *See* Ex. "R," p. 37:1-38:16.  Hadnot testified that unless there were other circumstances, normally it was the policy and practice to: have cells checked in the morning, at lunch and at dinner to feed them; dispatchers would primarily monitor more from their screen in their room; and the bailiff (Mike Peters) checks on them during the day. *See* Ex. "R,"

p. 40:9-43:7. Hadnot said it was their custom and practice to dress detainees out in an orange uniform, but that was up to the officer's discretion if the person was intoxicated or violent/combative, in which case the officer may choose to search them and leave them in their clothes, rather than risk injury. *See* Ex. "R," p. 45:3-46:9. Generally, with an intoxicated person, their practice is to place them in a detox cell and provide them food, water, a mat or a mattress and blanket, if appropriate, and check on them until they are able to fully cooperate with commands, or see the judge, whichever comes first; but they have not received training on detoxification protocol. *See* Ex. "R," p. 46:10-47:20. Hadnot passed through the book-in area where Qualls was located several times that day while dealing with computer maintenance issues, and he noticed that Qualls was still in the detox cell, in the same position with his arm through, and/or kind of resting on, it, but Hadnot did not have any communications with Qualls, as it was not Hadnot's practice to interact with anybody in the jail unless it's case related, or they speak to him in a non-formal fashion. *See* Ex. "R," p. 48:21-49:15 and 50:22-52:2. Hadnot did not feel obligated to specifically check on Qualls, because Peters, and the dispatcher, through camera feed, where checking on him. *See* Ex. "R," p. 49:16-24. Around 4:30 P.M., Hadnot is sitting in the dispatcher area speaking with dispatcher Rustie DeLome, and he looks at the screen for the cameras and notes that Qualls has moved, and is now kneeling in the center of the room. *See* Ex. "R," p. 52:3-53:4. Hadnot ends up staying past 5:00 P.M. to make sure the night shift does not have any computer issues, and around 7:15 P.M., he looks at the camera feed and noticed Qualls surrounded by a dark-colored liquid that he could not identify; so, he walked back to Qualls cell to make sure it was not blood, looked in and determined it was not red, like blood, but was black in color. *See* Ex. "R," p. 53:5-54:25. Hadnot did not consider that Qualls needed medical assistance based upon the color, because he had already come from the hospital, he had been in their facility, and the dark-color liquid was unknown to him, and he had no idea what it was. *See* Ex. "R," p. 55:1-15. Hadnot then asked dispatcher O'Dell to have Sergeant Griffin (who came to work at 6:00 P.M.) come to the jail and check on Qualls, and Hadnot left; around 7:57 P.M., dispatcher O'Dell called Hadnot's cell phone and advised him that it was vomit on the floor and the officers were cleaning it up, which led Hadnot to believe that Qualls was in good health and in no distress, and Hadnot received no further update during the night, nor did he expect an update, as same was discretionary. *See* Ex. "R," p. 57:14-59:12. Hadnot admitted, that during his investigation, he learned Qualls vomited a second time that same night and that Sgt. Griffin had observed in the vomit a small bag of the type used to conceal narcotics, but Hadnot did not believe Griffin should have called EMS to check Qualls out because of the unknown circumstances of where the bag actually came from as follows: it could have been from the first time, it could have come from the mop, it could have been on the bottom of their shoe, or stuck to their shoe, or from on, or under, the mat, or any array of other areas where a piece of a bag may have come from. *See* Ex. "R," p. 59:22-61:17. Hadnot also noted Qualls had come from the hospital, and under those circumstances, an officer or dispatcher may determine a person can vomit four, five or six times, and be perfectly healthy and fine. *See* Ex. "R," p. 61:18-62:3. It was Hadnot's opinion, based upon his investigation, and his law enforcement education, experience and training, that there was no need for any Jasper P.D. employee to contact EMS to check out Qualls, and no one at Jasper P.D. violated law enforcement norms as to the care of Qualls, and if he had been in Griffin's position (finding the baggie in the vomit), he would have done exactly what Griffin did. *See* Ex. "R," p. 62:16-64:4. On January 30, 2019, around 8:00 A.M., Hadnot returned to work, made his usual rounds, and at approximately 8:39 A.M. he checked the board in the book-in area and noticed that Qualls was still listed as being in the detox cell; he also noticed Qualls was not making any sounds, and it was quiet; so, he could have been sleeping. *See* Ex. "R," p. 65:23-67:4. At this time, he was only aware of

Qualls vomiting once the night before, but he subsequently asked Peters about Qualls, and at some point, he decided to look into the detox cell window; however, he could not see enough of Qualls from the window and because of his prior DEA and other experience involving narcotic related deaths, he asked Peters to open the door to physically look at him at around 8:42 A.M. *See* Ex. "R," p. 67:9-68:3; 70:11-19 and 72:4-75:1. After Peters opened the door, Hadnot, based upon his law enforcement experience and what he observed, felt, that Qualls was deceased. *See* Ex. "R," p. 70:20-71:3 and 76:5-17. The dispatcher, Ms. Gray, was told to immediately contact EMS, as well as the Chief and Hadnot notified Captain Poindexter, who contacted the Jasper County Sheriff's Office for a Justice of the Peace. *See* Ex. "R," p. 76:25-78:13 and 79:23-80:3. Acadian EMS and their EMTs or paramedics arrived. *See* Ex. "R," p. 81:18-21. Hadnot was asked about completing the intake form, and he stated with respect to intoxicated individuals, they complete what they can, and fill in the rest when the intoxicated individual has sobered up. *See* Ex. "R," p. 84:5-23. Hadnot also confirmed the City does not employ physicians, nurses, nurse assistants, nurse practitioners or physician's assistants; they only call and let EMS in the jail, and then, if necessary, they are transported to the hospital for further treatment. *See* Ex. "R," p. 85:20-86:21.

89.   Chasity Marie Gray/Bearden, is a TCOLE licensed telecommunication operator's license, working for Jasper P.D. *See* Ex. "S," p. 5:5-11; 7:23-10:10 and 12:13-14:24. On the date of Qualls' death (January 30, 2019), she was working the day shift from 6:00 A.M. to 6:00 P.M., and had just come back to work from her days off, and she did not know anything about Mr. Qualls being in jail until she showed up that morning. *See* Ex. "S," p. 17:2-7; 19:6-22; 20:18-20 and 41:8-43:5. Mrs. Gray stated her dispatcher day can vary from nothing going on to everything breaking loose. *See* Ex. "S," p. 21:10-22:23. Gray stated she typically communicates over the radio and by typing on the system, rather than on the phone, which she can do at the same time, including communicating on two separate channels (police and fire channels). *See* Ex. "S," p. 22:8-23:15. When the inmates try to contact them, they may press a button in their cell connecting them to dispatch, or they may just yell out the door; this line of communication to the dispatcher's room is never turned down, unlike other speakers. *See* Ex. "S," p. 23:16-24:22 and 26:5-17. At the time of the incident, the button/speaker in the detox cell was not working; however, the video does not show Plaintiff ever trying to use same. *See* Ex. "S," p. 26:15-27:6. If everything is going on at once, the officers and fire fighters are first priority, unless an inmate is yelling about a medical problem, in which case the inmate would take priority, and an officer would be called to respond and give her permission to call EMS; regardless, Mrs. Gray testified she also has the right to call EMS on her own, if she sees an inmate in distress. *See* Ex. "S," p. 24:23- 25:11 and 31:10-33:4. Basically, the dispatcher has to balance officer safety and the life of an officer, and the life of a prisoner, and this is the practice at Jasper P.D. and what she has been trained to do. *See* Ex. "S," p. 30:7-31:9. Regarding contacting EMS, Mrs. Gray testified the Jasper Police Department has a button which goes directly to Acadian Ambulance or Care Plus, and she testified she has contacted EMS "a lot" about inmates and they typically respond in just a few minutes. *See* Ex. "S," p. 33:5-34:11. Mrs. Gray also helps inmates with their court situation, toiletries, toothpaste, etc.; however, if she has to leave her dispatch area to assist them, she would only do that when it was safe to do so from an officer safety perspective, and she would typically have a hand-held radio while doing so, to monitor the police channel or hear the phone ring, so she can get back to her desk. *See* Ex. "S," p. 25:16-26:4; 27:18-29:25 and 34:21-35:5. Mrs. Gray confirmed that her duties also include keeping an eye on the inmates in the jail by surveillance via a screen in the dispatch office, and serving their meals during the day shift. *See* Ex. "S," p. 35:12-37:14. Mrs. Gray testified that the surveillance screen is

in the dispatch area where she normally sits, and there are several screens at which they look at least once per hour, and there is a jail log in which the hourly checks are logged, and you note if you see anything; she stated she was not required to actually go back to the cell and look in. *See* Ex. "S," p. 37:12-39:11. Mrs. Gray testified she had multiple interactions with Mr. Qualls, all at the Jasper City Jail as an inmate, and he was highly intoxicated, or high. *See* Ex. "S," p. 43:6-45:24. She stated, he was unable to function most of the time; would just stand there and act strange, and you could never understand what he was saying; and he would crawl on the floor and typically talk; and he did nothing on this occasion that was different than what he had normally done. *See* Ex. "S," p. 45:21-47:3 and 47:20-48:6. She also testified it would normally take him about two to three days to sober up, and see the judge; to her knowledge, before this incident, they never had to call medical assistance for Qualls. *See* Ex. "S," p. 47:7-15 and 48:7-10. On the date Qualls passed away, Mrs. Gray showed up to work around 6:00 A.M., and was updated about the previous shift, as is normally done, by dispatcher O'Dell, and she was informed that Mr. Qualls was in the detox cell and had thrown up twice, including a black substance and a plastic baggie, and she was left with the impression he had been there a day or two. *See* Ex. "S," p. 49:2-51:12 and 51:25-52:8. Mrs. Gray did not think anything of it, and she said she had never experienced anyone throwing up a plastic baggie before. *See* Ex. "S," p. 51:13-24. She believes she asked if EMTs had been requested, and was told that he came from the hospital, but otherwise, there was no further discussion involving medical care. *See* Ex. "S," p. 52:9-19. O'Dell stayed with her in the dispatch area, off the clock, talking and hanging out, until about 7:35 A.M., which was unusual. *See* Ex. "S," p. 53:21-54:13. During that time, they both noticed Qualls on the screen in dispatch moving in the middle of the floor and they heard him making noises every now and then (a grunt or something like that), as the sound travelled down the hallway into the dispatch area. *See* Ex. "S," p. 54:14-55:8. Mrs. Gray estimated she looked at the screen/video monitor in the dispatch room eight to ten times per hour the morning Mr. Qualls died. *See* Ex. "S," p. 69:10-16. Mrs. Gray testified that the audio they received in dispatch from audio recorders in the lobby and jail area stay turned down, because if it is turned up high it creates background noise, feedback, and squealing, and if you leave it turned up it makes it hard to hear radio and emergency calls. *See* Ex. "S," p. 57:12-58:14. Mrs. Gray also recorded that a jail check, by video surveillance, took place around 8:00 A.M., which she was allowed to do, and it showed that Qualls had re-positioned himself in the corner of the cell leaving only his foot in view of the cell camera. *See* Ex. "S," p. 56:7-25 and 58:15-59:5. Mrs. Gray when asked about her observations that day, responded: that everything was about the same and nothing sticks out to her, as everything he was doing, she had seen him do on prior occasions in the jail; and she saw nothing that indicated he needed any help; and nothing stuck out to her that would make her assume that Qualls was not the way he was every other time that she has seen him in our jail. *See* Ex. "S," p. 59:11-18 and 69:17-22. The next thing she remembers, is Officer Peters saying to call EMS and she requested same. *See* Ex. "S," p. 61:8-20 and 62:1-13. Finally, she confirmed that intoxicated persons are typically placed in the detox cell, and provided with jail clothing (unless dressing them out presents a potential problem), as well as food, water, and a mattress, and allowed to rest and sleep it off, but if they need medical treatment, or show the need, they give them medical treatment. *See* Ex. "S," p. 63:20-64:22.

90.    Mark Allen Fulcher started working at the Jasper Police Department around December 2, 2016 as a patrolman, and worked his way up to corporal and then left in 2020, to go work at the Diboll Police Department, closer to home. *See* Ex. "T," p. 5:5-11; 6:24-7:12 and 8:15-18; 10:15-24; and 13:4-14:17. Fulcher did not come to work until 6:00 A.M. on January 30, 2019, the morning when Qualls died, and he had no personal knowledge regarding Qualls' arrest and stay

at the Jasper City jail prior to that time. *See* Ex. "T," p. 18:7-20:8 and 48:24-49:25. However, he did otherwise interact with Qualls at least two, and possibly four, times as a police officer. *See* Ex. "T," p. 20:9-16. Three of the incidents (Jan. 9, March 7 and Dec. 4, 2017), similar to the case here, all occurred at Jasper Memorial, were each time he was agitated and intoxicated, and his speech was rambling, and he was arrested for either public intoxication or criminal trespass, as he denied medical care and would not leave. *See* Ex. "T," p. 20:17-21:3; 21:20-22:2; 22:24-23:2; 23:23-24:5; 28:16-29:8; 32:9-12; 32:23-33:16 and 64:18-65:23; 25:13-26:19; 32:17-22; 33:17-21; 68:4-69:11; 31:4-21; 32:13-16 and 65:24-67:8. Fulcher testified it was hard to keep his encounters with Qualls separate, because his encounters with Qualls were similar in nature. *See* Ex. "T," p. 69:15-70:1 and 73:8-15. Fulcher had no knowledge of Qualls ever being assaulted by any Jasper Police Officers or at the Jasper Police Department. *See* Ex. "T," p. 28:3-9. Fulcher testified that there was not a maximum amount of time someone could stay at the jail, but agreed that they encouraged officers to either release or transfer inmates at Jasper PD as soon as practicable. *See* Ex. "T," p. 34:21-36:5. On January 30, 2019, the date of Qualls death, around 6:00 A.M., Fulcher began with a shift briefing in the squad room with night shift Officers Griffin and Linebaugh, and Griffin informed him that Qualls was in the detox cell, still highly intoxicated from the night before last. *See* Ex. "T," p. 38:7-19 and 40:15-41:23. Fulcher did not think it was odd for a person to be intoxicated on a morning from two nights before, and he remembered several instances where people were too intoxicated to be arraigned by the judge on two tries, and he remembered other people being intoxicated for two to three days, and stated it depends on what they ingested as it affects people in different ways. *See* Ex. "T," p. 42:17-43:17. The practice regarding intoxicated people was to put them in detox, give them food and water, a blanket, and keep an eye on them, unless other needs arise, such as if they become unresponsive to the officers or dispatch, or request medical, in which case EMS will be called. *See* Ex. "T," p. 43:18-44:10 and 45:3-11. If a person was intoxicated, they would be placed in detox and dressed out in an orange top and bottom; although a person may be left in his street clothes if changing them into their oranges presented a risk of injury to the inmate or officer, such as if they are combative or intoxicated, as they may not understand your instructions, refuse to follow instruction, or can't stand or sit without falling down. *See* Ex. "T," p. 45:12-46:11; 56:3-20; and 46:17-47:13. He had no opinion as to whether it was appropriate to leave Qualls in his street clothes for 33-34 hours, but he was sure Griffin had a reason for doing so. *See* Ex. "T," p. 47:20-48:23. Typically, the book-in sheet was filled out by the arresting officer, or the jailer, or another officer, and had mental and medical health care questions and if they were too intoxicated to answer same, they would leave it blank and then come back to it later. *See* Ex. "T," p. 53:17-54:13. If they get a highly intoxicated person, they need to be placed in the detox cell and monitored, either by checks from the officers (which he has done, making sure they are breathing and moving and did not need anything), or the dispatchers looking up at their screen in their office. *See* Ex. "T," p. 57:20-58:15 and 61:2-21. Fulcher was told that Qualls had been medically cleared from Jasper Memorial. *See* Ex. "T," p. 58:22-59:16. Fulcher testified they had no medical personnel at the City Jail. *See* Ex. "T," p. 59:17-60:1. Finally, Fulcher stated the Jasper Police Department, overall, got the inmates what they needed and for the most part they got what they asked for. *See* Ex. "T," p. 70:2-14.

91.     Rustie Denise DeLome, currently a licensed telecommunicator (dispatcher), started working for Jasper PD as a dispatcher in the dispatch center around August of 2017, under a temporary license, and is still employed there today. *See* Ex. "U," p. 5:6-12; 8:19-9:13 and 12:25-15:21. Her duties include answering the phone (emergency and non-emergency calls), inputting information from the phone calls, dispatching officers and the fire department, communicating with

phone and officers at the same time, and taking care of people that may be in their holding facility, and doing laundry. *See* Ex. "U," p. 15:25-16:21 and 22:17-21.  She takes care of people in their holding facility by feeding them breakfast, lunch and dinner and checking on them through the TV monitors/screens, and, at the time Qualls was there, they looked at his cell constantly, and she looked at her monitor every hour (on average, at least 5-10 times per hour), if not more, with her glancing up constantly out of habit, and this was to make sure they are okay and still in the cell and not trying to get out; also, although they are not required to physically check the cell, if an inmate yelled she would usually go to the cell and check on them, and ask if they are okay, and what they need. *See* Ex. "U," p. 18:17-19:24; 22:8-23:4; 58:1-59:6; 66:8-13; 67:1-10; 72:7-74:13 and 80:23-81:11.  The TV monitor sits in a box, which is up and to their right as they sit at their work station, and has approximately 15-16 squares/screens covering all the cells. *See* Ex. "U," p. 23:19-25:25.  Mrs. DeLome does recall looking up at those screens at the time Mr. Qualls was there. *See* Ex. "U," p. 26:1-5 and 26:11-18.  There is also a recording audio box in the dispatch area that transmits audio from the lobby and book-in area, which produces feedback or a loud squealing if it's turned up to high; so, they keep it turned down so it doesn't interrupt their radio traffic and cause officer safety issues. *See* Ex. "U," p. 59:7-19 and 60:21-62:13.  Regardless, they can still hear the inmates because they are not far away. *See* Ex. "U," p. 59:22-60:20.  Mrs. DeLome testified she has had prior experiences (more than one) with Mr. Qualls in the City of Jasper holding facility, and they were also narcotics related, and he was always under the influence of something, and was coming off of a high, or detoxing, or not, and he was always very quiet and calm, and sleeping, and not speaking in complete sentences and was normally very hard to understand. *See* Ex. "U," p. 26:19-28:12; 31:14-32:3; 32:25-34:18 and 80:17-22.  Mrs. DeLome was in dispatch and had taken a 9-1-1 call and communicated with officers during the initial encounter with Mr. Qualls at Jasper Memorial Hospital on January 28, 2019 around 4:35 P.M. *See* Ex. "U," p. 75:18-76:7.  Mrs. DeLome was next working on Tuesday, January 29, 2019, from 6:00 A.M. until 6:00 P.M., and she recalls the following: She was updated by dispatcher O'Dell that Qualls had been discharged from the hospital as fine, but was publicly intoxicated and under the influence of something and was taken to jail; she saw that Qualls was on the white board, said hello, and Qualls mumbles some words and looks at her, and she went into her office noting he acted the way he has always acted in the past, and to do shift change; then, she gets his breakfast, heats it up, puts it out for him to eat, and returns to her office, continuously checking the screen; when Peters arrives around 8:00 A.M, he tells her he will feed Qualls lunch and dinner, as he did not want Qualls to grab her through the bean chute; and then, she left at shift change, updating dispatcher O'Dell, as normal, on Qualls, before she left, and she never saw him again, as he died the next day (Wednesday), nor did she know what was happening to him during that time frame, until after she heard he died. *See* Ex. "U," p. 27:5-29:12; 34:23-36:11; 44:13-45:2; 51:4-23; 55:22-56:5; 76:20-77:11 and 81:25-82:8.  Mrs. DeLome stated that during the day, every time she looked at the screen in her work area, he was pretty much sitting (sitting on his bottom with his knees to the side and his feet beside him) at the cell door looking through the bean chute, and that all day, except for one occasion when he called her, he had acted like he had in the past – usually when he was coming off drugs, he was very quiet. *See* Ex. "U," p. 29:16-30:13 and 31:14-32:12. When Qualls  called for her, he said something that indicated he wanted somebody to come to his cell; she looked at her screen and saw that he was not in any kind of distress and continued working; however, he had yelled another time, and this other time, she checked on him, asked him multiple times – What? and he was unable to form his words to make complete sentences in response; and so, she told him to get some rest, and returned to her office. *See* Ex. "U," p. 43:11-44:12.  DeLome testified she never requested medical treatment for Qualls, nor did she even think

about it.  *See* Ex. "U," p. 46:3-5.  Although her duties did not require a dispatcher to physically go to the cell and look in, she testified that if someone yelled she would grab a radio and go see if they are okay, or needed something, and return to her station.  *See* Ex. "U," p. 30:14- 31:13.  Mrs. DeLome stated the longest she has seen a prisoner in the jail was two to three days.  *See* Ex. "U," p.56:15-22. She has never been working when somebody has passed away at the jail.  *See* Ex. "U," p. 63:11-13. If an officer asks for medical, or she needs medical, she notifies her supervisor (an officer) to come, and they tell her to call EMS; she has called EMS for a variety of situations, and she could not count how many times she has contacted EMS.  *See* Ex. "U," p. 63:17-65:5.

92.     Dispatcher Heather O'Dell, testified that on Monday, January 28, 2019, she arrived at Jasper P.D. at approximately 1800hrs, and was made aware of a call that was "rolling over" to her shift involving Qualls being at Jasper Memorial Hospital (JMH) and there being confusion whether it was Jasper County Sheriff Department's (JCSO) call or the City of Jasper's.  (p. 1).  At approximately 18:28hrs, she received a call from JCSO TCO Burrow advising Qualls is at JMH, and is calling the JCSO repeatedly and she advised that Qualls is still admitted in the hospital and she is sending Deputy Cody Abshier as well. (p. 1-2). Jasper PD Sgt. Griffin and Officer Linebaugh responded and at approximately 19:35hrs went 10-8.  At approximately 20:10hrs a nurse with JMH ER, called advising they've had a problem with a patient, not wanting to stay in his room. (p. 2). At approximately 20:27, a second report of an issue with the patient not staying in his room came in from JMH, and they wanted to know how long before Officer's arrive, as they have people and ambulances coming in, and he may get aggressive. (p.2). Shortly after Officers arrived on scene, Officer Linebaugh advised everything was okay and Mr. Qualls is patiently waiting to be discharged from the hospital. (p. 2.).  At approximately 21:31hrs, JMH called advising Qualls has been discharged, and he is refusing to leave. (p. 2).  Officers were dispatched again to JMH at 21:32 hrs, Sgt. Griffin called and advised that they offered Mr. Qualls a ride but he refused, and he just wanted to stand outside of JMH. Officers are sitting outside of JMH to see if he will just walk away, but someone on the hospital staff opened the doors and is currently talking to him. (p. 2). At 22:02hrs, a nurse with JMH called stating the cops escorted him out of the building but now he keeps pressing the emergency staff button outside the door, and when he does so it sets the alarm off, and the only way they can turn it off is by opening the door. (p. 2) The nurse stated that they want him off the property, he has been seen, treated, and he needs to go. (p. 2). O'Dell dispatched Officers again at 22:03hrs; by 22:07hr Griffin advised Qualls was in custody for public intoxication and enroute to Jasper P.D. (p. 2). O'Dell witnessed, via camera feed, Mr. Qualls entered JPD book-in at approximately 22:22hr without incident. (p. 2). She was made aware by Officers that he wasn't going to be dressed out to inmate clothing and he was being placed in detox cell due to the level of intoxication. (p. 2).  O'Dell was familiar with Qualls, as he had been in the Jasper PD Jail on at least one prior occasion, and had detoxed for one or more days, exhibiting similar characteristics to his current stay, such as similar movements, being very intoxicated, and not being able to communicate well. (p.2). Regarding Qualls' stay at the jail, the video/audio tapes referenced above most accurately reflect O'Dell's interactions with Qualls, and the affidavit testimony is consistent with same. (p. 2). During shift change, day shift TCO Rustie Delome was made aware of Mr. Qualls being heavily under the influence and that he was not able to communicate clearly and to keep an eye on him. (p. 2).  When O'Dell came on the next day at 1800 hrs, TCO Delome advised her that Peters advised dispatch not to feed Mr. Qualls, but to have an Officer give his meal to him. (p.3).  Shortly after shift change, Sgt. Griffin entered dispatch and was given Mr. Qualls meal, and then provided it to Mr. Qualls. (p.3).  On this second

night, again the video/audio tapes referenced above most accurately reflect O'Dell's interactions with Qualls, and the affidavit testimony is consistent with same (p. 3-4). But, not on the video, at approximately 19:20hrs, is Det. Josh Hadnot, bringing Qualls' cell to O'Dell's attention via camera feed, where she observed what appeared to be Qualls bent over on his knees with his back facing the camera in the middle of the floor, and next to him a dark/black liquid. (p.3). She asked Det. Hadnot to go and check, because she also knew that there was a drain in the floor close to him and was concerned that something had come out of the drain. (p.3). Detective Hadnot returned advising to contact Sgt. Griffin, and have them come and check on him, and that the liquid appears to be vomit or possibly feces due to the dark color, but did not appear to be blood. (p.3). Around 19:23hrs, Sgt. Griffin was contacted via phone making him aware of Mr. Qualls' status. (p.3). Detective Hadnot departed and advised O'Dell to update him on the status of Qualls once determined by Sgt. Griffin. O'Dell stated she checks the television screen to review the jail and other areas of the department, versus physically going to these area, multiple times. (p.3). She checked the television screen on Qualls multiple times every hour during both her shifts while he was in the detox cell during this incarceration. (p.3). Sgt. Griffin was made aware that the black liquid appeared to be vomit, and that he was now laying in it and he needed to be checked out. (p.3). At approximately 1940hrs, Sgt Griffin and Officer Linebaugh entered Detox cell to tend to Qualls, as shown in the video. (p.3). O'Dell asks Sgt. Griffin if EMS was needed, and Griffin replied no, Mr. Qualls is "coming down" and he is dehydrated. (p.3). O'Dell did not question, or disagree with, his decision regarding EMS, and stated it was his call, and he was in the cell with Mr. Qualls, and therefore, he was in a better position than her to make that determination. (p.3). At 23:00hrs, O'Dell observed Mr. Qualls vomiting for the second time and notified Sgt Griffin and Officer Linebaugh. (p.3). Officer's responded and tended to Qualls, and checked on Qualls for the remainder of their shift, as shown in the video. (p.3). At approximately 06:00 hrs, O'Dell advised TCO Chasity Bearden of all the calls, jail issues, and the current inmates, including Mr. Qualls being in the Detox Cell, and of his twice vomiting a black substance, and the Officers cleaning and re-positioning him. (p.4). As O'Dell assisted TCO Bearden in dispatch, they witnessed, in the Detox camera view, Qualls moving and rolling from his mat to the middle of the floor and making sounds. (p.4). Qualls continued rolling from his mat to the middle of the floor up to the point in time when O'Dell exited the department ending her shift at approximately at 07:32. (p.4). These movements and sounds were consistent with what she had experienced with Qualls in the past. (p.4). *See* Ex. "H."

## STATEMENT OF ISSUES TO BE RULED UPON

I.   Defendants' Motion for Summary Judgment on Plaintiff's 42 U.S.C. § 1983 claims against Griffin, Linebaugh, O'Dell, and Hadnot, should be granted, as there is no Fourteenth Amendment inadequate medical care episodic act or omission case that can be proved, against any of these individual Defendants.

II.  Defendants' Motion for Summary Judgment on Plaintiff's 42 U.S.C. § 1983 claims against Jasper should also be granted, as there is no Fourteenth Amendment inadequate medical care episodic act or omission case, or conditions of confinement case, that can be proved against Jasper.

III.    Defendants' Motion for Summary Judgment on Plaintiff's 42 U.S.C. § 1983
claims against Griffin, Linebaugh, O'Dell, and Hadnot should be granted,
as Plaintiff cannot overcome Defendants' qualified immunity.

## MOTION FOR SUMMARUY JUDGMENT STANDARD OF REVIEW

93.    A party may move a court to enter summary judgment before trial.  FED. R. CIV.

PROC. 56(a) and (b).  Summary Judgment is appropriate if the moving party identifies pleadings,

depositions, answers to interrogatories, and admissions on file, which establish there is no genuine

issue of material fact and the moving party is entitled to judgment as a matter of law.  *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Only disputes about those facts preclude the

granting of summary judgment.  *Id.* "Factual disputes that are irrelevant or unnecessary will not

be counted." *Anderson*, 477 U.S. at 248.

94.    Once the movant meets its burden under Rule 56, the non-movant must designate

specific facts showing there is a genuine issue for trial.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586-87 (1986).  Conclusory assertions or denials in pleadings,

unsupported by specific facts presented in affidavits opposing the motion for summary judgment

are insufficient to defeat a proper motion for summary judgment.  *Lejaun v. Nat'l Wildlife*

*Federation*, 497 U.S. 871, 888 (1990); *Celotex Corp.*, 477 U.S. at 322 n.3.  A court should view

all evidence and the reasonable inferences to be drawn therefrom "in the light most favorable to

the party opposing the motion."  *United States v. Diebold*, 369 U.S. 654, 655, (1962).  But,

"[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not

sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539,

541 (5th Cir. 2003).

95.    "[W]here the nonmoving party fails to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial, no

genuine issue of material fact can exist," and summary judgment must be granted.  *Apache Corp.*

*v. W&T Offshore, Inc.*, 626 F.3d 789, 793 (5th Cir. 2010). *Id.* at 1953-54.

## SUMMARY OF THE ARGUMENT

96.     Plaintiff complains about alleged Fourteenth Amendment Constitutional violations

under 42 U.S.C. § 1983 based on alleged inadequate medical care - episodic acts/omissions and

conditions of confinement.  However, Plaintiff fails to state, and cannot prove, a claim against

Defendants under this federal statute or constitutional provision, or overcome each individual

Defendant's qualified immunity.  Thus, Defendants must be granted summary judgment under

FRCP 56, and Plaintiff's claims against all Defendants should be dismissed with prejudice.

## ARGUMENT AND AUTHORITIES

**I.      Defendants' Motion for Summary Judgment on Plaintiff's 42 U.S.C. §
1983 claims against Griffin, Linebaugh, O'Dell, and Hadnot, should be
granted, as there is no Fourteenth Amendment inadequate medical care
episodic act or omission case that can be proved, against any of these
individual Defendants.**

97.     Plaintiff asserts Section 1983 constitutional claims allegedly occurring while Qualls

was a pretrial detainee at the Jasper Police Depart jail, based upon alleged episodic acts/omissions

and conditions of confinement related to medical care.  *See* Doc. 1, generally.  "The constitutional

rights of a pretrial detainee flow from both the procedural and substantive due process guarantees

of the Fourteenth Amendment." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir.

1999)(citation omitted). The Fourteenth Amendment provides, no state shall "deprive any person

of life, liberty, or property, without due process of law. ..." U.S. Const. Amend. XIV, § 1.  "The

Due Process Clause of the Fourteenth Amendment guarantees that a person detained by the police

is entitled to medical care." *Carter v. Reach*, 399 F. Appx. 941, 942 (5th Cir. 2010). 42 USC Section

1983 provides a vehicle for redressing the violation of federal law by those acting under color of

state law. *Nelson v. Campbell*, 541 U.S. 637, 643, 124 S. Ct. 2117, 158 L. Ed. 2d 924 (2004).

98.     It is Defendants' position that Plaintiff cannot plead and prove a Fourteenth Amendment 42 U.S.C. § 1983 episodic act or omission claim against the current and/or former individual City of Jasper employee Defendants herein, as they committed no act or omission that violated the Fourteenth Amendment protections related to medical care.  Further, as demonstrated in the *next* section on Section 1983 liability against a municipality, Plaintiff cannot establish, but "[Plaintiff] must establish: a policy maker, an official policy, and a violation of a constitutional right whose moving force is the policy or custom." *Hines v. Henson*, 293 Fed. Appx. 261, 263 (5th Cir. 2008)(citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). These elements are required, as Jasper cannot be vicariously liable for the actions of its employees in a 42 U.S.C. § 1983 cause of action.  *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978).

99.     In the Fifth Circuit, "there is no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care." *Thomas v. Mills*, 614 Fed. Appx. 777, 778 (5th Cir. 2015)(quoting *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001)). "Constitutional challenges by pretrial detainees may be brought under two alternate theories: as an attack on a 'condition of confinement' or as an 'episodic act or omission.'" *Reed v. Wichita Cty. (Estate of Henson)*, 795 F.3d 456, 462 (5th Cir. 2015)(quoting *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009)(citing *Hare*, 74 F.3d at 644-45)). A condition of confinement case, is a claim against the municipality, as same involves a constitutional challenge to "general conditions, practices, rules, or restrictions of pretrial confinement." *Hare*, 74 F.3d at 644.  By contrast, an episodic acts or omissions claim "faults specific jail officials for their acts or omissions." *Shepherd,* 591 F.3d at 452.  While an episodic acts or omissions case can be maintained against a municipality, a state actor is "interposed between the detainee and the municipality, such that the detainee

complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Reed,* 795 F.3d at 463 (quoted citation omitted).

100.    Regarding episodic act or omissions, the Fifth Circuit has determined that the Fourteenth Amendment inadequate medical treatment claims applicable to pretrial detainees are governed by the same standard as applied by the United States Supreme Court to inadequate medical treatment of convicted prisoners under the Eighth Amendment - a "deliberate indifference to serious medical needs" standard.   *Hare v. City of Corinth*, 74 F.3d 633, 648-50 (5th Cir. 1996)(*Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991); *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014).  Accordingly, Defendants cite herein both Eighth and Fourteenth Amendment cases with respect to the interpretation of the deliberate indifference standard.  The Fifth Circuit determined, "… despite the distinct constitutional sources of the rights of pretrial detainees and convicted inmates, state jail and prison officials owe the same duty to provide the same quantum of basic human needs and humane conditions of confinement to both groups. … a pretrial detainee's rights are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.' … That pretrial detainees may have more protections or rights in general, however, does not mean that they are entitled to greater protection of rights shared in common with convicted inmates." *Hare*, 74 F.3d at 649 (citations omitted).

101.    Deliberate indifference is an extremely high standard to meet.  *Sanchez v. Young Cty., Texas*, 866 F.3d 274, 280 (5th Cir. 2017)(citation omitted); *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006); *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  To establish subjective deliberate indifference, plaintiff must show that the defendants had "subjective

knowledge of a substantial risk of serious harm" to the inmate's health, and they responded with deliberate indifference to that risk. *Reed*, 795 F.3d at 465; *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 394 (5th Cir. 2000); *Hines v. Henson*, 293 Fed. Appx. 261, 263 (5th Cir. 2008)(applying this deliberate indifference standard to a right of medical care case); *Olabisiomotosho*, 185 F.3d at 526 (citing *Hare*, 74 F.3d at 650). It appears that currently, two elements are required: "[t]o succeed on a deliberate-indifference claim, plaintiffs must show that (1) the official was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' and (2) the official actually drew that inference."[4] *Dyer v. Houston*, No. 19-10280, 2020 U.S. App. LEXIS 11199, *9 (5th Cir. April 9, 2020)(citing *Domino*, 239 F.3d at 755)(quoting *Farmer*, 511 U.S. at 837)); *Reed*, 795 F.3d at 464 (citations omitted); *Calhoun v. Hargrave*, 312 F.3d 730, 734 (5th Cir. 2002). "Negligence is insufficient to meet the standard for deliberate indifference." *Hines*, 293 Fed. Appx. at 263. "[E]ven gross negligence" is not enough. *Hare*, 74 F.3d at 645. Further, liability only attaches if the defendant actually knows about, not merely should have known about, the significant risk of harm. *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 528 (5th Cir. 1999)(citing *Farmer*. 511 U.S. at 838 ("An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment)).

---

[4] The Fifth Circuit has, at times, applied a third subjective intent to harm element, but has more recently, and perhaps more often, not applied same. *Sanchez v. Young Cty.*, 866 F.3d 274, 280 (5th Cir. 2017)(**applied** subjective intent to harm element); *Trevino v. Hinz,* 751 Fed. Appx. 551, 554 (5th Cir. 2018)(same); *Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011)(same); *Tamez v. Manthey*, 589 F.3d 764, 770 (5th Cir. 2009)(same); *Mace v. City of Palestine*, 333 F.3d 621, 626 (5th Cir. 2003)(same); *Thompson v. Upshur County*, 245 F.3d 447, 458-59 (5th Cir. 2001)(same); *Dyer v. Houston*, No. 19-10280, 2020 U.S. App. LEXIS 11199, *9 (5th Cir. April 9, 2020)(**did not** apply subjective intent to harm element); *Garza v. City of Donna*, 922 F.3d 626, 635-36 & n.6 (5th Cir. 2019)(*Garza*, and the numerous citations omitted did not apply same); *Sabbie v. Southwestern Corr., LLC*, 2019 U.S. Dist. LEXIS 214463, *116 (E.D. Tex. Mar. 6, 2019)(did not apply subjective intent to harm element). However, because there is no clear consensus Defendants alternatively assert the subjective intent to harm element, and to the extent this Court determines the subjective intent to harm element applies, Defendants assert Plaintiff has also failed to plead and prove same.

102.    The test for establishing deliberate indifference is "one of subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 837.  Accordingly, Plaintiffs' pleadings and proof must show someone "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert*, 463 F.3d at 346. (citation omitted); *see also Wakat v. Montgomery County*, 471 F. Supp. 2d 759, 770 (S.D. Tex. 2007) (citations omitted); *Domino*, 239 F.3d at 756, *Hines*, 293 Fed. Appx. at 263.

103.    Importantly, deliberate indifference may **not** be predicated on unsuccessful medical treatment, *negligence*, medical malpractice, disagreement with treatment, *whether to provide additional treatment*, or *negligent medical judgment.  Gobert*, 463 F.3d at 346 (citations omitted).[5]

104.    Considering the above, the almost 36 hours of undisputed video, and other, evidence fails to demonstrate any malice, ill will, or subjective deliberate indifference, to Qualls,' care, or medical needs, by Defendants herein.  Instead, the evidence establishes nothing but care and concern for Qualls, and his health/medical needs, as evidenced by the undisputed facts and each Defendant's tone as they dealt with Qualls.  By way of example, the evidence shows Qualls was

---

[5] *See also Estelle v. Gamble*, 429 U.S. 97, 107, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)(the decision whether to provide additional treatment "is a classic example of a matter for medical judgment."); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991); *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)("incorrect[] diagnos[is]" by prison medical personnel and unsuccessful medical treatment does not state a claim for deliberate indifference nor give rise to a 1983 cause of action); *Fielder v. Bosshard*, 590 F.2d 105, 107 (5th Cir. 1979)(mere negligence, neglect or medical malpractice does not give rise to a claim); *Hall v. Thomas*, 190 F.3d 693, 697-98 (5th Cir. 1999)(same); *Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001)(same); *Stewart,* 174 F.3d at 534 (same); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)("Disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs."); *Delaughter v. Woodall*, 909 F.3d 130, 136 (5th Cir. 2018)(same); *Spears v. McCotter*, 766 F.2d 179, 181 (5th Cir. 1985)(same); *Young v. Gray*, 560 F.2d 201, 201 (5th Cir. 1977)(same); *Farmer*, 511 U.S. at 838 (the "failure to alleviate a risk that [Defendant] should have perceived but did not" is insufficient to show deliberate indifference); *Domino*, 239 F.3d at 756 (same); *Murrell v. Bennett*, 615 F.2d 306, 310 n. 4 (5th Cir. 1980)(Deliberate indifference is "something more than a medical judgment call, an accident, or an inadvertent failure."); *Graves v. Hampton*, 1 F.3d 315, 319 (5th Cir. 1993)("It is firmly established that negligent or mistaken medical treatment or judgment does not implicate the eighth amendment and does not provide the basis for a civil rights action.").

intoxicated and initially examined by EMS and brought to Jasper Memorial Hospital, where he was examined, evaluated, treated and observed, over about a 5-hour period, and medically released, before being arrested for public intoxication, and brought to the Jasper jail.  Although during this time Griffin, Linebaugh, and/or Abshire patiently dealt with Qualls at the hospital trying to get him into his room, or to eat the sandwich, or to drink the water provided, as well as trying to find him a ride, no one, including Jasper County, or his own mother (Plaintiff if this case), or apparently nearby relatives, would deal with Qualls, or pick him up from JMH.  Once medically discharged, JMH called Jasper P.D., and Griffin and Linebaugh returned again.  Not wanting to arrest Qualls, Griffin and Linebaugh gathered his jacket and discharge papers, and walked him out of JMH, and told Qualls that they would take him anywhere in the County he wanted to go, or he could walk.  However, Qualls would not tell them where he wanted to go, nor get in the car, nor walk.  Even then, Officers Linebaugh and Griffin left Qualls alone, got in their vehicles, and went across the parking lot to see if he would start walking.  Instead, Qualls simply tried to re-enter JMH, setting off its alarms. Unfortunately, JMH, then called Jasper P.D. to have him removed from their property.  So, essentially, after all of their efforts to help and care for Qualls, Linebaugh and Griffin were forced to arrest him and take him to the Jasper PD jail.   At the jail, Linebaugh medically questioned/screened Qualls, identified him as being intoxicated, and Griffin allowed him to remain in his street clothes; thus, avoiding potential problems with dressing out an intoxicated person. Griffin thoroughly searched Qualls, and placed him in a detox cell which was monitored by 24-hour a day surveillance camera, and in person periodically, as he "sobered up." Although Plaintiff complains about the search, Defendants have found no constitutional right to whatever she believes is an adequate search.  The evidence also establishes almost 50 times where Defendants, or other City employees, personally interacted with, or looked in on, Qualls, during his 34-hour detention,

and every personal interaction was polite, professional, and caring in tone, and they attempted to answer every single question posed by Qualls, and explain any situation, and/or they were involved in providing him water and meals, and encouraging him to eat and drink and sleep, as same would help him with his intoxication.  Further, when they were not assisting Qualls, they were otherwise doing their other job tasks.  The evidence establishes the three dispatchers, including O'Dell, and other Officers (Peters, and Hadnot who first discovered Qualls vomiting), also used the 24-hour surveillance system to monitor Qualls, and all three dispatchers, including O'Dell, said they checked Qualls at least once per hour, but usually, multiple times per hour, including, depending on the dispatcher, as much as 5-10, or 8-10, times per hour, or more.  The evidence establishes, each shift reported to the next shift concerning Qualls' intoxicated condition and that he needed to be watched. Further, all the dispatchers, including O'Dell, had a previous experience with Qualls where he was intoxicated, and two noted prior detoxing for one or more, or two to three, days, as did Peters, and during which Qualls exhibited all the same symptoms he had during this visit.  Fulcher also said he had seen individuals detox for two or more days, and Griffin, the entire time, felt that Qualls was properly detoxing and just had to get it out of his system, and hopefully would be detoxed in one to two days.  Importantly, the evidence establishes Defendants did not subjectively know what he was on, or what he had consumed, or the amount which caused his intoxication, or when he consumed same. Although Defendants Griffin, Linebaugh and O-Dell where present soon after Qualls threw up twice, and when the *empty* baggie was discovered, there is no recorded discussion, or evidence, indicating any one of them subjectively thought Qualls had recently consumed same at the jail, and the contemporaneous speculative discussions regarding causation, with respect to Qualls throwing up, centered around food consumed at the jail, as well as consuming charcoal and/or the baggie, *before* the ambulance picked him up, and nothing else.  Regardless, there is no evidence or discussion

indicating that anyone subjectively knew what was in the baggie, how much was in the baggie, or how the baggie got there.  Further, they all responded quickly each time Qualls threw-up, explained to Qualls what they were going to do, and cleaned up the floor, and Qualls.  While Qualls did yell when they lifted and slid him over twice, there is no video evidence he verbally, or by any action, indicated what caused him to yell, or that he was suffering from some physical or medical problem. As to the black color of the vomit, again, the recorded contemporaneous comments reveal all three felt it was likely caused by consuming charcoal before EMS picked him up, and O'Dell indicated she thought he had thrown up black stuff the last time he was in the jail.  Although the intercom system was broken, there is no video evidence Qualls attempted to use same.  Defendants note that all of Griffin's contemporaneous comments establish his belief that Qualls was starting to undergo his normal detoxification process, and needed to throw up, and might do so again; not once is any significant medical condition, other than intoxication, either mentioned or considered by Defendants. It should also be noted Qualls was looked in on 7 times in the 7 hours Griffin and Linebaugh had remaining to work after he threw up the second time, with no significant negative change in Qualls' behavior.  Further, all the Defendants knew he had been seen at the JMH and released.   Additionally there where large amounts of time where officers and employees were in the book-in area, and throughout all of the recorded verbal remarks Qualls made, he never once asked an employee at Jasper P.D. for medical help, nor did he state to anyone that he needed medical care, nor did he exhibit any out-of-the-ordinary symptoms that any Defendant recognized as justifying a need for immediate emergency medical care or treatment.  While Qualls may have used the word "help" a few times during this 30-plus hour period, again there is no evidence that anyone heard same, or related same to a serious medical problem.  Finally, unfortunately the last 1.5 hours of Qualls life were during shift change, and the last 15-30 or so minutes of video show Qualls' activity level,

talking and sounds increase, the evidence shows that when O'Dell and Gray, observed same on video, or heard same, whenever they looked, or could hear, or paid attention, they neither saw nor heard anything out of the normal course of events based upon their prior observations of Qualls, and important here, there is certainly no evidence they knew something was seriously medically wrong with Qualls and failed to take action.  There is simply no evidence of deliberate indifference by any Defendant here (i.e., no evidence any Defendant here was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; nor any evidence any Defendant actually drew that inference and/or intended to harm, Qualls).  Further, Plaintiff's prior medical treatment by EMS and at the Hospital necessarily negates deliberate indifference,[6] and the failure to return him to the hospital after being placed in the detox cell is at most negligence, which is not actionable.  Again, while Mitchell vomited during his detention, "[a]s a matter of common sense, vomiting does not always indicate medical distress in the sense that it requires immediate medical attention." *Trevino v. City of Fort Worth*, No. 4:17-CV-227-A, 2017 WL 3704511, at \*5 (N.D. Tex. Aug. 25, 2017).  Importantly, and again, there is no evidence which indicates any particular Jasper employee refused to treat him upon request, ignored any complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious or immediate medical needs any Defendant was aware of.  Plaintiff's Fourteenth Amendment claims and the evidence support, at most, nothing more than negligence in the failure to discover an underlying serious medical[7] condition or issue of an intoxicated person, based upon ambiguous intermittent symptoms such as vomiting, incoherent speech/mumbling, etc., most of which, Qualls

---

[6] Medical treatment such as examinations, diagnostic procedures, and prescribing medications, some of which are pled to exist here, negate claims of deliberate indifference.  *Bass v. Sullivan*, 550 F.2d 229 (5th Cir. 1977); *Mendoza v. Lynaugh*, 989 F.2d 191, 193-95 (5th Cir. 1993)(same); *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995).

[7] Plaintiff also asserts an unspecified underlying "mental" condition, but Plaintiff does not factually plead how this "mental" condition was, or could have been, discovered, nor how the failure to discover/treat same caused his death.

had exhibited in past interactions and/or detentions, including successfully detoxing for days, and

accordingly, same must be dismissed under the factually similar case law requiring pleadings, and

proof, of deliberate indifference, which does not exist here.[8] Without a constitutional violation rising

to the level of deliberate indifference, no Defendant can be liable, whether based upon personal

---

[8] Several factually similar Fifth Circuit cases have dismissed, or granted summary judgment on, plaintiff's claims under the Fourteenth Amendment, where the detainee was intoxicated, exhibited ambiguous symptoms such as those in this case, and did not receive medical treatment: *Trevino*, 751 Fed. Appx. at 754-56 (The court doubted whether Plaintiff had alleged facts demonstrating deliberate indifference, as opposed to negligence, in not realizing the gravity of Plaintiffs' intoxication and failing to call an ambulance, but the court instead focused on, and granted dismissal based on, the officers' qualified immunity, as the law was not clearly established that, officers who failed to recognize ambiguous symptoms, such as vomiting, having several shaking episodes, and telling officers she was sick, as constituting a medical emergency, had violated clearly established law); *Sanchez v. Young Cty.*, 866 F.3d 274, 277-78 and 280 (5th Cir. 2017)(The court granted summary judgment finding no deliberate indifference, even though plaintiff was arrested for public intoxication, and the husband had told authorities she was missing and was a suicide risk, she was intoxicated when officers found her sleeping in the driver's seat of her car at 5 p.m., she had slurred speech, responded slowly, had trouble keeping her eyes open, and walked unsteadily, there was an empty pill bottle on the passenger floor board, and were empty beer cans in the back of the car, and opened and partially empty packets of medication in her purse, and she fell asleep during a horizontal gaze nystagmus test, she admitted to earlier drinking and taking medication, they did not take her to the hospital but did have a medic evaluate her, and while at the jail her husband called and requested that they take her to the hospital and a MHMR facility, but jail staff said she was just drunk and needed to sleep it off, and about 8.5 hours after being placed in a jail cell, she was found unresponsive, and was pronounced dead at the hospital from mixed drug intoxication); *Tamez v. Manthey*, 589 F.3d 764, 770-71 (5th Cir. 2009)(Unknown to the officers, pre-arrest, plaintiff swallowed a baggie of cocaine that had burst. Despite the fact that the officers observed that plaintiff had maximally dilated pupils and a nurse suggested that he needed medical clearance/treatment before going to jail, the officers did not seek medical help; nevertheless, summary judgment was granted, because pupil dilation can mean a lot of things, and neither pupil dilation, nor the need for medical clearance shows that the officers were aware of an unjustifiably high risk to plaintiff's health, or that plaintiff needed immediate attention, or that they were deliberately indifferent.); *Estate of Allison v. Wansley*, 524 F. Appx. 963, 972 (5th Cir. 2013)(The trial court's denial of summary judgment was reversed and qualified immunity was granted where officers knew a women in custody – who later died of ethanol poisoning – smelled of alcohol, failed a field sobriety test, refused to take a breathalyzer exam, "was very intoxicated, had taken prescription drugs not in accordance with directions, had attempted to commit suicide using pills a year earlier" but nevertheless allowed her to "sleep it off" while checking on her periodically," to make sure she was breathing and noting that she passed out and otherwise moaned and mumbled The woman was unsteady, slurred her speech, and told officers she had abused prescription drugs, yet the officers believed her symptoms were consistent with intoxication and did not believe she was having a medical emergency. The Court found no evidence of deliberate indifference, and further held it was objectively reasonable to allow an intoxicated detainee to "sleep it off" with periodic monitoring to safeguard her well-being); *Hines v. Henson*, 293 Fed. Appx. 261, 262-64 (5th Cir. 2008)(summary judgment was granted on an inadequate medical care claim where detainee plaintiff alleged the jail staff observed plaintiff exhibiting signs of intoxication, placed him in a detox cell, listed him as a medical risk and was allegedly denied medical care for a pre-arrest stroke, because there was no showing the jail staff knew he was in need of serious medical care and nevertheless denied him medical care, or ignored his complaints. Also, the Court denied plaintiff's deliberately indifferent policy claim as the policy to place individuals in detox cells did not authorize a denial of medical care to intoxicated individuals, and other policies dealt with medical needs of inmates).

participation, supervisory, or bystander liability, or ratification, and any such claims of Plaintiff, if

any, are subject to summary judgment, and should be dismissed.

II.     **Defendants' Motion for Summary Judgment on Plaintiff's 42 U.S.C. § 1983 claims against Jasper should also be granted, as there is no Fourteenth Amendment inadequate medical care episodic act or omission case, or conditions of confinement case, that can be proved against Jasper.**

105.     Regarding **episodic act or omission claims**, for municipal liability to attach under

the Fourteenth Amendment, a plaintiff must prove (1) a governmental employee acted with

*subjective* deliberate indifference (as described in the preceding section) and (2) the employee's

act resulted from a policy or custom adopted or maintained with *objective* deliberate indifference

to the plaintiff's constitutional rights. *Olabisiomotosho,* 185 F.3d at 526.  Thus, under the first

element, if no Jasper employees/officers committed a constitutional violation (an episodic act or

omission that constituted subjective deliberate indifference to Plaintiff's medical needs), Jasper

cannot be held liable.  *Olabisiomotosho,* 185 F.3d at 529.  Further, even if unconstitutional

employee conduct is proven, which it undisputedly has not, "[t]he unconstitutional conduct must

be directly attributable to the [governmental entity] through some sort of official action or

imprimatur; isolated unconstitutional actions by [governmental] employees will almost never

trigger liability." *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (citation

omitted).  Therefore, a plaintiff "must point to more than the actions of [a Jasper] employee, they

must identify a policymaker with final policymaking authority and a policy that is the 'moving

force' behind the alleged constitutional violation." *Id.*  An official policy is either a policy

statement, ordinance, regulation, etc., that has been officially adopted by a policymaker, or a

persistent, widespread custom or practice of officials or employees, which although not authorized

by officially adopted and promulgated policy, is so common and well settled as to constitute a

custom that fairly represents the municipality's policy. *Cox v. City of Dallas*, 430 F.3d 734, 748

(5th Cir. 2005). If a custom/practice exists, the policymaker must have either actual or constructive

knowledge of the alleged policy due to its duration and frequency. *Id.*; *Rivera*, 349 F.3d at 249.

106.    However, isolated alleged unconstitutional actions by a city employee(s) will

almost never trigger liability (i.e., no required unconstitutional policy or custom demonstrated),

and where the evidence, as here, does not demonstrate this singular governmental action (i.e.,

failure to discover Qualls needed medical treatment) was taken with deliberate indifference to a

known or obvious unconstitutional consequence/injury, nor a pattern of inadequate medical care,

training or supervision, no claim can be maintained. *Wakat,* 471 F. Supp. 2d at 769 (citations

omitted); *See also Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010)("Deliberate

indifference is more than mere negligence."); *Burge v. St. Tammany Parish*, 336 F.3d 363, 370

(5th Cir. 2003)(holding that proof of deliberate indifference generally requires a showing "of more

than a single instance of the lack of training or supervising causing a violation of constitutional

rights")(citation omitted); *Valle v. City of Houston*, 613 F.3d 536, 548 (5th Cir. 2010) (the "[p]rior

instances must point to the specific violation in question; 'notice of a pattern of similar violations

is required.'"); *Cousin v. Small, 325* F.3d 627, 637 (5th Cir. 2009) (Plaintiffs must plead

more than a single incident or a single person in which there was inadequate supervision; rather,

they must plead a "a history of wide-spread abuse."). Plaintiff's Original Complaint has

failed to do so here. *See* Doc. 1, generally.

107.    In *Olabisiomotosho,* the Court held neither the City, nor its officer employees

could be held liable for subjective deliberate indifference, even though plaintiff told the arresting

officers she had asthma, informed them that they were walking her too fast, she was wheezing and

experiencing shortness of breath, and later at the jail she requested to go to the clinic and was

coughing really bad and wheezing really loud, and a judge ordered her to the medical clinic which was unheeded, as there was no evidence they knew of a substantial risk of serious harm, and disregarded same. *Id.* at 527-29.

108.   Considering the above, because Defendants have already demonstrated no Jasper employees/officers committed a constitutional violation (i.e., an episodic act or omission that constituted subjective deliberate indifference to Plaintiff's medical needs), Jasper cannot possibly be held liable.  Further, the evidence does not establish an *unconstitutional written* policy, act or omission, by the authorized policymaker of Jasper (the Jasper City Council), which was causally related to the incident at issue, nor any prior similar incidents. In fact, the written policies are asserted as, and shown to be, constitutional, as Plaintiff, in a conclusory fashion, claims a violation of same, through practice or custom, is some evidence of a constitutional violation. Doc. 1, ¶¶ 72-78.  Further, the relevant City Policy is Constitutional.  By way of example, Jasper P.D. written policy No. 5.100, pertaining to the Detention Facility, states that if Jasper P.D. employees have a doubt about the health or medical condition of a detainee, the officer should summon the paramedics or EMT.  Plaintiff fails to prove, or factually identify, any prior frequent custom or practice that violated these policies, and caused injury, or a similar injury, much less any unconstitutional custom or practice that caused similar injury.  *Id.* Although Plaintiff generally alleges the City Council, City Manager or Chief of Police may have been a policymaker, the undisputed evidence establishes the City Council is the policy maker, and there is no pleading, or evidence, that Defendants are aware of, where the City Council approved of, or was aware of a policy or custom to deliberately withhold medical treatment.  Doc. 1, ¶ 90.    While Plaintiff generally lists policies, practices and/or customs that allegedly were the moving force behind Qualls' death, there is not any evidence of even *one* prior factual instance of a similarly occurring

death, or injury, much less a prior death, or injury caused by an unconstitutional policy, practice or custom.  Doc. 1, ¶¶ 91-92.  There is simply no factual pleading, supported by evidence, indicating a persistent, widespread, frequent unconstitutional custom or practice of officials or employees, which was known by the City Council policymaker, and which caused similar alleged unconstitutional injuries, and which was so common and well settled as to constitute a custom that fairly represents Jasper's policy. Further, there is also no evidence indicating that in this instance, there was any underlying unconstitutional action causing injury, nor any actual knowledge of same by Council, nor deliberate indifference by, Jasper or its employees, with respect to Qualls' serious medical needs.  Also, many of the alleged policies, practices, or customs involve the alleged failure to have a particular type of policy, measure, personnel or equipment in place, and are thus, not policies at all, nor is there any evidence proving that their alleged absence constituted an unconstitutional practice or custom which caused this or any prior injury.  Further, there is a failure to identify any constitutional deficiency within any alleged, yet to be proven, policy or custom which either caused injury, or similarly caused prior injury.  Finally, Plaintiff's pleadings, and facts related to policy or custom appear to have only led to, at most, alleged acts of medical negligence, negligence, or failures to act or discover medical issues, or failure to seek additional medical treatment, by Jasper employees, rather than deliberate indifference by Jasper employees, or its authorized policy maker – the City Council.  Thus, Plaintiff cannot prove, a 42 U.S.C. § 1983 Fourteenth Amendment medical episodic act or omission deliberate indifference claim against Jasper; and, summary judgment and dismissal is required as against said alleged claims.

109.    Regarding **condition of confinement claims**, "the proper inquiry is whether those conditions amount to punishment of the detainee." *Garza v. City of Donna,* 922 F.3d 626, 632 (5th Cir. 2019).  "'[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is

arbitrary or purposeless—a court permissibly may infer that the purpose of the government action is punishment that may not constitutionally be inflicted upon detainees …'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 539 (1979). Conversely, "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell,* 441 U.S. at 539. Thus, to be actionable, "[p]er *Bell*, such condition must be 'not reasonably related to a legitimate governmental objective' and must cause the inmate's constitutional deprivation." *Id.* (quoting *Bell*, 441 U.S. at 539). The Supreme Court has held that government not only has an interest in ensuring a detainee's presence at trial, but also has an interest, and need, to manage its facility, as far as legitimate operational and administrative concerns, and measures, such as those relating to maintaining security and order, which without more, even if uncomfortable, do not constitute unconstitutional punishment. *Bell*, 441 U.S. at 540. "[A] proper application of *Bell's* reasonable relationship test is functionally equivalent to a deliberate indifference inquiry," as again, the issue is whether the conditions amount to punishment. *Hare*, 74 F.3d at 643. The Fifth Circuit has determined that the following elements must be established to prove a conditions of confinement claim: "(1) 'a rule or restriction or … the existence of an identifiable intended condition or practice … [or] that the jail official's acts or omissions were sufficiently extended or pervasive'; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of [a detainee's] constitutional rights. *Montano v. Orange Cnty., Tex.*, 842 F.3d 865, 874 (5th Cir. 2016) (quoting *Estate of Henson v. Wichita County*, 795 F.3d 456, 468 (5th Cir. 2015)). Having a written rule or restriction is self-explanatory. However, "A detainee challenging jail conditions [or practice, act, or omission] must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lessor showing cannot prove punishment in violation of the detainee's Due

Process rights." *Shepherd*, 591 F.3d at 454.  The Fifth Circuit has written proving "a pattern is a heavy burden, one that has rarely been met in our case law." *Id*. at 452.  Further, "isolated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate."  *Montano*, 842 F.3d at 876. Also, "a plaintiff must show that the pattern or practice "was the moving force behind the violation." *Sanchez v. Young Cty.*, 956 F.3d 785, 791 (5ᵗʰ Cir. 2020).  When that showing is made, the court "assume[s], by the municipalities promulgation and maintenance of the complained of condition that it intended to cause the alleged constitutional deprivation." *Flores v. County of Hardeman,* 124 F.3d 736, 738 (5ᵗʰ Cir.1997).

110.    Here this Court had previously identified 17 policies, practices, and customs of the City pled by Plaintiff, and previously rejected 8 of them as not being actionable alleged conditions of confinement policies.  *See* Doc. 39, p. 13-16.  Thus, some 9 unwritten alleged de-facto policies/practices/conditions remain: (1) The alleged custom/practice of failing to fully complete the prisoner intake form fails, as there is no evidence this alleged practice constituted punishment, nor that same caused, nor was same the moving force behind, Qualls' death as the form reflected his intoxication, nor is there any evidence that said practice  caused others any harm, illness, injury, or death, nor is there any evidence this was an identifiable intended practice, as the form of Qualls was completed, and in other instances same was completed when individuals sobered up, nor is there any evidence this alleged practice constituted a pervasive pattern resulting in a serious deficiency to basic human needs, such as medical care, or injury; (2) the alleged custom of not requiring arrestees to undergo a mental health evaluation fails as there is no evidence that same constitutes punishment, or that mental issues caused, or were the moving force behind, Qualls' death, nor is there any evidence that same caused others any harm, illness, injury, or death, nor is there any evidence this was an identifiable intended practice, nor is there any evidence this alleged

practice constituted a pervasive pattern causing a serious deficiency to basic human needs; (3) the alleged custom of allegedly allowing people to "detox" without appropriate jail or medical staff fails, as there is no evidence this alleged practice constituted punishment, or is deficient, nor led to any injuries, much less a pattern of deficiencies to medical care causing injury; further, Plaintiff does not specify, or prove, who might be "appropriate jail staff," but likely means "medical staff" and whether or not the City hires medical staff is an administrative function, and the City has a legitimate administrative, budgetary and operational interests in determining whether they hire medical personnel, or simply request them to come out to the jail to treat detainees on an as needed basis and/or then send them to a medical facility, if necessary; (4) there is no evidence of a common practice of ignoring inmates who are seriously intoxicated, or perceived as withdrawing from illegal drugs, nor was Plaintiff ignored, nor is there any evidence that he was perceived as having withdrawal symptoms, nor is there any evidence this was a widespread or pervasive practice; so, this claim fails; (5) the alleged custom of not using medical procedures and withdrawal protocols for inmates suffering from drug intoxication or abuse fails, as there is no evidence this alleged practice constituted punishment, and as there is no evidence this alleged policy is deficient, nor led to any prior injuries, much less a pattern of deficiencies to medical care causing injury; further, again same relates to City's legitimate administrative, budgetary and operational functions regarding whether it can provide medical services and protocols through hired staff, or simply have them come in, or have the inmate sent out, to receive same when needed; (6) the alleged custom of employing a mental health officer which was not required to evaluate prisoners thought to be detoxing fails, as there is no evidence this alleged practice constituted punishment, and as again, Qualls' mental health, and in turn this alleged practice, was not the moving force behind his death, or any other injury, nor is there any evidence the alleged practice constituted a pervasive pattern

resulting in a serious deficiency to basic human needs, such as anyone's mental; (7) the allegation of a practice of allowing dispatchers to turn audio in the dispatch area down, and thus, muting inmate requests and verbalization of pain fails, as there is no evidence this alleged practice constituted punishment, and as the evidence establishes there are numerous opportunities to request help, or verbalize pain, to the numerous officers and dispatchers that walk through, or work, in the book-in area in front of the detox cell, as well as the officers that continuously check on inmates, and inmates that simply ask for help loudly can be heard by dispatchers; additionally there is no evidence this alleged practice constituted a pervasive pattern resulting in a serious deficiency to basic human needs, such as medical care,  causing any prior injury; (8)  the alleged practice of requiring dispatchers to fulfill duties of supervision and care of prisoners, when they could not do so and fulfill their dispatch duties fails, as there is no evidence this alleged practice constituted punishment, and as the evidence does not establish dispatchers had supervisor duties, nor were they required to care for prisoners, in lieu of their dispatcher  duties, so same is not a proven identifiable practice, and consequently, there is no evidence same caused Qualls death, or led to any prior injury, much less a pattern of deficiencies to medical care causing injury; and (9) the allegation of a practice of placing a camera in  the detox cell at a location not visible to a viewer in the dispatch area fails, as this is not punishment, a portion of Qualls was always visible, same did not cause the injury at issue, nor is there any evidence same caused a prior injury, much less a pattern of deficiencies to medical care causing injury.  Finally, the death of Qualls was an isolated incident, and indeed, Plaintiff  cannot put evidence before this court of any prior inmate who was detoxing in the Jasper P.D. jail, that sustained an injury of any kind, much less an injury due to any of the alleged conditions of confinement put forth by Plaintiff, which constitutes punishment. The evidence in this case also establishes that Qualls was monitored 24 hours a day by camera,

and said monitors were checked numerous times per hour, and the Officers and dispatchers personally checked on or interacted with Qualls some 48 times over the 34-hour period he was there.  Qualls was not punished by any alleged condition, but instead was constantly monitored, looked after, and provided food and water.  If he had wanted medical care, the evidence shows, he just had to ask someone, and there was ample opportunity to do so, with the numerous Officers that traveled through, or stopped in, the book-in area, as well as the ones that specifically asked Qualls what he wanted.  While it is true that none of the individual Defendants suffered any adverse employment decision, the evidence above establishes these Defendants did not do anything to Qualls that was unconstitutional, or deliberately indifferent to him, or his medical needs, nor did any of the Defendants know, at any time, Qualls was at a significant medical risk, nor were they aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, nor did they actually draw that inference and/or intend harm.  Defendants simply subjectively believed he would safely detox, as he had in the past, and they checked on him regularly.  Accordingly, Plaintiff's condition of confinement claims against Jasper fail, and summary judgment as to same should be granted.

### III.   Defendants' Motion for Summary Judgment on Plaintiff's 42 U.S.C. § 1983 claims against Griffin, Linebaugh, O'Dell, and Hadnot should be granted, as Plaintiff cannot overcome their qualified immunity.

111.   Plaintiff generally, and in a conclusory fashion, simply asserts that "Defendants are not entitled to qualified immunity," and then, in foot note 1, argues that said judicially or "court created doctrine" or "qualified immunity" should be "abrogated or limited," but does not say how it should be limited.  ¶ 99.  Defendants deny that qualified immunity should be abrogated, and also note that because said immunity is "qualified," as opposed to "absolute," it is already somewhat

"limited;" however, qualified immunity should not otherwise be further limited beyond the existing case law that defines it.  Defendants assert their qualified immunity in this case.

112.    Governmental officials are entitled to qualified immunity if their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). The individual Defendants herein plead they are entitled to summary judgment on Plaintiffs' claims because the evidence establishes Defendants were, at all relevant times, performing their discretionary functions, and Plaintiffs' Complaint, and the undisputed evidence, fails to demonstrate why these individual Defendants are not entitled to qualified immunity.  *See* Doc. 1, generally (i.e., there is only one conclusory paragraph, ¶ 99, that addresses qualified immunity, and the remaining paragraphs do not factually plead what each of these Defendants did, so as to overcome immunity).

113.    [Q]ualified immunity is 'an immunity from suit rather than a mere defense to liability.'" *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014) (citing *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)(quoted cite omitted)).  Initially, Plaintiff is required to "state with factual detail and particularity the basis for the claim which necessarily includes why the defendant-official cannot successfully maintain the defense of immunity." *Elliot v. Perez*, 751 F.2d 1472, 1473 (5th Cir. 1985); *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002) (A plaintiff's complaint must allege facts of specific conduct and actions which give rise to a constitutional deprivation); *Stogner v. Sturdivant*, 515 Fed. Appx. 280, 282 (5th Cir. 2013)(plaintiff bears the burden of negating the defense and cannot rest on conclusory allegations); *Michalik v. Hermann*, 422 F.3d 252, 262 (5thCir. 2005)(same); *McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002)("[T]he burden is on the plaintiff to demonstrate the inapplicability of the [immunity] defense."); *Brown v. Glossip,* 878 F.2d 871, 874 (5th Cir. 1989) (a plaintiff must allege

particularized facts which, if proven, would defeat the presumption of immunity.).  At the summary judgment stage, a plaintiff must show, with proof specific to *each Defendant,* why immunity does not apply. *See Meadours v. Ermel,* 483 F.3d 417, 421 (5th Cir. 2007) (each official's actions must be evaluated individually, not collectively, and a plaintiff must demonstrate a lack of immunity for each defendant).  "In order to meet [this] burden, the plaintiff must show that 'the officers' actions were objectively unreasonable, in light of clearly-established law at the time, and in light of the information the officers possessed.'" *Stogner*, 515 F. App'x at 282 (*quoting Wagner v. Bay City, Tex.*, 227 F.3d 316, 321 (5th Cir. 2000).  "Qualified immunity 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" *Estate v. Davis v. City of N. Richland Hills*, 406 F.3d 375,380 (5th Cir. 2005)(quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

114.    A qualified immunity analysis involves two primary elements; the Court, must: (1) determine whether a constitutional right was in fact violated, *and* (2) whether a constitutional violation was clearly established at the time of the events in question and whether the officer acted unreasonably based upon said clearly established law. *Plumhoff*, 134 S. Ct. at 2020-23 (citations omitted); *Michalik v. Hermann*, 422 F.3d 252, 257 (5th Cir. 2005)(same).  The Court can determine which prong to analyze first. *Plumhoff*, 134 S. Ct. at 2020 (*Pearson*, 555 U.S. at 242).

115.    With respect to Plaintiff's first requirement (whether a constitutional right was violated), Defendants note, as demonstrated above, Plaintiff has not produced any facts indicating any one of the individual Defendants herein violated the Fourteenth Amendment's due process clause, or were deliberately indifferent to Qualls' medical care.  Plaintiff cannot satisfy prong one.

116.    Even if an individual Defendant technically violated the Fourteenth Amendment (prong one), which Defendants deny, an individual Defendant is still entitled to qualified immunity

under the second prong, "unless it is shown that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." *Plumhoff*, 134 S. Ct. at 2023 (citing *Ashcroft v. al-Kidd*, 563 U.S. __, 131 S. Ct. 2074, 2077, 179 L. Ed. 2d 1149, 1153 (2011). However, "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 134 S. Ct. at 2023 (*citing Ashcroft*, 131 S. Ct. at 2083). "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id.* (*quoting Ashcroft*, 131 S. Ct. at 2083). "[T]he salient question …is whether the state of the law" at the time of the incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730,741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002). To date, Plaintiff's Complaint fails to identify any case law that existed at the time of the incident which would have put the individual Defendants on notice that what they are alleged to have done violated clearly established law. *See* Doc. 1, generally; *Trevino*, 751 Fed. Appx. at 754-56.

117.    Further, in relation to the "objectively unreasonable" requirement of the second prong necessary to overcome the qualified immunity defense, Plaintiffs have not proved facts which would establish that no objectively reasonable person in the individual's position would have acted as Defendants did under similar circumstances. *See Estate of Allison v. Wansley,* 524 F. Appx. 963, 972 (5th Cir. 2013). Plaintiff's complaint appears to be that all of these Defendants *should have* realized that Qualls needed medical health care. However, Plaintiff is required to prove that each Defendant had subjective knowledge of a substantial risk of serious harm to Qualls health, and they responded with deliberate indifference to that risk, and there are no facts whatsoever evidencing any Defendants subjective knowledge of a substantial risk of serious harm

to Qualls, nor deliberate indifference by any one of these individual Defendants. *Id.*  Instead, as proved above, Defendants continuously watched over, and cared for, the intoxicated Qualls, and they thought he would just sleep it off, or sober up, in the detox cell as he had done before. Unfortunately, Qualls' health rapidly declined in the last 15-30, or so, minutes leading to his death around 7:38 A.M.  However, Linebaugh (left around 6:00 A.M), Griffin (left around 5:45-6:00 A.M), O'Dell (was off the clock at 6:00 A.M.) and Hadnot (arrived around 8:00 A.M) were not even there and/or working during this time frame.  Further, Hadnot had little involvement with Qualls prior to his death, as he was dealing with computer issues, and was only aware of Qualls throwing up once, prior to his death, as he had left around 7:22 P.M. the day before, and was not otherwise advised of further developments before Qualls died.  Qualls had already been to the hospital once, and it was reasonable for them to rely on the hospital's medical release, and there is no evidence that Qualls ever asked for any form of medical treatment or health care at the jail, or that his condition markedly changed, or was any different than before, and was witnessed by Defendants.  Defendants discuss above at length the reasonableness of the care Defendants provided Qualls, and incorporate same here.  Plaintiff's pleading and evidentiary deficiencies in her case are fatal, because to overcome Defendants' assertion of qualified immunity, Plaintiff must initially allege facts, and ultimately produce evidence, to show that each defendant was deliberately indifferent to Plaintiff's serious medical needs and that *no reasonable government official could have believed* the Movants' alleged misconduct was lawful in light of the information they possessed and clearly established law. *See Babb* v. *Dorman,* 33 F.3d 472, 477 (5th Cir. 1994). Here, Hadnot, a reasonable Officer, stated that he would have acted as Griffin did; so, Plaintiff cannot prove that no officer would have acted as Griffin did.  Regardless, if officials of reasonable competence could disagree as to whether the alleged conduct violated a

plaintiff's rights, immunity remains intact.  *See Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986).  Similarly, another opinion stated, "[i]n the Fifth Circuit, a governmental official is entitled to qualified immunity unless *all reasonable officials* would have realized that the challenged conduct was proscribed by law."  *Cooper v. Morales*, 535 Fed. App'x. 425, 429 (5th Cir. 2013)(emphasis added)(citing *Dudley v. Angel*, 209 F.3d 460, 462 (5th Cir. 2000).  Thus, even if the conduct of any one of the Defendants is determined with the benefit of 20/20 hindsight to be imperfect, they are still entitled to the protections of qualified immunity if they could reasonably have believed their actions were proper under the circumstances they faced at the time. *See Montoute* v. *Carr,* 114 F.3d 181, 184 (11th Cir. 1997).  Stated another way, a defendant is entitled to qualified immunity even if only an *arguable* basis for their actions exists.  *See Vance* v. *Nunnery,* 137 F.3d 270, 274 (5th Cir. 1998).

118.    Considering the above, the undisputed facts in evidence do not reveal one fact indicating deliberate indifference exercised by any one of these individual Defendants.  There is also not one factually similar case mentioned which addresses their "Qualified Immunity," or demonstrates why any Defendant should be denied qualified immunity.

119.    In summary, other than conclusory, collective, and vague allegations, there are no specific facts in evidence tending to indicate any one of these Defendants violated the Constitution, or acted in an unreasonable manner, under an objective standard or otherwise, and there is certainly no evidence tending to indicate that no similarly situated individual would have acted as Defendants acted under the undisputed factual circumstances of this case, nor is there any identification of a clearly established law that existed at the time, that was violated by Defendants.  In fact, the cases in f. n. 8 above establish Defendants all acted reasonably and well within then existing law.

120.    Consequently, there are no facts involving any individual Defendant which overcome

their qualified immunity, and accordingly, Defendants are entitled to summary judgment on Plaintiff's claims, and said claims should be dismissed.

## CONCLUSION

121.   For the reasons above, all Defendants request Plaintiff's Original Complaint (Doc. 1) against them be dismissed with prejudice, and summary judgment be granted in Defendants' favor under Federal Rule of Civil Procedure 56.

WHEREFORE, PREMISES CONSIDERED, Defendants, **CITY OF JASPER**, **STERLING RAMON LINEBAUGH, TODERICK GRIFFIN, HEATHER O'DELL** and **JOSHUA L. HADNOT** pray all of Plaintiff's claims against them be dismissed with prejudice, under FRCP 56, and that Plaintiff take nothing from Defendants and Defendants be awarded all relief, general and specific, at law or in equity, to which Defendants are entitled.

Respectfully submitted,

**CALVERT EAVES CLARKE & STELLY, L.L.P.**
Beaumont Tower
2615 Calder Avenue, Suite 1070
Beaumont, Texas 77702
Phone:  (409) 832-8885
Fax:      (409) 832-8886

By: _____
Frank D. Calvert
Texas State Bar No.:  03667700
fcalvert@calvert-eaves.com

F. Blair Clarke
Texas State Bar No.:  04316560
fbclarke@calvert-eaves.com.

**ATTORNEYS FOR DEFENDANTS, CITY OF JASPER, STERLING RAMON LINEBAUGH, TODERICK GRIFFIN, HEATHER O'DELL AND JOSHUA L. HADNOT**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing was furnished to all counsel of record by electronic filing on this 22nd day of January, 2021.

Frank D. Calvert